UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TIFFANY (NJ) LLC and TIFFANY AND COMPANY,

        Plaintiffs,

    v.

QI ANDREW, GU GONG, SLIVER DENG, and
KENT DENG, all d/b/a TIFFANYSTORES.ORG,
FASHION STYLE and STORESORG; ABC
COMPANIES; and JOHN DOES,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

2010 Civ. ___ 10 CV 9471 (WHP)


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EX PARTE
APPLICATION FOR TEMORARY RESTRAINING ORDER, ASSET
RESTRAINING ORDER, EXPEDITED DISCOVERY ORDER, ORDER
AUTHORIZING ALTERNATIVE SERVICE, AND ORDER TO SHOW
CAUSE FOR PRELIMINARY INJUNCTION**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Plaintiffs Tiffany (NJ) LLC
and Tiffany and Company*


New York, New York
December 20, 2010

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

ARGUMENT.........................................................................................................................8

I.  PLAINTIFFS HAVE MET THE STANDARD FOR A TEMPORARY
    RESTRAINING ORDER AND PRELIMINARY INJUNCTION ....................................8

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR TRADEMARK
     RELATED CLAIMS ...............................................................................................9

     A.  There Is a Likelihood of Confusion...............................................................9

         1.  The Tiffany Marks Are Strong and Distinctive..........................................10

         2.  The Infringing Products Are Virtually Identical to Authorized
             Tiffany Products ......................................................................................11

         3.  The Competing Products Overlap and There Is No Gap to
             Bridge .....................................................................................................11

         4.  Defendants' Marks Were Designed in Bad Faith.......................................12

         5.  The Quality of Defendants' Products, Although Inferior, Is
             Similar .....................................................................................................13

     B.  Plaintiffs Are Also Likely to Succeed on Their State Law Claims ......................13

     C.  Plaintiffs' Cyberpiracy Claim is Also Likely to Succeed....................................14

     D.  Defendants' Activities Clearly Dilute the Tiffany Marks ....................................15

III.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE
      OF AN INJUNCTION.............................................................................................16

     A.  Defendants Will Continue to Damage Plaintiffs' Goodwill and
         Reputation....................................................................................................17

     B.  Defendants Will Continue to Interfere With Plaintiffs' Right to
         Control the Quality of Goods Bearing the Tiffany Marks....................................19

     C.  The Balance of the Hardships Favors Plaintiffs ...................................................19

**TABLE OF CONTENTS**  *[continued]*

<u>**Page**</u>

D.    An Order Enjoining Defendants' Activities Will Also Serve the Public Interest ..................................................................................................20

E.    Plaintiffs Also Satisfy the Alternate Standard for a Preliminary Injunction......................................................................................................24

IV.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS' TRANSFER OF ASSETS .........................................25

V.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY ..................................28

VI.    PLAINTIFFS ARE ENTITLED TO AN ORDER AUTHORIZING ALTERNATIVE SERVICE OF PROCESS BY EMAIL ..................................................30

A.    The Hague Convention Is No Bar to Service of Process by Email ......................31

B.    Service of Process By Email Is Reasonably Calculated to Provide Notice to the Defendants ......................................................................................32

CONCLUSION ...............................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.*,
    No. 94 Civ. 5620 (JFK), 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994) ............................28

*Am. Safety Table Co. v. Schreiber*,
    287 F.2d 417 (2d Cir. 1961) ...............................................................................26

*Ayyash v. Bank Al-Madina*,
    233 F.R.D. 325 (S.D.N.Y. 2005)......................................................................27, 29

*Balenciaga Am., Inc.  v. Dollinger*,
    No. 10 Civ. 2912 (LTS), 2010 WL 3952850 (S.D.N.Y. Oct. 8, 2010) ............................25

*Bausch & Lomb, Inc. v. Allergan, Inc.*,
    No. 87 Civ. 1284 (RO), 1987 WL 12080 (S.D.N.Y. June 4, 1987) ...................................22

*Biosafe-One, Inc. v. Hawks*,
    524 F. Supp. 2d 452 (S.D.N.Y. 2007) ...............................................................16

*Consol. Cigar Corp. v. Monte Cristi de Tabacos*,
    58 F. Supp. 2d 188 (S.D.N.Y. 1999) ................................................................13

*Dan-Foam A/S v. Brand Named Beds, LLC*,
    500 F. Supp. 2d 296 (S.D.N.Y. 2007) ...............................................................15

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .............................................................................................8

*El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*,
    806 F.2d 392 (2d Cir. 1986) .........................................................................13, 19

*Fourth Toro Family L.P. v. PV Bakery, Inc.*,
    88 F. Supp. 2d 188 (S.D.N.Y. 2000) ................................................................10

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
    111 F.3d 993 (2d Cir. 1997) .............................................................................11

*Gaffigan v. Does*,
    689 F. Supp. 2d 1332 (S.D. Fla. 2010) .........................................................14, 20

*Gayle Martz, Inc. v. Sherpa Pet Grp., LLC*,
    651 F. Supp. 2d 72 (S.D.N.Y. 2009) ..........................................................18, 19, 21

i

## TABLE OF AUTHORITIES *[continued]*

Page(s)

*GTFM, Inc. v. Solid Clothing Inc.,*
    215 F. Supp. 2d 273 (S.D.N.Y. 2002) ............................................................ 11, 12, 14, 16

*Gucci Am., Inc. v. Action Activewear, Inc.,*
    759 F. Supp. 1060 (S.D.N.Y. 1991) ................................................................. 11, 12, 13

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.,*
    286 F. Supp. 2d 284 (S.D.N.Y. 2003) ................................................................... 9

*Hermès Int'l v. Lederer de Paris Fifth Ave. Inc.,*
    219 F.3d 104 (2d Cir. 2000) .............................................................................. 20, 21

*In re Int'l Telemedia Assocs., Inc.,*
    245 B.R. 713 (Bankr. N.D. Ga. 2000) ................................................................. 33

*In re Vuitton Et Fils S.A.,*
    606 F.2d 1 (2d Cir. 1979) ................................................................................... 9, 27

*Karam Prasad, LLC v. Cache, Inc.,*
    No. 07 Civ 5785 (PAC), 2007 WL 2438396 (S.D.N.Y. Aug. 27, 2007) ........................ 15

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.,*
    831 F. Supp. 123 (S.D.N.Y. 1993) ...................................................................... 12, 16

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,*
    51 F.3d 982 (11th Cir. 1995) .............................................................................. 25

*Levitt Corp. v. Levitt,*
    593 F.2d 463 (2d Cir. 1979) ............................................................................... 26

*Lexington Mgmt. Corp. v. Lexington Capital Partners,*
    10 F. Supp. 2d 271 (S.D.N.Y. 1998) ................................................................... 13

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
    799 F.2d 867 (2d Cir. 1986) ............................................................................... 10

*MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co. Ltd.,*
    No. 08 CV 2593, 2008 WL 5100414 (N.D. Ill. Dec. 1, 2008) ............................... 31

*Mason Tenders Dist. Council Pension Fund v. Messera,*
    No. 95 Civ. 9341 (RWS), 1997 WL 223077 (S.D.N.Y. May 7, 1997) ....................... 26

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.,*
    312 F.3d 94 (2d Cir. 2002) ................................................................................. 8, 24

## TABLE OF AUTHORITIES  *[continued]*

**Page(s)**

*Microsoft Corp. v. Atek 3000 Computer Inc.,*
    No. 06 Civ. 6403 (SLT) (SMG), 2008 WL 2884761 (E.D.N.Y. July 23, 2008) ............... 18

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
    818 F.2d 254 (2d Cir. 1987) ........................................................................... 12

*Moseley v. V Secret Catalogue, Inc.,*
    537 U.S. 418 (2003) .............................................................................. 11, 15

*Multi-Local Media Corp. v. 800 Yellow Book Inc.,*
    813 F. Supp. 199 (E.D.N.Y. 1993) ................................................................... 17

*N. Face Apparel Corp. v. TC Fashions, Inc.,*
    No. 05 Civ. 9083 (RMB), 2006 WL 838993 (S.D.N.Y. March 30, 2006) ........................ 25

*N.Y. State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.,*
    79 F. Supp. 2d 331 (S.D.N.Y. 1999) ................................................................. 12

*N.Y.C. Triathlon, LLC v. N.Y.C. Triathlon Club, Inc.,*
    704 F. Supp. 2d 305 (S.D.N.Y. 2010) ........................................................... 14, 17

*Nabisco, Inc. v. PF Brands, Inc.,*
    191 F.3d 208 (2d Cir. 1999) .................................................................. 11, 15, 16

*NBA Props., Inc. v. YMG, Inc.,*
    No. 93 C 1533, 1993 WL 462836 (N.D. Ill. Nov. 9, 1993) ......................................... 12

*Omega Importing Corp. v. Petri-Kine Camera Co., Inc.,*
    451 F.2d 1190 (2d Cir. 1971) ......................................................................... 17

*Paddington Corp. v. Attiki Imps. & Distribs., Inc.,*
    996 F.2d 577 (2d Cir. 1993) .......................................................................... 11

*Philip Morris USA, Inc. v. Veles LTD,*
    No. 06 Civ. 2988 (GBD), 2007 WL 725412 (S.D.N.Y. Mar, 12, 2007) ..................... 30, 32

*Polaroid Corp. v. Polarad Elecs. Corp.,*
    287 F.2d 492 (2d Cir. 1961) ........................................................................... 9

*Polo Fashions, Inc. v. Craftex, Inc.,*
    816 F.2d 145 (4th Cir. 1987) .......................................................................... 9

*Popular Enters., LLC v. Webcom Media Grp., Inc.,*
    225 F.R.D. 560 (E.D. Tenn. 2004) ................................................................... 33

TABLE OF AUTHORITIES  *[continued]*

**Page(s)**

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.,*
  754 F.2d 91 (2d Cir. 1985) .................................................................................. 17

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va., LLC,*
  144 F. Supp. 2d 241 (S.D.N.Y. 2001) ................................................................ 26

*Rado Watch Co., Ltd. v. ABC Co.,*
  No. 92 Civ. 3657 (PKL), 1992 WL 142747 (S.D.N.Y. June 8, 1992) .............. 11

*Reebok Int'l Ltd. v. Marnatech Enters., Inc.,*
  737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd,* 970 F.2d 552 (9th Cir. 1992)........... 25, 26

*Republic of the Philippines v. Marcos,*
  862 F.2d 1355 (9th Cir. 1988) ............................................................................ 26

*Reuters Ltd. v. United Press Int'l Inc.,*
  903 F.2d 904 (2d Cir. 1990) .......................................................................... 20, 24

*Rio Props., Inc. v. Rio Int'l Interlink,*
  284 F.3d 1007 (9th Cir. 2002) ........................................................................ 31, 32

*RSM Prod. Corp. v. Fridman,*
  No. 06 Civ. 11512 (DLC), 2007 WL 1515068 (S.D.N.Y. May 24, 2007)........ 30

*Ryan v. Brunswick Corp.,*
  No. 02-CV-0133E(F), 2002 WL 1628933 (W.D.N.Y. May 31, 2002) .............. 33

*S.E.C. v. Lines,*
  No. 07 Civ. 11387 (DLC), 2009 WL 3179503 (S.D.N.Y. Oct. 2, 2009) .......... 31

*Salinger v. Colting,*
  607 F.3d 68 (2d Cir. 2010) .................................................................................. 8

*SLY Magazine, LLC v. Weider Publ'ns L.L.C.,*
  529 F. Supp. 2d 425 (S.D.N.Y. 2007) ................................................................ 16

*Tiffany & Broadway, Inc. v. Comm'r of Patents & Trademarks,*
  167 F. Supp. 2d 949 (S.D. Tex. 2001)................................................................ 10

*Tiffany & Co. v. Boston Club, Inc.,*
  231 F. Supp. 836 (D. Mass 1964)................................................................... 10, 14

*Tiffany & Co. v. Parfums Lamborghini,*
  214 U.S.P.Q. 77 (S.D.N.Y. 1981) .................................................................. 10, 15

## TABLE OF AUTHORITIES *[continued]*

**Page(s)**

*Tiffany (NJ) LLC v. Dongping et al,*
    10-cv-61214 (PAS), 2010 WL 4450451 (S.D. Fla. July 20, 2010) .................................3, 10

*Topps Co., Inc. v. Gerrit J. Verburg Co.,*
    41 U.S.P.Q.2d 1412 (S.D.N.Y. 1996) ...............................................................................9

*Tri-Star Pictures, Inc. v. Unger,*
    14 F. Supp. 2d 339 (S.D.N.Y. 1998) ..............................................................................13

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.,*
    749 F. Supp. 473 (S.D.N.Y. 1990) .................................................................................28

*United States v. Torkington,*
    812 F.2d 1347 (11th Cir. 1987) ......................................................................................21

*Virgin Enters., Ltd. v. Nawab,*
    335 F.3d 141 (2d Cir. 2003) ...............................................................................8, 9, 11

*Von Grabe v. Ziff Davis Publ'g Co.,*
    No. 91 Civ. 6275 (DLC), 1994 WL 719697 (S.D.N.Y. Dec. 29, 1994)............................8

*Webadviso v. Bank of Am. Corp.,*
    No. 09 Civ. 5769 (DC), 2009 WL 5177997 (S.D.N.Y. Dec. 31, 2009) ...........................18

*Williams-Sonoma, Inc. v. Friendfinder, Inc.,*
    No. C 06-06572 JSW, 2007 WL 1140639 (N.D. Cal. Apr. 17, 2007) .......................31, 33

*Zino Davidoff SA v. CVS Corp.,*
    571 F.3d 238 (2d Cir. 2009) ..........................................................................................19

### Statutes

15 U.S.C. § 1114 ....................................................................................................................9

15 U.S.C. § 1117(a) ..............................................................................................................25

15 U.S.C. § 1117(b) ..............................................................................................................25

15 U.S.C. § 1117(c) ..............................................................................................................25

15 U.S.C. § 1125(a) ................................................................................................................9

15 U.S.C. § 1125(d)..............................................................................................................14

**TABLE OF AUTHORITIES**  *[continued]*

<u>Page(s)</u>

**Other Authorities**

20 U.S.T. 361 (1969) ..................................................................................................31

Joint Statement, 130 Cong. Rec. H 12,080 (1984) .......................................................27

**Rules**

Fed. R. Civ. P. 4(f) ......................................................................................................30

Fed. R. Civ. P. 26(d) ...................................................................................................29

Fed. R. Civ. P. 30(b) ...................................................................................................28

Fed. R. Civ. P. 34(b) ...................................................................................................28

Plaintiffs Tiffany (NJ) LLC and Tiffany and Company ("Tiffany & Co.") (collectively, "Plaintiffs" or "Tiffany"), by their undersigned attorneys, submit this memorandum of law in support of their application for a temporary restraining order, asset restraining order, order for expedited discovery, order authorizing alternative service, and order to show cause for preliminary injunction against Defendants Qi Andrew, Gu Gong, Sliver Deng, and Kent Deng, all doing business as TiffanyStores.org, Fashion Style and Storesorg; ABC Companies; and John Does (collectively, "Defendants").[1]

## PRELIMINARY STATEMENT

Defendants have, without authorization or consent, intentionally misappropriated Tiffany's world-famous trademarks for use in connection with their international counterfeiting operation. Specifically, Defendants offer for sale, sell, and ship various types of jewelry as well as watches, key rings, cuff links and money clips bearing Plaintiffs' trademarks. In fact, even though Defendants' website states that its products are "replica" products, Defendants specifically label their products as "Tiffany" and incorporate the trademark TIFFANY name in their registered domain name www.tiffanystores.org ("TiffanyStores.org"). Defendants knowingly traffic in these counterfeit products and engage in cyberpiracy in complete disregard of trademark laws and Plaintiffs' trademark rights. Defendants also mislabel their counterfeit goods as "sterling silver"—when they are not—and ship them into the United States from China by falsely declaring to customs that the packages containing counterfeit jewelry are "plastic toys" with a value of $6.

---

[1] Plaintiffs believe that other entities and individuals, whose identities have not yet been discovered, are also liable as joint tortfeasors with the named defendants. Their identities will be the subject of discovery as this case proceeds.

Defendants are engaged in a practice that courts in this District and elsewhere have uniformly condemned. Their actions have deceived untold numbers of unsuspecting consumers, thereby causing Plaintiffs irreparable harm and an incalculable loss of goodwill and damages. In view of the foregoing, Plaintiffs respectfully request that this Court issue: (i) a temporary restraining order against Defendants enjoining their manufacture, importation, exportation, distribution, offer for sale, and sale of counterfeit products bearing Plaintiffs' trademarks and use of Plaintiffs' trademarks in any domain names; (ii) an asset restraining order; (iii) an order for expedited discovery allowing Plaintiffs to inspect and copy Defendants' books and records that go to the heart of this dispute; (iv) an order authorizing alternative service of process via email; and (v) an order to show cause why a preliminary injunction should not issue.

## STATEMENT OF FACTS

For over 170 years, Tiffany has achieved great renown as a purveyor of luxury goods, including items such as jewelry, watches, sterling silver goods (other than jewelry), personal accessories, fragrances, stationery and home items (collectively, the "Tiffany Products"). *See generally* Declaration of Richard Perrone, dated December 20, 2010 ("Perrone Decl."). Consumers identify Tiffany Products through the trademark TIFFANY name, as well as through the products' designs, logos and other source identifying indicia selected by Tiffany, including the instantly recognizable "Tiffany Blue" box and packaging (collectively, the "Tiffany Marks" or "Plaintiffs' Marks"). *Id.* ¶ 6. Tiffany has carefully built its reputation by, among other things, adhering to strict quality control standards. *Id.* ¶ 14. Tiffany carefully selects the materials, metals, and gems that are utilized in connection with the Tiffany Products. *Id.* Tiffany closely controls and limits the distribution of goods authorized to bear the Tiffany Marks. *Id.* ¶ 13. In addition, Tiffany spends tens of millions of dollars a year advertising and promoting its

products—indeed, in the past decade, Tiffany spent in excess of $750 million marketing its products in the United States. *Id.* ¶ 8.

Tiffany has achieved an outstanding reputation among consumers and is an internationally famous brand. The Tiffany Marks are well known in the industry and to the public and have come to symbolize the goodwill of Tiffany's business. *Id.* ¶ 12. Tiffany's marketing efforts, combined with its attention to quality and construction, have resulted in over $12.6 billion in retail sales in the United States in the last ten years. *Id.* ¶ 8.

The global sale of counterfeit goods on the internet is one of the greatest threats to Tiffany's business because of the damage that counterfeit products cause to Tiffany's reputation and goodwill. *Id.* ¶ 17. The existence of websites such as the one operated by Defendants, that expressly incorporate the TIFFANY mark in the domain name, are especially harmful as such websites divert customers searching for the authorized Tiffany website, www.Tiffany.com. *Id.* ¶ 17. Accordingly, Tiffany devotes significant resources to combating the sale of counterfeit Tiffany merchandise over the internet.[2] *Id.* Through the course of an ongoing investigation into sales of counterfeit versions of the Tiffany Products, Tiffany became aware that Defendants were offering for sale on the internet products designed to imitate authentic Tiffany Products and bearing counterfeit versions of the Tiffany Marks (the "Counterfeit Products"). *See* Declaration

---

[2]  As part of its anti-counterfeiting efforts, Tiffany shuts down hundreds of infringing websites each year and took action against 634 websites selling counterfeit Tiffany merchandise in 2009 and 2010 alone. Perrone Decl. ¶ 17. Tiffany has sought and obtained injunctive relief against numerous defendants who sold counterfeit goods bearing the Tiffany Marks on the internet. *See Tiffany (NJ), LLC v. Keresy et al*, 10-cv-62245 (JAL) (S.D. Fla. Dec. 2, 2010); *Tiffany (NJ) LLC v. Dongping et al*, 10-cv-61214 (PAS) (S.D. Fla. July 20, 2010); *Gaffigan et al. v. Does 1-10*, 09-cv-61206 (JAL) (S.D. Fla. Sept. 11, 2009); *Tiffany & Co. v. Dimitrov*, BC398631 (Cal. Super. Ct. Sept. 24, 2008) (attached to Declaration of Robert L. Weigel, dated December 20, 2010, ("Weigel Decl.") as Exhibits 1-4, respectively).

of Joseph Pepe, dated December 20, 2010 ("Pepe Decl."), ¶¶ 2-3.  Tiffany commenced a diligent

investigation into these activities and confirmed that Defendants were responsible for the

marketing and sale of the Counterfeit Products through the website TiffanyStores.org.  *See*

*generally* Pepe Decl.

Defendants' website freely admits that the Counterfeit Products offered for sale are not

authentic, but are "Replica" and "Cheap Tiffany Jewelry."  *Id.* ¶¶ 5-15.  Defendants boast that

they offer the "[b]est quality replicas" of Tiffany Products.  *Id.* ¶¶ 7-15. Defendants' Counterfeit

Products  Tiffany Products and display exact copies of the Tiffany Marks and other design

elements.  For example, shown below on the left is an image of an authentic Tiffany 1837™ cuff

in sterling silver.  Through their website TiffanyStores.org, Defendants offer for sale a nearly

identical version of this product, which is shown on the right below.  Defendants describe this

item as a "Tiffany 1837 Open Wide Bangle in Sterling Silver" and "Grade 1:1 Replica (Best

quality replicas)."  *See* Compl. ¶ 31.  Defendants' Counterfeit Product has ornamentation, design

and labeling that are intended to appear like the ornamentation, design and labeling on the

authentic product.  *Id.*  The overall visual impact of Defendants' Counterfeit Product is not only

confusingly similar to the authentic Tiffany cuff shown on the left, they also both bear Tiffany's

federally registered T & CO. trademark.  *See id.* Ex. 1. (U.S. Reg. No. 1,699,365).





**AUTHENTIC**  **COUNTERFEIT**

Similarly, shown below on the left is an image of an authentic Return to Tiffany™ heart tag toggle bracelet in sterling silver.  Through their website TiffanyStores.org, Defendants offer for sale a nearly identical version of this product, which is shown below on the right.  Defendants describe this product as a "Tiffany Heart Bracelet" and "Grade 1:1 Replica (Best quality replicas)."  *See* Compl. ¶ 32.  Defendants' Counterfeit Product has ornamentation, design and labeling that are intended to appear like the ornamentation, design and labeling on the authentic product.  The overall effect of the Counterfeit Product is not only confusingly similar to the design of the authentic Tiffany Product shown on the left, they also both bear Tiffany's federally registered TIFFANY & CO. trademark.  *See id.*





**AUTHENTIC**                          **COUNTERFEIT**

Defendants' Counterfeit Products all follow this pattern—each displays copies of one or more of the Tiffany Marks and/or replicates the ornamentation, design and labeling of the Tiffany Products.  *See* Pepe Decl. Ex. 1.  Defendants sell their Counterfeit Products through the use of a website available at the Uniform Resource Locator ("URL") designation www.TiffanyStores.org—which unlawfully uses the trademark TIFFANY name in its domain name—and possibly other websites yet unknown to Plaintiffs.  *See* Pepe Decl. ¶ 3.

Through publicly available information, Tiffany's investigation has tied the operations of the TiffanyStores.org website to Defendants Qi Andrew, Gu Gong, Sliver Deng, and Kent Deng. Defendants appear to be based in China, although Plaintiffs cannot confirm that the addresses provided by Defendants are valid. Pepe Decl. ¶ 53. As detailed in the accompanying declaration of Joseph Pepe, Plaintiffs' investigator purchased multiple Counterfeit Products through Defendants' website TiffanyStores.org, which were shipped to Plaintiffs' investigator in New York. *Id.*, *passim.* In shipping the items to New York, Defendants falsely declared each of these Counterfeit Products as "plastic toys" with a value of $6. Pepe Decl. ¶¶ 23, 32.

Although Defendants admit that their products are not authentic, Tiffany independently examined these Counterfeit Products and confirmed that they are inferior reproductions of the Tiffany Products bearing counterfeits of the Tiffany Marks, complete with unauthorized versions of the packaging Plaintiffs use for genuine Tiffany Products—the "Tiffany Blue" box, shopping bag and velvet pouch. Perrone Decl. ¶¶ 25-27; *see also* Pepe Decl. ¶¶ 24, 33. Tiffany did not manufacture, inspect or package the Counterfeit Products, and did not approve the Counterfeit Products for sale or distribution. Perrone Decl. ¶ 28. Plaintiffs did not authorize Defendants to manufacture, import, export, distribute, advertise, sell, or offer to sell the Counterfeit Products. *Id.* Plaintiffs have not had the opportunity to control the quality and nature of the Counterfeit Products. *Id.*

As set forth in the declaration of Tiffany's Group Director of Quality Assurance, Richard Perrone, the items purchased from Defendants by Plaintiffs' investigator are clearly not authentic Tiffany Products because, among other identifiers, the workmanship, metals, measurements, and general quality of assembly of the samples is poor and does not match the specifications or quality standards for genuine Tiffany Products. *Id.* ¶¶ 25-29. Significantly, although Defendants

advertised both of the items purchased by Plaintiffs' investigator as being made from "925 sterling silver" (*see* Pepe Decl. ¶¶ 16, 25), Tiffany's inspection of the Counterfeit Products revealed that the items were not sterling silver alloys. Perrone Decl. ¶¶ 25-26.  Whereas authentic Tiffany sterling silver jewelry and accessories are 92.5% silver, the Counterfeit Products inspected by Tiffany were composed primarily of copper and also contained significant amounts of nickel. *See id.*  Nickel is a common allergen that can trigger a condition known as contact dermatitis, which presents itself in the form of red, itchy bumps or welts.  Weigel Decl. Ex. 10 (Melinda Beck, *Till Dermatitis Do Us Part*, Wall St. J., Dec. 15, 2009).  Indeed, the use of nickel in jewelry has been "severely restricted" in the European Union because of the frequency with which it causes allergic reactions in consumers.  *Id.*  The nickel content in the counterfeit bracelet purchased from Defendants' website ranged from 8.29% in the clasp to 18.58% in the chain, while the top and bar of the counterfeit cuff links contained at least 10% nickel each.  Perrone Decl. at ¶¶ 25-26.  It is unknown how many consumers may have experienced adverse reactions after purchasing and using Defendants' Counterfeit Products.

The purchases made by Plaintiffs' investigator also show that Defendants keep the profits of the sales from the Counterfeit Products at least temporarily with third-party financial institutions.  In particular, Plaintiffs' investigator attempted to purchase and paid for Defendants' Counterfeit Products designed to replicate a pair of Tiffany 1837™ Square Cuff Links in sterling silver, and a Return to Tiffany™ heart tag toggle bracelet in sterling silver.  Pepe Decl., *passim*. In these instances, Plaintiffs' investigator made purchases through a MasterCard and Visa card and agents of Defendants accepted payment by these credit cards through PayPal.  *See* Pepe Decl. ¶¶ 17, 26.

## ARGUMENT

### I.   PLAINTIFFS HAVE MET THE STANDARD FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs are entitled to either a temporary restraining order or a preliminary injunction upon a showing of:  (1) irreparable harm; and (2) either (a) a likelihood of success on the merits, or (b) the existence of serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the plaintiff's favor.  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003); *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002); *see also Von Grabe v. Ziff Davis Publ'g Co.,* No. 91 Civ. 6275 (DLC), 1994 WL 719697, at *1 (S.D.N.Y. Dec. 29, 1994) (the same standard applies for both preliminary injunctions and temporary restraining orders).

Recently, the Second Circuit concluded that the test articulated by the Supreme Court for granting permanent injunctive relief under the Patent Act in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), applies to the grant of a preliminary injunction in a case involving allegations of copyright infringement and unfair competition.  The Second Circuit concluded that Plaintiffs seeking a preliminary injunction must show: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor"; (2) "the court may issue the injunction only if the plaintiff has demonstrated that he is likely to suffer irreparable injury in the absence of an injunction"; (3) "a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor"; and (4) "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (alteration in original, quotation marks and citations omitted).

Plaintiffs here easily satisfy both versions of this test and are entitled to an order enjoining Defendants' unlawful behavior.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR TRADEMARK RELATED CLAIMS

### A.   There Is a Likelihood of Confusion

A proper likelihood of confusion analysis, whether conducted under the infringement (15 U.S.C. § 1114(1)) or false designation of origin (15 U.S.C. § 1125(a)) prongs of the Lanham Act, *Virgin Enters.* , 335 F.3d at 146, looks at the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961):  (1) the strength of the plaintiff's trade dress; (2) the similarity between the two dresses; (3) the competitive proximity of the parties' products in the marketplace; (4) the likelihood that the senior user will bridge the gap, if any, between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.  *Id.* at 495.

In this case, however, the Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion.  *See Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (citing *Topps Co., Inc. v. Gerrit J. Verburg Co.*, 41 U.S.P.Q.2d 1412, 1417 (S.D.N.Y. 1996) ("Where the marks are identical, and the goods are also identical and directly competitive, the decision can be made directly without a more formal and complete discussion of all of the *Polaroid* factors.")).  Indeed, confusing the customer is the whole purpose of creating counterfeit goods.  *See In re Vuitton Et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979) (granting writ of mandamus awarding temporary restraining order because "the very purpose of the individuals marketing the cheaper [and virtually identical] items is to confuse the buying public into believing it is buying the true article"); *see also Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) ("Where, as here, one produces

counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion.").

Moreover, in this case, a straightforward application of the *Polaroid* factors also demonstrates that the likelihood of confusion is extremely high.

### 1.     The Tiffany Marks Are Strong and Distinctive

It is well established that the Tiffany Marks are famous, distinctive, and strong. *See Tiffany & Co. v. Parfums Lamborghini*, 214 U.S.P.Q. 77, 78 (S.D.N.Y. 1981) ("Courts have consistently recognized the strength of plaintiff's mark, i.e., the identification of the name 'Tiffany' with the store located at Fifth Avenue and 57th Street"); *see also Tiffany v. Dongping*, No. 10-61214-CIV, 2010 WL 4450451, at *5 (S.D. Fla. Oct. 29, 2010) ("[Tiffany's] Marks are distinctive and famous"); *Tiffany & Co. v. Boston Club, Inc.*, 231 F. Supp. 836, 842-43 (D. Mass 1964) (finding that the Tiffany mark "is a strong mark well known to the public, used frequently as a synonym for quality of a very high degree"). Most, if not all, of the registered Tiffany Marks are arbitrary or fanciful as applied to the goods or services with which they are used. *See Tiffany & Broadway, Inc. v. Comm'r of Patents & Trademarks*, 167 F. Supp. 2d 949, 952 (S.D. Tex. 2001) (finding the name Tiffany "almost as arbitrary as Kodak or Exxon, being wholly constructed for their trade name purpose"); *see also Fourth Toro Family L.P. v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 195 (S.D.N.Y. 2000) ("H&H" is an arbitrary mark when used to indicate the source of bagels); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection."). To the extent there is any question as to the inherent distinctiveness of the Tiffany Marks, there is no dispute that the Tiffany Marks have been prominently used for a long period of time, achieving widespread recognition and fame and, therefore, have acquired distinctiveness. Perrone Decl., ¶¶ 6-7, 9-10.

**2.      The Infringing Products Are Virtually Identical to Authorized
Tiffany Products**

Defendants employ identical counterfeits of the Tiffany Marks on their Counterfeit

Products; thus, this *Polaroid* factor favors Plaintiffs. *See Rado Watch Co., Ltd. v. ABC Co.*, No.

92 Civ. 3657 (PKL), 1992 WL 142747, at *4 (S.D.N.Y. June 8, 1992) (granting injunction where

it is "exceedingly difficult" to distinguish between authentic and infringing goods, "even in a

side-by-side comparison"). Furthermore, minor differences between the authentic and

counterfeit items do not matter because "the test of confusion is not whether the products can be

differentiated" when compared side-by-side. *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,

111 F.3d 993, 1004 (2d Cir. 1997). Instead, the test is "whether they create the same general

overall impression such that a consumer who has seen" the senior user's product would, "upon

later seeing the [infringing product] alone, be confused." *Id.*; *see also Paddington Corp. v. Attiki*

*Imps. & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993) (differences in the details of parties'

products did not matter because "[e]ach label's lettering style, layout, and coloration, taken

together, convey the same impression").

**3.      The Competing Products Overlap and There Is No Gap to
Bridge**

The closer the defendants' goods are "to those the consumer has seen marketed under"

the plaintiffs' brand, "the more likely that the consumer will mistakenly assume a common

source." *Virgin Enters.*, 335 F.3d at 150. Here, because both Plaintiffs and Defendants are in

"the same segment of commerce," there is "no gap" between them at all. *Nabisco, Inc. v. PF*

*Brands, Inc.*, 191 F.3d 208, 219 (2d Cir. 1999) (overruled in part by *Moseley v. V Secret*

*Catalogue, Inc.*, 537 U.S. 418, 433 (2003)); *see also GTFM, Inc. v. Solid Clothing Inc.*, 215 F.

Supp. 2d 273, 296 (S.D.N.Y. 2002) (where both plaintiff and defendant sell jerseys, "[b]oth of

these factors weigh heavily in favor of" finding a likelihood of confusion); *Gucci Am., Inc. v.*

*Action Activewear, Inc.*, 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991) ("Where, as here, the parties are selling very closely related, if not identical, products, there is no gap to bridge.").

### 4.       Defendants' Marks Were Designed in Bad Faith

If there is a showing that Defendants intended to copy Plaintiffs' Marks, "likelihood of confusion will be presumed as a matter of law." *N.Y. State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)).  Here, Defendants use nearly identical versions of the Tiffany Marks, product designs, and packaging, including the trademark "Tiffany Blue Box" and "Tiffany Blue Shopping Bag," to market and sell the Counterfeit Products.  These facts make "the conclusion that [Defendants] wanted the public to identify [their] merchandise with [the Plaintiffs'] trademarks . . . inescapable." *NBA Props., Inc. v. YMG, Inc.*, No. 93 C 1533, 1993 WL 462836, at *3 (N.D. Ill. Nov. 9, 1993).  This showing of bad faith entitles Plaintiffs to a presumption of confusion in the marketplace. *See Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 132 (S.D.N.Y. 1993) (courts may infer intent to capitalize on the plaintiff's goodwill "[w]hen a company appropriates an identical mark that is well known and has acquired a secondary meaning"); *see also GTFM, Inc.*, 215 F. Supp. 2d at 297 (where similarities "are so strong that they could only have occurred through deliberate copying . . . a presumption arises that the copier has succeeded in causing confusion").[3]

---

[3]    *See also Action Activewear, Inc.*, 759 F. Supp. at 1065 ("Where the evidence 'show[s] or require[s] the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.'") (alteration in original) (citation omitted).

### 5. The Quality of Defendants' Products, Although Inferior, Is Similar

If Defendants' Counterfeit Products are inferior, this *Polaroid* factor weighs in favor of Plaintiffs. *See Consol. Cigar Corp. v. Monte Cristi de Tabacos*, 58 F. Supp. 2d 188, 199 (S.D.N.Y. 1999); *Action Activewear*, 759 F. Supp. at 1066 ("the existence of inferior infringing goods strengthens a plaintiff's 'interest in protecting its reputation from debasement'") (citation omitted). The renown of the Tiffany Marks and Tiffany Products is due largely to Tiffany's rigorous quality control standards. *See, e.g.*, Perrone Decl., ¶ 13. Tiffany's initial inspection of Defendants' Counterfeit Products revealed, among other things, poor metal quality and workmanship that failed to meet the specifications or quality standards for genuine Tiffany Products and packaging. *See id.* at ¶¶ 25-26. More importantly, however, the "actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986). Because Plaintiffs have no control over the quality of Defendants' Counterfeit Products, this factor further supports a finding of likelihood of confusion.

### B. Plaintiffs Are Also Likely to Succeed on Their State Law Claims

Because so many of the *Polaroid* factors favor a finding of confusion, an award of preliminary relief is appropriate. *See, e.g.*, *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 288-89 (S.D.N.Y. 1998) (issuing preliminary injunction where only five of the *Polaroid* factors favor a likelihood of confusion). For the same reason, Tiffany has also shown a likelihood of success on its trademark infringement, unfair competition, and deceptive trade practices claims under New York State law. *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 359 n.18 (S.D.N.Y. 1998) (because "the standards for trademark infringement are essentially the same under the Lanham Act, New York law and the common

law . . . Defendants have similarly infringed upon Plaintiffs' marks under New York law and the common law"); *see also GTFM, Inc.*, 215 F. Supp. 2d at 300-02 (likelihood of success on federal infringement claims supports likelihood of success on New York infringement, unfair competition, dilution, and deceptive business practices claims).

### C.    Plaintiffs' Cyberpiracy Claim is Also Likely to Succeed

Defendants market their Counterfeit Products through a website that incorporates the trademark TIFFANY name in its domain name, thereby confusing consumers who may be searching for the authorized Tiffany website.  The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), imposes liability upon a person for the bad faith intent to profit from a protected mark by registering or using a domain name that is identical or confusingly similar to, or dilutive of that mark.  *See* 15 U.S.C. §1125(d).  To prevail on a claim under the ACPA, a plaintiff must show that "(1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) that the defendant has a bad faith intent to profit from the mark."  *See N.Y.C. Triathlon, LLC v. N.Y.C. Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 324 (S.D.N.Y. 2010) (citations omitted).  As set forth in detail above, Tiffany has demonstrated that its marks are distinctive.  The trademark TIFFANY name has been in use since at least 1920. *See* Compl., Ex. 1.  Defendants' domain name was registered as of July 28, 2010, long after the Tiffany Marks became distinctive and famous.  *See* Pepe Decl., Ex. 16; *see also Boston Club, Inc.*, 231 F. Supp. at 842-43 (finding the TIFFANY trademark strong and famous as of 1964). Yet Defendants have incorporated the trademark TIFFANY name into their domain "TiffanyStores.org."  Pepe Decl. ¶ 3.  As such, the domain name is confusingly similar to Plaintiffs' registered mark. *See Gaffigan v. Does*, 689 F. Supp. 1332, 1340 (S.D. Fla. 2010) (finding domain names including "shoptiffanynow.com" and "tiffany-jewery-us.com"

confusingly similar to the Tiffany Marks).  Moreover, Defendants' website blatantly sells
Counterfeit Products bearing exact copies of the Tiffany Marks.  Defendants have clearly
misappropriated the TIFFANY trademark to divert consumers looking for the authorized Tiffany
website.  Accordingly, there can be no question that Defendants registered the domain name with
bad faith intent.

### D.      Defendants' Activities Clearly Dilute the Tiffany Marks

Plaintiffs also meet the standard for trademark dilution established in this Circuit:
"(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a
commercial use in commerce; (4) it must begin after the senior mark has become famous; and
(5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco, Inc.*, 191 F.3d
at 215.  Here, the first four factors are beyond dispute.  Plaintiffs' Marks are undeniably famous
and distinctive, and Defendants began using infringing versions of Plaintiffs' Marks in
commerce long after Plaintiffs first made them famous.  *See* Perrone Decl., *passim*; Pepe Decl.,
Ex. 16; *see also Parfums Lamborghini*, 214 U.S.P.Q. at 78.

With respect to the fifth factor, in light of the Trademark Dilution Revision Act of 2006,
Pub. L. No. 109-312, 120 Stat. 1730 (codified in relevant part at 15 U.S.C. § 1125(c)(1)),
Plaintiffs need only establish a "likelihood of dilution" rather than "actual dilution."  *See Dan-
Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 & n.87 (S.D.N.Y. 2007)
(explaining that the Trademark Dilution Revision Act of 2006 established a "likelihood of
dilution" standard in place of an "actual dilution" standard); *accord Karam Prasad, LLC v.
Cache, Inc.*, No. 07 Civ. 5785 (PAC), 2007 WL 2438396, at *3 (S.D.N.Y. Aug. 27, 2007) (New
York State dilution law requires mere "likelihood of dilution").  Plaintiffs, however, can meet
their burden under either standard.  Where, as here, "the junior and senior marks are identical . . .
actual dilution can reliably be proven through circumstantial evidence." *Moseley*, 537 U.S. at

434.  In fact, "the closer the products are to one another, the greater the likelihood of both

confusion and dilution."  *Nabisco, Inc.*, 191 F.3d at 222.  Defendants sell their merchandise for

the obvious purpose of offering a cheaper and inferior version of the Tiffany Products.  It is hard

to imagine circumstantial evidence that would show more clearly a reduction in the capacity to

identify and distinguish Plaintiffs' officially licensed goods and services.  *See, e.g., Kraft Gen.*

*Foods, Inc.*, 831 F. Supp. at 134-35 (it is "abundantly clear" that dilution, in addition to

infringement, occurs when defendant uses plaintiff's marks "in the same markets and the names

are similar enough to cause confusion among the purchasing public").

Moreover, 15 U.S.C. § 1125(c) and New York State dilution law recognize two types of

dilution: (1) "blurring, which is the diminished ability of the mark to serve as a unique identifier

of the plaintiffs' goods and services," and (2) "tarnishment, which is the disparagement of the

mark's reputation." *Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 466 (S.D.N.Y. 2007); *see*

*also SLY Magazine, LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 444 (S.D.N.Y. 2007).

Defendants' use of the Tiffany Marks to identify the Counterfeit Products runs the risk that the

Tiffany Marks "will lose [their] ability to serve as a unique identifier of the [Plaintiffs']

product[s]." *See GTFM, Inc.*, 215 F. Supp. 2d at 301 (New York State dilution claim established

by defendant's use of plaintiff's "05" trademark on competing jerseys) (citation and internal

quotation marks omitted).  Accordingly, Defendants are engaging in blurring of the Tiffany

Marks.  Similarly, Defendants are tarnishing the Tiffany Marks by using them on goods of lesser

quality.  *Id.*; *see also* Perrone Decl., *passim*.

## III.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

If this Court does not issue an injunction, Plaintiffs will suffer very real harm in the form

of lost goodwill, unquantifiable lost sales, and the loss of control over the reputation of the

Tiffany Marks.  "Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *N.Y.C. Triathlon*, 704 F. Supp 2d at 343 (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)); *see also Multi-Local Media Corp. v. 800 Yellow Book Inc.*, 813 F. Supp. 199, 202 (E.D.N.Y. 1993) ("Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the damage to the trademark and the resulting difficulty in proving monetary damages.").  As the Second Circuit has stated, irreparable injury "almost inevitably follows" because of the consumer confusion caused by counterfeiting.

> Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors.  Yet to prove the loss of sales due to infringement is also notoriously difficult. . . .  Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Omega Importing Corp. v. Petri-Kine Camera Co., Inc.*, 451 F.2d 1190, 1195 (2d Cir. 1971) (citations omitted).  Here, both the evidence before the Court and the undisputed allegations of the Complaint support this time-tested principle.

### A.   Defendants Will Continue to Damage Plaintiffs' Goodwill and Reputation

The Defendants in this action are counterfeiters who illegally apply exact copies of the Tiffany Marks to inferior products and then sell these superficially similar products to the public through a website that is confusingly similar to the authorized Tiffany website.  Compl. ¶ 2-4; 29-45; Perrone Decl., ¶¶ 27-30.  Defendants also misleadingly represent their Counterfeit Products as "sterling silver" when, as shown by Tiffany's laboratory analysis, Defendants' products are mostly copper and contain significant quantities of a toxic metal.  *See* Pepe Decl.

¶¶ 16, 25; Perrone Decl. ¶¶ 25-26. Without an injunction to bar Defendants from continuing this practice, the goodwill and reputation that Tiffany has built over nearly two centuries essentially rests in the hands of these counterfeiters.

Courts in this Circuit have recognized that this harm more than justifies the issuance of injunctive relief. For example, in *Gayle Martz, Inc. v. Sherpa Pet Grp., LLC*, 651 F. Supp. 2d 72 (S.D.N.Y. 2009), the Court recognized the irreparable injury caused to a trademark owner by the unauthorized use of its mark, finding that "[t]he unauthorized use of a mark . . . invariably threatens injury to the economic value of the goodwill and reputation associated with a . . . mark." *Id.* at 85 (alteration in original, quotation marks and citations omitted). In granting the plaintiff's request for a permanent injunction, the Court found that the plaintiff had demonstrated the possible damage to its reputation and the absence of an adequate remedy at law "since 'there is no assurance in the record against defendant[s'] continued violation of plaintiff's . . . trademarks.'" *Id.* (alteration in original) (quoting *Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 Civ. 6403 (SLT) (SMG), 2008 WL 2884761, at *5 (E.D.N.Y. July 23, 2008)).

Defendants' cyberpiracy further justifies entry of a preliminary injunction. *See Webadviso v. Bank of Am. Corp.*, No. 09 Civ. 5769 (DC), 2009 WL 5177997, at *4 (S.D.N.Y. Dec. 31, 2009) (finding defendants' loss of control over domain name using its trademark could cause irreparable loss of goodwill). Defendants' domain name incorporates the trademark TIFFANY name in a clear attempt to divert potential consumers of authentic Tiffany Products to their website. The website has been registered since at least July 28, 2010, and receives approximately 2,100 page views per day. *See* Pepe Decl., Exs. 16, 21. Accordingly, it is likely that thousands of consumers have already accessed the website and likely many thousands more will do so absent an injunction.

**B.    Defendants Will Continue to Interfere With Plaintiffs' Right to
Control the Quality of Goods Bearing the Tiffany Marks**

An injunction here is also justified because, without court intervention, Plaintiffs have no

ability to control the quality of products to which Defendants illegally apply the Tiffany Marks.

The products offered for sale by Defendants bear duplicates of the Tiffany Marks, indicating for

all the world that these products are consistent with the high quality associated with authorized

products bearing the Tiffany Marks.  Defendants' Counterfeit Products, however, "did not come

from Tiffany, nor were they produced by any party that is authorized by Tiffany to manufacture,

license or distribute Tiffany Products."  Perrone Decl. ¶ 28.  Moreover, Tiffany "did not have the

opportunity to control the quality and nature of products offered for sale by Defendants."  *Id.*

As the Second Circuit has noted, "[o]ne of the most valuable and important protections

afforded by the Lanham Act is the right to control the quality of the goods manufactured and

sold under the holder's trademark."  *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d

Cir. 2009) (internal quotation marks omitted) (affirming district court's grant of preliminary

injunction) (quoting *El Greco*, 806 F.2d at 395).  By their actions, Defendants have taken this

right away from Plaintiffs.  In *Davidoff*, the Second Circuit recognized the irreparable harm

caused to a trademark owner who cannot control the quality of their products because "a higher

incidence of substantial sales of counterfeit goods, which are invariably non-conforming and

inferior" would "harm [Plaintiffs'] reputation and diminish the value of its trademark."  *Id.* at

244.  Given the possibility of irreparable and non-quantifiable harm to Plaintiffs, this factor

weighs in favor of issuing a temporary restraining order now.

**C.    The Balance of the Hardships Favors Plaintiffs**

The remaining issue, the balance of hardships, tilts decidedly in Tiffany's favor.  As the

Court correctly observed in *Gayle Martz*, "the only hardship that will befall Defendants in this

19

case is the imposition of an obligation to comply with the law, while [plaintiff] faces continued loss of goodwill and ability to exploit the trademarks that [plaintiff] itself owns if an injunction does not issue." 651 F. Supp. 2d at 85; *see also Gaffigan*, 689 F. Supp. 2d at 1341 (finding injury to Tiffany's goodwill outweighs potential harm to defendant counterfeiters and granting preliminary injunction).

On the other hand, if no injunction is issued, Tiffany will suffer significant, irreparable hardship because it will have lost control over the very indicia that communicates the high quality of the Tiffany Products to millions of consumers. Moreover, countless consumers will continue to be misled by Defendants' conduct and no later action by this Court could retrieve that lost goodwill. *See, e.g.*, *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) ("irreparable harm discussed earlier" meets plaintiff's burden under the balance of hardships).

### D.   An Order Enjoining Defendants' Activities Will Also Serve the Public Interest

Further, issuing an injunction in this case would protect not only Tiffany, but also the public. As the Second Circuit has observed, "[t]rademark laws exist to protect the public from confusion." *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107-08 (2d Cir. 2000). In offering the Counterfeit Products as "[b]est quality replicas" of genuine Tiffany Products through a domain name containing the trademark TIFFANY name, there is no doubt that Defendants have endeavored to create the very public confusion that the Lanham Act was designed to avoid. *See id.* at 107 ("[B]y explicitly informing their customers that the style and workmanship of the knock-offs were such that no third party observer would be able to tell they were not genuine Hermès bags, [defendants] . . . encourage[d] consumer confusion in the post-sale context."). Indeed, the use of the trademark TIFFANY name in the TiffanyStores.org

domain name likely confuses some customers into believing they are purchasing authentic Tiffany Products.  Without an injunction, it is impossible to know how many potential customers seeking Tiffany Products will buy Counterfeit Products from the Defendants' website.

Even if some consumers purchase the Counterfeit Products with full knowledge that they are not authentic Tiffany Products, post-sale confusion will occur as a result of the sale of such Counterfeit Products:  unknowing recipients of gifts as well as members of the public will encounter the inferior products and think they were made by Plaintiffs.  This harms the general public, and an injunction against infringing sales serves to protect the public interest.  *See Gayle Martz*, 651 F. Supp. 2d at 85 ("[T]he public interest lies in the enforcement of the Acts of Congress, especially the prevention of consumer confusion as espoused by the Lanham Act.") (quotation marks omitted).  In *Hermès*, the Second Circuit cited with approval the Eleventh Circuit's summary of the theory behind protecting the public interest in trademark cases:

> 'It . . . is important to recognize that the enforcement of trademark laws benefits consumers even in cases where there is no possibility that consumers will be defrauded.  For, to the extent that trademarks provide a means for the public to distinguish between manufacturers, they also provide incentives for manufacturers to provide quality goods.  Traffickers of these counterfeit goods, however, attract some customers who would otherwise purchase the authentic goods.  Trademark holders' return to their investments in quality are thereby reduced.  This reduction in profits may cause trademark holders to decrease their investments in quality below what they would spend if there were no counterfeit goods.  This in turn harms those consumers who wish to purchase higher quality goods.'

219 F.3d at 108 (quoting *United States v. Torkington*, 812 F.2d 1347, 1353 n.6 (11th Cir. 1987) (citation omitted)).

Defendants have put the public's health at risk by falsely labeling their items as "925 sterling silver," which indicates even to consumers—even those who understand that they are not buying genuine Tiffany Products—that the items are made of the same material as authentic Tiffany Products (*i.e.*, 92.5% silver).  *See* Pepe Decl. ¶¶ 16, 25.   In truth, the Counterfeit

Products sold by Defendants and inspected by Plaintiffs contained less than 3% silver, were

made primarily of copper and contained anywhere from 8.58% to 18.58% nickel, a toxic metal

and common allergen. *See* Perrone Decl. ¶¶ 25-26. Indeed, the use of nickel in jewelry is

"severely restricted" in the European Union due to the allergic reactions it causes among the

consuming public. Weigel Decl. Ex. 10. Allergic reactions to nickel commonly include contact

dermatitis, which may present itself as "red, scaly welts" or "red bumps." *Id.* Studies suggest

that "[s]ensitization to nickel is quite common in the United States, [and] estimate[e] that 5.8

percent of American adults tested positive to nickel allergy through a routine skin test." *Id.* Ex.

11 (Jacob P. Thyssen & Howard I. Maibach, *Nickel release from earrings purchased in the*

*United States: The San Francisco earring study*, 58 J. of the Am. Acad. of Dermatology 1000

(June 2008)). Others estimate that nickel allergies "affect 24% to 36% of women and 7% to 15%

of men." *Id.* Ex. 10. An unknowable number of consumers may have purchased Defendants

Counterfeit Products for themselves or as gifts and have suffered allergic reactions due to

Defendants' deceptive statements. The risk to the public's health caused by Defendants'

trademark infringement further justifies entry of a preliminary injunction. *See Bausch & Lomb,*

*Inc. v. Allergan, Inc.*, No. 87 Civ. 1284 (RO), 1987 WL 12080, at *1 (S.D.N.Y. June 4, 1987)

(awarding injunctive relief to plaintiff on showing of health risk to consumers who may confuse

defendants' product with that of plaintiff's).

Defendants also completely disregard the applicable customs laws in running their

counterfeiting business. Defendants not only falsely identified their goods as "925 sterling

silver," but also intentionally mislabeled the products for purposes of shipping them into the

United States—claiming on two separate occasions that the pieces of counterfeit jewelry they

shipped from China to New York were "plastic toys" with a declared value of "$6." *See* Pepe

Decl. ¶¶ 23, 32.  The public will be greatly served by shutting down Defendants' counterfeiting operations.

The public harm caused by counterfeiting has also been recognized by lawmakers of both parties and successive administrations.  In 2006, when signing the bipartisan Stop Counterfeiting in Manufactured Goods Act, former President George Bush stated that:  "Counterfeiting costs our country hundreds of billions of dollars a year. . . .  Counterfeiting hurts businesses.  They lose the right to profit from their innovation.  Counterfeiting hurts workers, because counterfeiting undercuts honest competition, rewards illegal competitors. . . .  Counterfeiting hurts the government.  We lose out on tax revenue. . . .  Counterfeiting hurts national security, as terrorist networks use counterfeit sales to sometimes finance their operations."  *See* Weigel Decl., Ex. 5.

Earlier this year, in a press release announcing the Department of Justice's new Intellectual Property Task Force, Attorney General Eric Holder similarly noted that "[t]he rise in intellectual property crime in the United States and abroad threatens not only our public safety but also our economic well being."  *See id.*, Ex. 6 (Press Release, Department of Justice Office of Public Affairs, Justice Department Announces New Intellectual Property Task Force as Part of Broad IP Enforcement Initiative (Feb. 12, 2010)).  Vice President Joe Biden echoed these sentiments in commenting that the "[t]heft of intellectual property does significant harm to our economy and endangers the health and safety of our citizens."  *Id.*  Similarly, as part of the 2010 Joint Strategic Plan on Intellectual Property Enforcement, the U.S. Intellectual Property Enforcement Coordinator noted in the cover letter to President Obama and Congress that "[i]ntellectual property laws and rights provide certainty and predictability for consumers and producers . . . .  Where there are insufficient resources, ability, or political will to appropriately

enforce these rights, exchanges between investors, producers and consumers may be inefficient, corrupt or even dangerous." *Id.* Ex. 7 (2010 Joint Strategic Plan on Intellectual Property Enforcement, the U.S. Intellectual Property Enforcement Coordinator (June 2010)).[4]

In contrast to the public harm caused by counterfeiting, the issuance of a preliminary injunction enforcing the trademark laws of the United States would serve to protect the public interest. As a result, this factor similarly weighs in favor of granting the injunctive relief sought by Plaintiffs.

### E.   Plaintiffs Also Satisfy the Alternate Standard for a Preliminary Injunction

Plaintiffs also are entitled to a preliminary injunction under the alternate standard because they have shown that (1) serious questions exist, going to the merits of the case, and that these questions are fair ground for litigation; and (2) the balance of hardships tips in their favor. *Merkos L'Inyonei Chinuch, Inc.*, 312 F.3d at 96.

As long as there is at least one issue of sufficient importance "going to the merits to create a firm ground for litigation," Plaintiffs have met their burden under the first prong of this standard. *Reuters Ltd.*, 903 F.2d at 909. Because they have shown a convincing likelihood of success on the merits, Plaintiffs, by definition, also have raised very substantial objections and questions that are fair game for litigation.

As explained above, the balance of hardships also tilts decidedly in favor of Plaintiffs.

---

4   The 2010 Joint Strategic Plan on Intellectual Property Enforcement also included the following observation regarding the role of the internet in the sale of counterfeit goods: "The Internet and other technological innovations have revolutionized society and the way we obtain information and purchase products. . . . These innovations have also facilitated piracy and counterfeiting on a global scale." *Id.*

## IV.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS' TRANSFER OF ASSETS

The damages provisions of the Lanham Act provide that if Plaintiffs succeed on the merits, they "shall be entitled . . . to recover [among other things] defendant's profits," 15 U.S.C. § 1117(a), treble their actual damages and prejudgment interest because this is a counterfeiting case, *id.* § 1117(b), or statutory damages up to a maximum of $2 million "per counterfeit mark per type of goods . . . sold, offered for sale, or distributed," *id.* § 1117(c).[5]  Courts in this and other circuits have made clear that district courts have "authority to freeze the [defendants'] assets insofar as they could be used to satisfy an award of their profits pursuant to Plaintiffs' Lanham Act claims." *Balenciaga Am., Inc. v. Dollinger*, No. 10 Civ. 2912 (LTS), 2010 WL 3952850, at *7 (S.D.N.Y. Oct. 8, 2010); *see also N. Face Apparel Corp. v. TC Fashions, Inc.*, No. 05 Civ. 9083 (RMB), 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995)); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 737 F. Supp. 1521, 1525 (S.D. Cal. 1989), *aff'd*, 970 F.2d 552 (9th Cir. 1992) ("Under the provisions of the Lanham Act, plaintiffs will be entitled to an equitable accounting of defendants' profits from the sale of such counterfeit merchandise" and therefore "an order freezing a defendant's assets is appropriate in order to preserve the status quo, so that assets can be preserved to satisfy an equitable decree.").  This is consistent with long-standing practices in the Second Circuit, which provide that "[t]he framing of an injunctive decree responsive to the particular facts in a trademark infringement and unfair competition suit is

---

[5]  In 2008, Congress amended 15 U.S.C. § 1117(c) to enhance the remedies available for trademark infringement by increasing the minimum amount of statutory damages from $500 to $1000 and increasing the maximum amount of statutory damages from $1 million to $2 million. *See* Prioritizing Resources and Organization for Intellectual Property Act of 2008, Pub. L. No. 110-403, § 104, 122 Stat. 4256, 4259 (codified as amended at 15 U.S.C. § 1117(c)).

ordinarily within the domain of the trial court," and that "[e]very reasonable means of preventing a continuance of deceptive practices is proper." *Levitt Corp. v. Levitt*, 593 F.2d 463, 469 n.10 (2d Cir. 1979) (citations omitted); *Am. Safety Table Co. v. Schreiber*, 287 F.2d 417, 419 (2d Cir. 1961).[6]

In *Reebok Int'l Ltd.*, the district court concluded that an asset restraint was appropriate based on plaintiff's showing of: (1) a "reasonable likelihood" that "defendants engaged in a substantial business of counterfeit goods"; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their illegal ill-gotten funds if their assets were not frozen. 737 F. Supp. at 1527. The Ninth Circuit, in affirming this decision, implied that it might be an abuse of discretion for a court to fail to award equitable relief such as an asset freeze "if such an action were necessary to protect a plaintiff's right to recovery of [Section] 1117 profits and damages and to ensure that a defendant may not benefit by willfully engaging in illegal trademark activity." *Reebok Int'l Ltd.*, 970 F.2d at 558-59.[7]

As set forth above, Plaintiffs have established a reasonable likelihood that Defendants engaged in a substantial business of selling counterfeit goods and the immediate and irreparable harm to Plaintiffs as a result of Defendants' illegal activities. The irreparable harm to Plaintiffs

---

[6]   *See also Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va., LLC*, 144 F. Supp. 2d 241, 250 n.9 (S.D.N.Y. 2001) ("[W]here plaintiffs seek both equitable and legal relief in relation to *specific* funds, a court retains its equitable power to freeze assets.").

[7]   *See also Mason Tenders Dist. Council Pension Fund v. Messera*, No. 95 Civ. 9341 (RWS), 1997 WL 223077, at *7 (S.D.N.Y. May 7, 1997) (acknowledging that "[a]lmost all the Circuit Courts [including the Second Circuit] have held that Rule 65 is available to freeze assets *pendente lite* under some set of circumstances"); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (*en banc*) ("A court has the power to issue a preliminary injunction to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies.").

resulting from trademark dilution, customer confusion and lost goodwill would be further compounded by Plaintiffs' inability to obtain an equitable accounting from Defendants and to recover their lost profits as they are entitled to do under the Lanham Act.  An asset freeze is crucial to preserve the funds in Defendants' accounts until Plaintiffs obtain a judgment in this action.

The Defendants in this case, moreover, are also likely to hide their assets.  These Defendants trade in counterfeit goods; thus, unlike a legitimate business that may be subject to accounting and tax requirements and that has readily identifiable assets that may be used to satisfy judgments against it, there is no reason to conclude that Defendants will make their assets available for recovery or will adhere to the authority of this Court any more than they have adhered to federal and state trademark law.  *See* Pepe Decl., ¶ 51; Joint Statement, 130 Cong. Rec. H 12,080 (1984) ("[M]any of those who deal in counterfeits make it a practice to destroy or transfer counterfeit merchandise when a day in court is on the horizon.").  The most reasonable inference is that Defendants will move quickly to remove monies subject to an equitable accounting to locations and accounts which neither Plaintiffs nor this Court will ever discover. *See, e.g., In re Vuitton Et Fils S.A.*, 606 F.2d at 5 (directing district court to issue an *ex parte* temporary restraining order in a trademark infringement case where notice would enable defendant to dispose of evidence and would "render fruitless further prosecution of the action").

Defendants, moreover, are not domiciled in New York and are doing business internationally, giving them the incentive and ability to hide their assets.  *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (granting plaintiff's motion for prejudgment attachment where defendants are "foreign individuals and corporations who have both incentive and capacity to hide their assets"); *see also* Pepe Decl., ¶ 55 ("most sellers of counterfeit

27

trademark goods, such as Defendants, establish multiple accounts with financial institutions in multiple names with the express intent of making it difficult to find and recover the profits from their counterfeiting activities"). In the absence of a preliminary injunction freezing these accounts, there will be nothing to stop Defendants from draining the accounts, thereby depriving Plaintiffs of their equitable rights under the Lanham Act.

## V.   PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY

Further, given the harm caused by Defendants' marketing and sale of the Counterfeit Products, Plaintiffs have a pressing need to ascertain the scope of Defendants' activities, Defendants' sources for their Counterfeit Products, any pending advertisements, offerings, sales, or shipments of Counterfeit Products, other unauthorized use of the Tiffany Marks, and the location of Defendants' ill-gotten profits without delay. Plaintiffs therefore respectfully request that this Court issue an order allowing expedited discovery from Defendants as well as third-party banks, credit card companies, other financial institutions, web hosts, and e-commerce service providers in possession of evidence relating to Defendants' activities.

District courts have broad power to permit expedited discovery and require early document production in appropriate cases. *See* Fed. R. Civ. P. 30(b), 34(b). Expedited discovery may be granted when the party seeking it demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that defendant will suffer if expedited relief is granted. *See Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.*, No. 94 Civ. 5620 (JFK), 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994); *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990). Plaintiffs have established each of these elements.

Further, Rule 26(d) of the Federal Rules of Civil Procedure permits the district court, in its discretion, to order expedited discovery from third parties to a civil action. *See* Fed. R. Civ. P. 26(d). The court evaluates a motion for expedited discovery "under the flexible standard of reasonableness and good cause," and examines "the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances." *Ayyash*, 233 F.R.D. at 327 (internal citations omitted). Where the moving party has established the substantiality of its claims and shown "good cause" for the motion, expedited discovery is appropriate. *See id.* (granting plaintiff's motion for expedited third-party discovery where defendants are "foreign individuals and corporations who have both incentive and capacity to hide their assets," giving plaintiff "considerable urgency . . . to seek information about the location of defendants' possible assets within the United States").

As stated in the supporting declarations and *supra*, Defendants have engaged in numerous deceptive practices that indicate Plaintiffs may lose the opportunity for meaningful discovery about the requested relief. The discovery requested on an expedited basis in Plaintiffs' proposed temporary restraining order has been precisely defined and carefully limited to include only what is essential for the preliminary injunction. Plaintiffs are unaware of any reason that Defendants, or their banks, credit card processors, or other financial institutions, web hosts, and e-commerce service providers would not be able to comply with these requests without undue burden. Moreover, due to the transitory and fraudulent nature of Defendants' business, the most useful information for Plaintiffs will likely come from the third-party service providers upon which Defendants rely to facilitate their sale of Counterfeit Products.

Accordingly, good cause exists for prompt discovery of the extent of Defendants' counterfeiting operations and the amount of profits they have derived from their unlawful use of

the Tiffany Marks.  Only armed with that information can Plaintiffs gain a full and accurate

picture of Defendants' infringing activities and ensure the complete cessation of the

counterfeiting of the Tiffany Marks and Tiffany Products by Defendants and their associates.  In

light of the breadth of Defendants' infringement, expedited discovery is both reasonable and

necessary to provide Plaintiffs adequate redress.

## VI.    PLAINTIFFS ARE ENTITLED TO AN ORDER AUTHORIZING ALTERNATIVE SERVICE OF PROCESS BY EMAIL

Defendants operate and conduct an international counterfeiting business and at least some

of the Defendants appear to be located in China, although the validity of addresses provided by

Defendants could not be confirmed.  Pepe Decl. ¶¶ 43, 53.  Although Defendants' mailing

address and location could not be confirmed, there is no question that Defendants regularly use

email for purposes of operating their counterfeiting business.  Indeed, Plaintiffs' investigator

received several email communications from Defendants from the same email address in

connection with the two purchases made through Defendants' website.  *Id.* ¶¶ 18-21, 27-30.

Defendants have also listed contact email addresses in connection with the registration

information provided for the various websites they operate.  Under these circumstances, service

of process by email is appropriate.

Federal Rule of Civil Procedure 4(f)(3) allows the Court to authorize service of process

by any "means not prohibited by international agreement as may be directed by the court," so

long as the alternative method of service authorized by the Court is "reasonably calculated, under

all circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections."  *See Philip Morris USA Inc. v. Veles Ltd.*, No. 06 Civ.

2988 (GBD), 2007 WL 725412, at *2 (S.D.N.Y. Mar. 12, 2007) (internal quotations omitted);

*see also RSM Prod. Corp. v. Fridman*, No. 06 Civ. 11512 (DLC), 2007 WL 1515068, at *1

(S.D.N.Y. May 24, 2007) (the decision of whether to allow alternative service "is committed to the sound discretion of the district court") (citation and internal quotation marks omitted).  There is no need for a party to exhaust other methods of service prior to requesting alternative service pursuant to Rule 4(f)(3).  Alternative service under Rule 4(f)(3) "is merely one means among several which enables service of process on an international defendant." *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002).  Alternative service of process by email is proper where, as here, the proposed method of service is not prohibited by international agreement and the nature of the defendants' business makes it the most likely method of service to provide prompt, actual notice of the plaintiffs' claims.  *See Rio Props.*, 284 F.3d at 1017-18 (noting that "when faced with an international e-business scofflaw, playing hide-and-seek with the federal court, email may be the only means of effecting service of process").

A.     **The Hague Convention Does Not Prohibit Service of Process by Email**

The fact that Plaintiffs cannot confirm the validity of Defendants' addresses is reason enough to authorize alternative service.  Indeed, the Hague Convention does not apply where a defendant's address is not known.  *See  S.E.C. v. Lines*, No. 07 Civ. 11387 (DLC), 2009 WL 3179503, at *3 (S.D.N.Y. Oct. 2, 2009) ("As Article I of the Hague Convention quite understandably recognizes, it 'shall not apply where the address of the person to be served with the document is not known.'") (quoting 20 U.S.T. 361 (U.S.T. 1969) and collecting cases).  However, even assuming the Hague Convention applies, it does not prohibit service via email.  *See Williams-Sonoma, Inc. v. Friendfinder, Inc.*, No. C 06-06572 JSW, 2007 WL 1140639, at *2 (N.D. Cal. Apr. 17, 2007) (concluding that the Hague Convention does not prohibit service via email and granting motion for alternative service via email).  As the district court noted in *MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co. Ltd.*, No. 08 CV 2593, 2008 WL 5100414 (N.D. Ill. Dec. 1, 2008):

31

> China and the United States are both signatories to the Hague Convention. The
> Hague Convention does not prohibit service by e-mail or facsimile. Therefore,
> this Court concludes that in certain circumstances service of process via e-mail
> and facsimile is appropriate and may be authorized under Fed. R. Civ. P. 4(f)(3).

*Id.* at \*2 (internal citations omitted). These decisions are consistent with recent orders entered in

this district authorizing service via email in similar counterfeiting cases involving defendants that

appeared to be based in China. *See* Weigel Decl., Ex. 8 (*Gucci Am., Inc. et al. v. Bagsmerchant

LLC, et al.*, No. 2010 Civ. 2911 (DAB) (S.D.N.Y Apr. 12, 2010), Ex. 9 (*Balenciaga Am., Inc. et

al. v. Dollinger*, No. 10 Civ. 2912 (LTS) (S.D.N.Y. Dec. 9, 2010).

### B.   Service of Process By Email Is Reasonably Calculated to Provide Notice to the Defendants

Court-directed alternative service satisfies due process if it is reasonably calculated under

the specific circumstances to notify the defendants of the claims and afford them the opportunity

to object. *See Philip Morris*, 2007 WL 725412, at \*2. In *Philip Morris*, the Court found that

service by email was appropriate where, as here, the plaintiff demonstrated that the defendants

"conduct business extensively, if not exclusively, through their Internet websites and correspond

regularly with customers via email." *Id.* at \*3. In *Rio Props.*, the Ninth Circuit similarly held

"[w]ithout hesitation" that service by email of an online business defendant that conducted its

business over the internet, used email regularly in its business, and encouraged parties to contact

it via email "was constitutionally acceptable" where email "was the method of service most

likely to reach [the defendant]." 284 F.3d at 1017.

The Defendants in this action conduct business extensively through their website

TiffanyStores.org and provide a contact email address on the website. As evidenced by the

extensive email communications between Defendants and Plaintiffs' investigator regarding the

Counterfeit Products, it is clear that the Defendants regularly use email to correspond with their

customers. *See* Pepe Decl. ¶¶ 18-21, 27-30; Exs. 3-6; 10-13. Further, Defendants' emails

encouraged customers to contact them by email regarding orders placed for Counterfeit Products. *Id.* ¶¶ 18, 27; Exs. 3, 10.  Courts have authorized alternative service by email under similar circumstances where the internet and email communications were essential components of the defendant's business.  *See Ryan v. Brunswick Corp.*, No. 02-CV-0133E(F), 2002 WL 1628933, at *2 (W.D.N.Y. May 31, 2002) (authorizing service by email where the defendant's website directed customers to communicate with it by email and finding that "[i]nasmuch as [defendant] conducts its business through these means of communication, such are reasonably calculated to apprise [defendant] of the pendency of this action and afford it an opportunity to respond") (citing *Rio Props.*, 284 F.3d at 1016-17); *Popular Enters., LLC v. Webcom Media Grp., Inc.*, 225 F.R.D. 560, 563 (E.D. Tenn. 2004) (finding service by email "fully authorized" under Rule 4(f)(3) where "it is the method of service most likely to reach defendant"); *In re Int'l Telemedia Assocs., Inc.*, 245 B.R. 713, 721 (Bankr. N.D. Ga. 2000) ("If any methods of communication can be reasonably calculated to provide a defendant with real notice, surely those communication channels utilized and preferred by the defendant himself must be included among them."). Given that the Defendants communicated extensively via email and the likelihood that the physical addresses associated with the Defendants are false or transitory, alternative service by email is the most effective and reliable way for Plaintiffs to adequately serve Defendants.  *See Williams-Sonoma*, 2007 WL 1140639, at *2 ("[Plaintiff] also has established that the email accounts they have for defendants have been effective means of communicating with the defendants, which would serve the purposes of ensuring the defendants receive adequate notice of this action and an opportunity to be heard.").

Through their actions, Defendants have designated email as the primary and preferred method of contact.  Indeed, the email addresses that Plaintiff proposes to use in order to effect

33

service upon the Defendants are the very email addresses that Defendants provided on their websites and the domain registrations associated with those websites. *See, e.g.*, Pepe Decl. Exs. 2, 16, 24. Accordingly, Plaintiffs respectfully request that the Court authorize alternate service by email upon the Defendants.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant an order (i) temporarily restraining Defendants from selling their Counterfeit Products or making any other unauthorized use of the Tiffany Marks; (ii) freezing Defendants' assets; (iii) authorizing expedited discovery from Defendants and third parties; (iv) authorizing alternative service; and (v) order to show cause as to why a preliminary injunction.

Dated:   New York, New York
         December 20, 2010

Respectfully submitted,

GIBSON, DUNN & CRUTCHER, LLP

By: _____

Robert Weigel (RW 0163)
Howard S. Hogan (HH 7995)
Jennifer C. Halter (JH 7032)
Anne M. Coyle (AC 3158)
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs Tiffany (NJ) LLC and Tiffany and Company*