UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| TIFFANY (NJ) LLC and TIFFANY AND COMPANY, | : |
| Plaintiffs, | : |
| v. | : |
| QI ANDREW, GU GONG, SLIVER DENG, and KENT DENG, all d/b/a TIFFANYSTORES.ORG, FASHION STYLE and STORESORG; ABC COMPANIES; and JOHN DOES, | : No. 10 Civ. 9471 (WHP) (HBP) |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS FROM
THIRD-PARTIES BANK OF CHINA, CHINA MERCHANTS BANK, AND
INDUSTRIAL AND COMMERCIAL BANK OF CHINA**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 51st Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Plaintiffs Tiffany (NJ) LLC
and Tiffany and Company*

May 3, 2011

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF FACTS ........................................................................ 3

ARGUMENT ............................................................................................ 6

I.   THIS COURT HAS THE AUTHORITY TO COMPEL THE BANKS TO
     COMPLY WITH THE SUBPOENAS AND THE PI ORDER ............................................ 7

         A.   This Court Has Personal Jurisdiction Over the Banks ................................ 7

         B.   The Banks Control the Documents Requested by Plaintiffs ...................... 7

II.  THE RELEVANT FACTORS WEIGH IN FAVOR OF COMPELLING
     PRODUCTION FROM THE BANKS ............................................................... 10

         A.   The Information Sought Is Crucial to the Vindication of Plaintiffs' Rights.
              ........................................................................................ 11

         B.   The Requests at Issue Are Narrowly Tailored. ........................................ 12

         C.   The Funds at Issue Originated in the United States. ................................ 14

         D.   There Is No Realistic Alternative Beyond Appropriate Discovery in the
              Current Acton ................................................................................ 15

         E.   United States Interests Strongly Favor Disclosure and Any Contrary
              Chinese Interest Pales in Comparison ................................................... 20

         F.   The Banks' Asserted Hardship of Compliance Is Entirely Speculative. ... 22

         G.   Good Faith of the Party Resisting Discovery ......................................... 24

CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Ayyash v. Bank Al-Madina,*
   233 F.R.D. 325 (S.D.N.Y. 2005) ................................................................................ 13

*Balenciaga Am., Inc.  v. Dollinger,*
   No. 10 Civ. 2912 (LTS), 2010 WL 3952850 (S.D.N.Y. Oct. 8, 2010) .................................. 12

*British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.,*
   No. 90 Civ. 2370 (JFK) (FM), 2000 WL 713057 (S.D.N.Y. June 2, 2000) .......................... 22

*Cf. In re Vuitton Et Fils S.A.,*
   606 F.2d 1 (2d Cir. 1979) ........................................................................................... 19

*Cooper Indus. Inc. v. British Aerospace, Inc.,*
   102 F.R.D. 918 (S.D.N.Y. 1984) ............................................................................... 7, 9

*Dietrich v. Bauer,*
   No. 95 Civ. 7051 (RWS), 2000 WL 1171132 (S.D.N.Y. Aug. 16, 2000) ................. 6, 7, 8, 16

*First Nat'l City Bank of New York v. I.R.S.,*
   271 F.2d 616 (2d Cir. 1959) ....................................................................................... 24

*Gayle Martz, Inc. v. Sherpa Pet Grp., LLC,*
   651 F. Supp. 2d 72 (S.D.N.Y. 2009) ........................................................................... 20

*Gucci Am., Inc. v. Curveal Fashion,*
   No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639
   (S.D.N.Y. Mar. 8, 2010) ..................................................................................... *passim*

*Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.,*
   219 F.3d 104 (2d Cir. 2000) ....................................................................................... 20

*Huang v. Advanced Battery Technologies, Inc.,*
   No 09 Civ. 8297 (HB), 2011 WL 813600 (S.D.N.Y. Mar. 8, 2011) ................................. 15

*Hudson v. Hermann Pfauter,*
   117 F.R.D. 33 (N.D.N.Y. 1987) .................................................................................. 19

*Hunter Douglas, Inc. v. Comfortex Corp.,*
   No. Civ. A. M8-85 (WHP), 1999 WL 14007 (S.D.N.Y. Jan. 11, 1999) ................................. 7

*In re Air Cargo Shipping Svcs. Antitrust Litig.,*
   No. 06-MD-1775, 2010 WL 1189341 (E.D.N.Y. Mar. 29, 2010) ..................................... 20

**TABLE OF AUTHORITIES**
**[Continued]**

Page(s)

*In re Equitable Plan Co.*,
   85 F. Supp. 57 (S.D.N.Y. 1960) ............................................................. 7

*In re Grand Jury Proceedings Bank of Nova Scotia*,
   740 F.2d 817 (11th Cir. 1984) ............................................................. 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
   No. 02 Civ. 5571 (RJH) (HBP), 2006 WL 3378115 (S.D.N.Y. Nov. 16, 2006)
   (Pitman, M.J.) ............................................................. 16

*Ings v. Ferguson*,
   282 F.2d 149 (2d Cir. 1960) ............................................................. 9

*Laker Airways Ltd. v. Pan American World Airways*,
   607 F. Supp. 324 (S.D.N.Y. 1985) ............................................................. 16

*Linde v. Arab Bank, PLC*,
   262 F.R.D. 136 (E.D.N.Y. 2009) ............................................................. 9, 10

*Milliken & Co. v. Bank of China*,
   No. 09 Civ. 6123 (LMM), 2010 WL 5187744
   (S.D.N.Y. Dec. 6, 2010) ............................................................. *passim*

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   116 F.R.D. 517, 520 (S.D.N.Y. 1987) ............................................................. 7

*N. Face Apparel Corp. v. TC Fashions, Inc.*,
   No. 05 Civ. 9083 (RMB), 2006 WL 838993 (S.D.N.Y. March 30, 2006) ............................................................. 12

*Reebok Int'l Ltd. v. Marnatech Enters., Inc.*,
   737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd*, 970 F.2d 552 (9th Cir. 1992) ............................................................. 12, 19

*S.E.C. v. Banca Della Svizzera Italiana*,
   92 F.R.D. 111 (S.D.N.Y. 1981) ............................................................. 22

*Societé Nationale Industrielle Aérospatiale v United States District Court for the
   Southern District of Iowa*,
   482 U.S. 552 (1987) ............................................................. *passim*

*Ssangyong Corp. v. Vida Shoes Int'l, Inc.*,
   No. 03 Civ. 5014 (KMW) (DFE), 2004 WL 1125659 (S.D.N.Y. May 20, 2004) ............................................................. 20

*Valois of Am., Inc. v. Ridson Corp.*,
   183 F.R.D. 344 (D. Conn. 1997) ............................................................. 16

# TABLE OF AUTHORITIES
## [Continued]

Page(s)

*Zenith Electronics LLC v. Vizio, Inc.*,
  No. M8-85, 2009 WL 3094889 (S.D.N.Y. Sept. 25, 2009) ..................................................... 9

**Statutes**

Lanham Act, 15 U.S.C. § 1116(d)(1)(A) .................................................................. 12, 13

Lanham Act, 15 U.S.C. § 1117 .............................................................................. 12

Lanham Act, 15 U.S.C. § 1117(a) .......................................................................... 12

N.Y. C.P.L.R. § 6220 ......................................................................................... 13

**Rules**

Fed. R. Civ. P. 1 ............................................................................................. 6

Fed. R. Civ. P. 26(b)(1) ..................................................................................... 6

Fed. R. Civ. P. 26(d)(1) ..................................................................................... 6

Fed. R. Civ. P. 34(c) ........................................................................................ 6

Fed. R. Civ. P. 44.1 ........................................................................................ 18

## PRELIMINARY STATEMENT

Plaintiffs Tiffany (NJ) LLC and Tiffany and Company (collectively, "Plaintiffs") submit this memorandum of law in support of their motion to compel the production of documents by third party banks Bank of China ("BOC"), China Merchants Bank ("CMB") and Industrial and Commercial Bank of China ("ICBC") (collectively, "the Banks").

The Defendants in this action blatantly sold counterfeit Tiffany products through several websites, all of which were hosted in the U.S. and accepted payment in U.S. Dollars. To facilitate their sales of counterfeit goods, Defendants used PayPal, Inc. ("PayPal"), a U.S.-based company, to process customers' credit card transactions. Defendants then moved the profits from their illegal operation—denominated in U.S. Dollars—into accounts held by the Banks.

Plaintiffs served the Banks at their New York branches with the preliminary injunction entered in this matter on January 3, 2011 (Dkt. No. 7) (the "PI Order"). Plaintiffs also served the Banks with subpoenas outlining the specific documents sought (the "Subpoenas") and provided the Banks with the complete account numbers for the accounts that received wire transfers from Defendants' PayPal accounts. The PI Order specifically required third party financial institutions to "provide to Plaintiffs all records in their possession, custody, or control, concerning the assets and financial transactions of Defendants or any other entities acting in concert or participation with Defendants, and that such records be produced within ten (10) business days of receiving actual notice of this order unless such banks . . . apply to this Court for relief from the terms of this paragraph within seven (7) days of service of this order." PI Order at 9. The Banks never applied to the Court to seek relief from the terms of the PI Order.

In the March 25, 2011 Joint Letter outlining this dispute for the Court (appended to the March 31, 2011 Order of Reference (Dkt. No.9)), the Banks did not dispute that the funds wired into accounts at their branches represent the proceeds from Defendants' counterfeiting operation.

Yet, despite the clear connection between the illegal activities outlined in the Complaint and a Court order requiring them to produce the account records, the Banks have refused to produce even the most basic information regarding these transactions or the account holders.  Because Defendants manufacture their counterfeit products in China, it is absolutely critical that Plaintiffs obtain the documents requested from the Banks in order to learn the full size and scope of Defendants' counterfeiting operations, identify all the individuals responsible, find the ultimate destination of the counterfeiting proceeds, and effectuate the asset freeze authorized by the Lanham Act and ordered by Judge Pauley.[1]

Whether the Banks intended to or not, they have become central to the sale of counterfeits on the internet.  The counterfeiters seek profits from consumers in the U.S. and hide their proceeds in accounts with the Banks.  The Banks earn profits from these accounts and legitimate brand owners, like Plaintiffs, are prevented from enforcing their trademark rights in the U.S. through this Court's orders.  Under the Banks' view of the law, counterfeiters who host their websites in the U.S., sell to U.S. consumers, deliberately violate the rights of U.S. trademark holders, and contract with U.S.-based companies to process their sales can shield their business records and assets by transferring their U.S. Dollar proceeds into a bank that is present and doing business in the U.S.—simply by electing to open an account in one of the Banks' branches in China.  The counterfeiters do business in New York, the Banks do business in New York, and even the Banks admit that Chinese law permits the counterfeiters to authorize the release of their bank records.  Under these circumstances, whatever interest the Chinese

---

[1] The bank accounts into which the Defendants wired their profits are subject to the asset restraint provisions of the PI Order because they are clearly "accounts associated with or utilized by any of the Defendants."  PI Order at 6.

government might have in protecting the privacy of counterfeiters cannot outweigh the interest of the U.S. in the enforcement of its trademark laws. The counterfeiters' rights to keep their records secret and hide the proceeds of their illegal activities cannot outweigh the rights of the U.S. consumers who are intentionally deceived into buying cheap, silver-plated jewelry instead of the sterling silver they are promised. Nor can the counterfeiters' rights outweigh Plaintiffs' rights to stop the counterfeiters from intentionally placing the Tiffany trademarks on cheap, inferior goods.

The Banks voluntarily chose to do business with counterfeiters who are openly selling counterfeits on the internet for anyone to see. Either the Banks turned a blind eye to the source of the hundreds of thousands of U.S. Dollars that their customers were wiring into their accounts, or the Banks knew that the U.S. Dollars they were processing were the proceeds of an illegal counterfeiting operation and did not care. Either way, the Banks chose to open branches in New York and to avail themselves of the benefits and protections of New York law. They have also chosen to accept hundreds of thousands of U.S. Dollars in wire transfers from the U.S. on behalf of individuals who are openly engaged in illegal activities in the U.S. Plaintiffs' ability to obtain full and final relief in this action will be severely jeopardized if the Banks are permitted to conceal the requested documents. Having voluntarily put themselves in the middle of sales made by the Defendants in the U.S. in U.S. Dollars, the Banks cannot now be heard to complaint that it is inconvenient to produce the records of Defendants' illegal counterfeiting operation.

## STATEMENT OF FACTS

The Defendants were duly served with notice of this action and the Court's orders, but have failed to appear or and respond to the Court's order requiring them to produce documents relating to the counterfeiting operation. Accordingly, Plaintiffs have had to focus their discovery efforts on third parties that provided the Defendants with various services in connection with

their counterfeiting operation, including PayPal, which was the sole method of payment accepted by Defendants for the counterfeit goods sold through their websites; GoDaddy.com, Inc. ("GoDaddy"), which provided website hosting services to the Defendants; and the Banks, into which the Defendants wired the U.S. Dollar proceeds of their counterfeiting operation.

Each of the Banks was served with a copy of the PI Order entered by the Court in this action. *See* Declaration of Robert L. Weigel, dated May 3, 2011 ("Weigel Decl."), Exs. 6, 8, 11. The PI Order expressly required the Banks to produce "all records in their possession, custody, or control, concerning the assets and financial transactions of Defendants or any other entities acting in concert or participation with Defendants . . . unless such banks . . . apply to this Court for relief . . . within seven (7) days of service of this order." PI Order at 9. The Banks never objected to the PI Order.

To provide the Banks with additional detail regarding the types of documents necessary for determining the scope of Defendants' counterfeiting business, Plaintiffs also served the banks with subpoenas seeking the following types of documents: (1) communications concerning Defendants or Defendants' accounts; (2) documents containing contact information associated with each of Defendants' accounts; (3) documents relating to any and all credit card transactions processed in connection with purchases from Defendants or Defendants' websites; (4) documents concerning any open or closed checking, savings, money market accounts, and certificates of deposit held in the name of any of the Defendants, including among other things, bank statements; (5) documents concerning any open or closed loans or mortgages relating to any of the Defendants; (6) wire transfer documents and files relating to any of the Defendants, including among other things, documents reflecting the source of funds for wires into

Defendants' accounts; and (7) documents relating to Currency Transaction Reports and Suspicious Activity Reports concerning any of the Defendants. *See* Weigel Decl., Exs. 7, 9, 11.[2]

In response, the Banks have refused to produce documents located in China. *Id.* Exs. 12-14. The Banks also admitted to limiting their search for responsive documents to their respective New York branches, even though neither the PI Order nor the Subpoenas contained any such geographical limitation. *Id.* The Banks asserted that they have no responsive documents in their New York branches. *Id.* Although there is no dispute that funds were wired from the PayPal accounts into specific accounts at BOC, CMB and ICBC, the Banks have not produced *any* documents even though it is clear that—at the very least—the Banks must have records of the above-referenced wire transfers.

None of the Banks' New York branches are separately incorporated from the branches that operate overseas, including the branches in China. Put another way, the very same corporate entities that operate in New York possess the documents requested. Nevertheless, the Banks assert that documents located outside of New York are not in their possession, custody or control. The Banks also claim that producing such documents would run afoul of Chinese law. However, even if the Banks can establish that producing documents in response to a valid U.S. court order would violate Chinese law, they cannot show anything more than a speculative risk of prosecution for complying with the Court's order.

---

[2] The subpoenas directed to ICBC and BOC contained only the last four digits of the account numbers because this was the only information available to Plaintiffs at the time. *Id.* Exs. 2-5. However, the Banks were all provided with the full account numbers relating to the wire transfers once Plaintiffs obtained that information from PayPal. *Id.* Exs. 10, 11.

For these reasons, and as set forth below, Plaintiffs respectfully request that this Court compel the Banks to produce the documents called for by the Court's PI Order and the Subpoenas, regardless of where such records may be located.

## ARGUMENT

### I.   THIS COURT HAS THE AUTHORITY TO COMPEL THE BANKS TO COMPLY WITH THE SUBPOENAS AND THE PI ORDER

Under the Federal Rules of Civil Procedure, if "this Court has personal jurisdiction over [a foreign bank], and if [the foreign bank] has control of the materials sought, then this Court can order [the foreign bank] to" produce documents, even if the documents are kept outside of a New York branch.  *See, e.g., Dietrich v. Bauer*, No. 95 Civ. 7051 (RWS), 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000); *Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639, at *8 (S.D.N.Y. Mar. 8, 2010) (Katz, M.J.) (ordering non-party foreign bank doing business in New York to "produce all documents and information responsive to the requests of the Subpoena," including documents located abroad).  There is no dispute that the entities served at their New York offices are the same corporate entities as those that have control over the relevant documents.  Accordingly, this Court has the authority to issue an order compelling the Banks to produce the requested documents.  *See Milliken & Co. v. Bank of China*, No. 09 Civ. 6123 (LMM), 2010 WL 5187744, at *8 (S.D.N.Y. Dec. 6, 2010) (noting that BOC "over which this Court has jurisdiction due to the presence of branches in this district, has effective control over documents and information maintained by its branches and could be compelled to make production").[3]

---

[3]  For the same reason, it is clear that Judge Pauley had the authority to issue the PI Order requiring the Banks to produce "all records" on an expedited basis.  *See* Fed. R. Civ. P. 1, 26(b)(1), 26(d)(1), 34(c).

## A.    This Court Has Personal Jurisdiction Over the Banks

It is well-settled that "a district court has the power to impose discovery under the Federal Rules of Civil Procedure when it has personal jurisdiction over the foreign party."  *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 520 (S.D.N.Y. 1987) (quoting *Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 552, 526 n.4 (1987)) (internal quotation marks omitted).  The Banks do not appear to contest that this Court has personal jurisdiction over them.  Although the Banks take great pains to refer to their New York branches as "BOC-NY," "CMB-NY," and "ICBC-NY," there is no corporate distinction between the Banks' New York branches and the BOC, CMB or ICBC branches that operate in China.  *See* Weigel Decl. Exs. 16, 17, 22 at ¶ 16 ("[T]he New York branch of BOC is not a distinct corporate entity from BOC itself.").  This Court therefore has jurisdiction over BOC, CMB and ICBC, not simply the Banks' New York branches.  *See Dietrich*, 2000 WL 1171132, at *4 ("This Court has jurisdiction over a foreign corporation doing business in New York.  This rules applies to a bank that maintains and operates a branch here.") (citations omitted).

## B.    The Banks Control the Documents Requested by Plaintiffs

The Banks also have control over the documents sought.  The Banks incorrectly frame the issue as whether their New York branches are in "possession, custody or control" of the requested documents.  *See* Joint Ltr. at 13, 17.  As a matter of law, though, a corporation is presumed to have custody and control of its own records ordinarily required in the course of business, and the burden of proving otherwise is on the corporation.  *See Hunter Douglas, Inc. v. Comfortex Corp.,* No. Civ. A. M8-85 (WHP), 1999 WL 14007, at *3 n.6 (S.D.N.Y. Jan. 11, 1999); *Cooper Indus. Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 n.2 (S.D.N.Y. 1984); *In re Equitable Plan Co.*, 185 F. Supp. 57, 60-61 (S.D.N.Y. 1960) (requiring foreign banks to

7

respond to document subpoenas served on New York branches).  As the Court observed in *In re Equitable Plan*, "[i]t is immaterial that the agent upon whom service is made does not have control of the books and records required to be produced.  It is not the agent who is to respond, but the corporation.  The agent is merely the vehicle for reaching the corporation."  185 F. Supp. at 59.

This is why courts in this District have found, without much controversy, that banks have "the legal right, authority or practical ability to obtain the materials sought" when a New York branch of an international bank is served with a subpoena for documents maintained by the same corporate entity.  *See Dietrich*, 2000 WL 1171132, at *3; *Curveal Fashion*, 2010 WL 808639, at *8.  If anything, the facts of this case are stronger than these precedents, because the relevant records are not maintained by a subsidiary—they are maintained by the Banks themselves. In fact, BOC has previously produced documents in New York from an overseas branch in China.  *See* Weigel Decl. Ex. 21.

In *Gucci Am., Inc. v. MyReplicaHandbag.com*, No. 07 Civ. 2438 (JGK) (DFE) (S.D.N.Y.), BOC publicly filed a status report on the ECF docket following oral argument on a motion to compel and cross-motion to quash, informing the Court that BOC would "produce to Gucci . . . transaction activity documents maintained by the Bank's Guangdong Branch which relate to the deposits and withdrawals from [the defendant's] accounts."  *Id.*[4]  Earlier, BOC had

---

[4] The Banks stated incorrectly at the hearing that it was inappropriate for Plaintiffs to provide the Court with this information due to the existence of a settlement agreement between the plaintiffs in that case and BOC.  *See id.* Ex 15, at 35:13-19.  The status report was publicly filed on the docket *by BOC.  Id.* Ex. 21.  It is also clear from the content of the report that, at the time it was filed, the plaintiffs and BOC had *not* reached any settlement, as reflected in BOC's statement that it was producing the documents in the hopes that the production *might* resolve the dispute and "render the pending motions moot."  *Id.*

stated to the Court that, "BOCNY . . . transmitted a copy of the March 26 Order to BOC's Head Office in Beijing and to the branch in Guangzhou." *Id.* Ex. 20, at 2.  As these communications show, the documents requested by Plaintiffs are in BOC's "possession, custody, or control," and BOC can direct its overseas branches to produce the documents in New York.  Further, these communications also suggest that, whether or not the New York and overseas branches are on different computer systems, BOC's branches can—and do—transmit information and documents to each other.  There is no reason to believe the same is not true for CMB and ICBC.

The cases relied upon by the Banks do not compel a different result.  *Zenith Electronics LLC v. Vizio, Inc.*, No. M8-85, 2009 WL 3094889 (S.D.N.Y. Sept. 25, 2009), involved a document subpoena served on the New York *subsidiary* of a foreign corporation and the Court framed the issue as "whether a subpoenaed domestic corporation can be compelled to produce documents held by a foreign affiliate."  *Id.* at *1.  Here, the Banks and their New York branches are not subsidiaries or affiliates—they are the *same* corporate entities and are therefore presumed to control their documents.  *See, e.g.*, *Cooper*, 102 F.R.D. at 920 n.2.[5]  In *Linde v. Arab Bank, PLC*, 262 F.R.D. 136 (E.D.N.Y. 2009), a defendant served a subpoena on a U.S.-based subsidiary of an Israeli bank that, unlike the Banks here, operated as a separate corporate entity from the parent in Israel, and the court did not have personal jurisdiction over the foreign parent.  *Id.* at 142, 145.  Although the court found no control over that parent, its treatment stands in stark

---

[5]  The Banks reliance upon *Ings v. Ferguson*, 282 F.2d 149 (2d Cir. 1960), a pre-*Aerospatiale* decision, is similarly misplaced.  There, the Court did not even reach the question of control, finding it "unnecessary to resolve" under the circumstances.  *Id.* at 152.  Further, the Court's comity analysis is of limited use since the Court did not engage in the type of multi-factor analysis that courts have used following the Supreme Court's ruling in *Aerospatiale*.  Instead, the Court mechanically determined that the possible conflict with Canadian law on its own was sufficient to warrant quashing the subpoena.  *Id.*

contrast to a separate Israeli bank that *did* have physical presence in the U.S.  For the bank that was present in the U.S., the court stated that there "is no dispute the Hapoalim is subject to personal jurisdiction in this court," and that the only issue was "the extent to which it should be compelled to comply with" documents requests.  *Id*. at 147.[6]  Similarly, here, the Banks that were served with the PI Order and the Subpoenas were the same corporate entities as the ones operating overseas.

## II.    THE RELEVANT FACTORS WEIGH IN FAVOR OF COMPELLING PRODUCTION FROM THE BANKS

Because the Banks have no reasonable argument on jurisdiction or control, the only basis on which to evade their discovery obligations to this Court is based on their claim that producing the requested documents is inconsistent with Chinese law.  The factors that courts use to evaluate such questions, though, overwhelmingly favor compelling the Banks to comply with the PI Order and the Subpoenas.  In determining whether to order discovery of documents and information located abroad, courts in this Circuit follow the approach set forth in the Restatement (Third) of Foreign Relations Law § 442(1)(c) and consider:  (1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the U.S.;  (4) the availability of alternative means of retrieving the information; and (5) the extent to which noncompliance with the request would undermine important interests of the U.S., or compliance with the request would

---

[6]  In *Linde*, the court also concluded that the Hapoalim documents were "of only indirect and attenuated significance to the issues to be decided."  *Id.* at 151.  Here, the documents Plaintiffs seek are crucial to the enforcement of their trademark rights.  *See* Section II.A, *infra*.  Further, the defendant in *Linde* had alternative means of obtaining the requested information—some of it was publicly available and some was available in the defendant's own records.  262 F.R.D. at 150.  That is not the case here.  *See* Section II.,C, *infra*.

undermine the important interests of the state where the information is located.  *See Curveal Fashion*, 2010 WL 808639, at *2.  In addition to these five factors, "courts in the Second Circuit may also consider the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery." *Id.* (internal quotation marks omitted).  An application of these factors to the present circumstances supports granting Plaintiffs' motion to compel.

### A.   The Information Sought Is Crucial to the Vindication of Plaintiffs' Rights.

Plaintiffs' ability to obtain information from third parties is critical.  Where, as here, counterfeiting defendants have defaulted and refused to comply with Court-ordered discovery, discovery as to the counterfeiters' operations and finances "is both relevant and vital to the litigation, and the first factor weighs heavily in favor of Plaintiffs." *Id.* at *3.  There is no reasonable dispute that the Banks maintain detailed information about source and the destination of the wire transfers from PayPal into Defendants' accounts with the Banks.  Under Chinese law, the Banks' transaction records for these wire transfers must include information regarding "the sources and uses of the funds" in customers' accounts—information directly relevant to Plaintiffs' claims and recovery of any judgment against Defendants.[7]

Without access to this information, Plaintiffs will not be able to enforce their trademark rights or the Court's injunctions.  Indeed, it has only been through documents obtained from other third parties that Plaintiffs were able to learn how the Defendants shifted their operations to

---

[7] *See* Weigel Decl. Ex. 23 (expressly requiring the Banks to maintain customer "[a]ccount records" and "transaction records" for at least five years), Ex. 24 (financial institutions must be able to "effectively identify beneficiaries" of customer transactions).

other websites.[8]  Without obtaining additional information from the Banks, Plaintiffs will have

no recourse to the remedies allowed by U.S. trademark law, *see, e.g.,* 15 U.S.C. § 1117, and it

will be impossible to determine the full size and scope of Defendants' operations.  The

information is relevant in assessing damages and in conducting the equitable accounting

authorized by the Lanham Act, 15 U.S.C. § 1117(a).

At most, the Banks argue that a pre-judgment subpoena cannot be justified on the basis

that information might be relevant to judgment enforcement.  *See* Joint Ltr. at 12, 17.  But the

cases cited by the Banks do not apply here.  The Lanham Act, which provides the basis for

several of Plaintiffs claims, specifically provides that trademark holders may seek *ex parte*

seizure not only of the counterfeit goods themselves, but the counterfeiters' business records as

well.  *See* 15 U.S.C. § 1116(d)(1)(A) ("the court may, upon ex parte application, grant an order .

. . providing for the seizure of . . . records documenting the manufacture, sale, or receipt of things

involved in such violation").

Moreover, it is also well-settled that the Lanham Act also provides courts with "authority

to freeze the [defendants'] assets" *before* judgment "insofar as they could be used to satisfy an

award of their profits pursuant to Plaintiffs' Lanham Act claims."  *Balenciaga Am., Inc.  v.*

*Dollinger*, No. 10 Civ. 2912 (LTS), 2010 WL 3952850, at *7 (S.D.N.Y. Oct. 8, 2010); *see also*

*N. Face Apparel Corp. v. TC Fashions, Inc.,* No. 05 Civ. 9083 (RMB), 2006 WL 838993, at *3

(S.D.N.Y. Mar. 30, 2006); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.,* 737 F. Supp. 1521, 1525

(S.D. Cal. 1989), *aff'd*, 970 F.2d 552 (9th Cir. 1992) ("Under the provisions of the Lanham Act,

---

[8]  For example, through information provided by GoDaddy and PayPal in response to the TRO
Plaintiffs identified two more websites being operated by Defendants that sold counterfeit
Tiffany Products, www.TiffanyStores.net and www.CantonWholesale.com.  *Id.* ¶  8.

plaintiffs will be entitled to an equitable accounting of defendants' profits from the sale of such counterfeit merchandise" and therefore "an order freezing a defendant's assets is appropriate in order to preserve the status quo, so that assets can be preserved to satisfy an equitable decree."). The Court's power to freeze the counterfeiters' assets necessarily includes the power to allow for discovery regarding the counterfeiters' assets and their location, as confirmed by the fact that the Lanham Act allows for the seizure of counterfeiters' business records. *See* 15 U.S.C. § 1116(d)(1)(A).[9] Further, where the Defendants "are foreign individuals and corporations who have both incentive and capacity to hide their assets," the Courts have recognized that there is a "considerable urgency to plaintiff's need to seek information about the location of defendants' possible assets." *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (ordering expedited discovery from third party banks pursuant to Rule 26(d)).

### B.   The Requests at Issue Are Narrowly Tailored.

Plaintiffs narrowly tailored their requests to target the specific accounts at the Banks into which funds were wired from the PayPal accounts, and Plaintiffs provided the Banks with the full account numbers for these accounts. *See* Weigel Decl. Exs. 7, 9, 10, 11. Plaintiffs' Subpoenas also included the reasonable request for documents relating to any other accounts "held in the name of any the Defendants." *Id.* Exs. 7,9, 11. Although the Banks now appear to take issue with the scope of the Subpoenas, Plaintiffs' requests fall well within the scope of the PI Order, which required the Banks to produce "all records" concerning "the assets and financial

---

[9] Similarly, New York law, under which Plaintiffs allege several causes of action, also allows for discovery of assets that are subject to a restraint. *See* N.Y. C.P.L.R.§ 6220 ("the court may order disclosure by any person of information regarding property in which the defendant has an interest, or any debts owing to the defendant").

transactions of Defendants or any other entities acting in concert or participation with Defendants."  PI Order at 9.

Moreover, in *Curveal Fashion*, Magistrate Judge Katz found requests nearly identical to Plaintiffs' requests here to be sufficiently specific where, as here, the plaintiffs provided a foreign bank with specific account numbers and provided evidence that the accounts were "a repository for . . . funds received by Defendants as a result of their infringing activities."  2010 WL 808639, at *3; *see also Milliken*, 2010 WL 5187744, at *7 (S.D.N.Y. Dec. 6, 2010) (plaintiff's requests were "narrowly tailored" because they were "limited to specific accounts").

### C.  The Funds at Issue Originated in the United States.

The PayPal records make clear that the funds—and at least some of the information about those funds—originated in the U.S., as the Defendants transferred their funds out of the U.S. and into accounts at the Banks.  *See* Weigel Decl. Exs. 2-5.  Further, BOC maintains a branch in Los Angeles in addition to the two branches it has in New York.  *Id.* Ex. 18.  Inexplicably, however, BOC does not appear to have conducted a search for documents at its other U.S. branch.  *Id.* Ex. 12.  Accordingly, Plaintiffs do not know whether there are, in fact,  responsive documents maintained in the U.S.

The Banks do not deny that they have documents relevant to this action, only that such documents are not located in New York.  However, all of the Banks provide online banking access, meaning that their customers—the counterfeiters—can access their account information over the internet anywhere in the world.  In describing its "Personal Internet Banking" program, CMB states that the "[a]round-the-clock on-line service of China Merchants Bank is subjected to no limit in time and space; as soon as you switch on your computer, account information with every detailed transactions [sic] is presented to you; . . . enabling fast and convenient fund transfer."  *Id.* Ex. 25. Similarly, ICBC offers its internet banking customers the ability to "bind

the accounts opened in domestic and overseas ICBC branches and manage [them] together so that all your global accounts are interlinked under Personal Internet Banking.  You can look up the balance and total assets in all of your accounts once they are linked with each other, or make transfer[s] between your global registered accounts."  *Id.* Ex. 27.  BOC likewise offers "[c]omprehensive and abundant online banking functions, including account enquiry."  *Id.* Ex. 28.  Given that the counterfeiters' accounts literally can be accessed by any computer in the U.S., it cannot fairly be said that the account records exist only in China.

> **D.    There Is No Realistic Alternative Beyond Appropriate Discovery in the Current Acton.**

Plaintiffs have no viable alternative but to seek the documents in the Banks' possession, because Defendants—who would be required to produce such documents—have failed to appear in this action.  The Banks do not dispute this, but instead suggest that Plaintiffs should be put to the burden of obtaining them by way of the Hague Evidence Convention.  Joint Ltr. at 14, 18.[10] The Supreme Court, however, has "decline[d] to hold as a blanket matter that comity requires resort to the Hague Convention's procedures without prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will be effective." *Aérospatiale*, 482 U.S. at 544.  In fact, the "discovery procedures provided by the Hague

---

[10]  The Banks make much of the fact that Tiffany conducts business in China, *see* Weigel Decl Ex. 15, at 22:11-18, but that is entirely irrelevant to the question before the Court—whether the  Banks must comply with the PI Order and Subpoenas.  Even if the Chinese courts might enforce Plaintiffs' trademark rights if they initiated litigation in China, *this* action is pending in the U.S., where Defendants' sales were transacted and where Plaintiffs maintain their principal place of business.  The Banks do not suggest that a company is likely to receive a timely or favorable ruling on a Hague application simply because it transacts business in China.  Further, in *Huang v. Advanced Battery Technologies, Inc.*, No 09 Civ. 8297 (HB), 2011 WL 813600, at *2 (S.D.N.Y. Mar. 8, 2011), relied upon by the Banks, the Court concludes only that a Chinese court "could exercise jurisdiction over [a contract] dispute" between a Chinese resident and Chinese corporation.  This case says nothing about the likelihood of success in obtaining documents through the Hague Convention.  *See id.* at *2.

Convention . . . are neither the exclusive nor even, necessarily, the first means for obtaining

discovery from a foreign entity, as compared with the Federal Rules of Civil Procedure."

*Dietrich*, 2000 WL 1171132 at *5; *see also In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ.

5571 (RJH) (HBP), 2006 WL 3378115, at *2 (S.D.N.Y. Nov. 16, 2006) (Pitman, M.J.).[11]

As "[t]he party seeking to displace the Federal Rules of Civil Procedure in favor of the

Hague Convention," the Banks "bear[] the burden of demonstrating that it is more appropriate

for the Court to follow the Hague Convention." *Vivendi*, 2006 WL 3378115, at *2; *see also*

*Valois of Am., Inc. v. Ridson Corp.*, 183 F.R.D. 344, 346 (D. Conn. 1997). China's Hague

Convention procedures, though, do not offer a meaningful avenue to discovery where, as here,

the process is likely to be "unduly time consuming and expensive, as well as less certain to

produce needed evidence than direct use of the Federal Rules." *See Aérospatiale*, 482 U.S. at

542-44; *Curveal Fashion*, 2010 WL 808639, at *5 (concluding that the "information is not

'easily obtained' through alternative means" where plaintiffs faced "possibly significant costs

and logistical concerns, and no clear likelihood of success," and these concerns

"counterbalance[] the third factor [(location of documents)]").

---

[11]  The cases relied upon by the Banks (Joint Ltr. at 14, 18) are entirely distinguishable. For
example, *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH), 2004 WL
3019766, at *1 (S.D.N.Y. Dec. 30, 2004), involved a request for deposition testimony, not
documents. In requiring the Rule 30(b)(6) depositions to proceed in France pursuant to the
Hague Convention, the Court noted the presumption that such depositions take place where
the witnesses reside. *Id.* at *1. Similarly, in *Hudson v. Hermann Pfauter*, 117 F.R.D. 33, 37
(N.D.N.Y. 1987), which did not involve document production, the court used the "tripartite
analysis" suggested by Justice Blackmun in the *Aérospatiale* dissent, not the multi-factor
analysis currently used by the Courts. In *Laker Airways Ltd. v. Pan American World
Airways*, 607 F. Supp. 324, 326-27 (S.D.N.Y. 1985), a pre-*Aérospatiale* case, the subpoenas
were "extremely broad" and "extraterritorial jurisdiction asserted over foreign interests by
the American antitrust laws has long been a sore point with many foreign governments."
Those circumstances are not present here.

First, the U.S. Department of State has recognized that pursuing evidence through Chinese authorities via the Hague Convention is likely to be lengthy and uncertain, stating that:

> While it is possible to request compulsion of evidence in China pursuant to a letter rogatory or letter of request (Hague Evidence Convention), such requests have not been particularly successful in the past.  Requests may take more than a year to execute.  It is not unusual for no reply to be received or after a considerable time has elapsed, for Chinese authorities to request clarification from the American court with no indication that the request will eventually be executed.

*See* Weigel Decl. Ex. 29 (the "State Department Circular").  The Banks have claimed, without any support, that this State Department Circular is "outdated"—even though this is the exact language that *currently* appears on the State Department's website.[12]

Second, courts in this District have also examined the question and, in reliance on the State Department's position, have also concluded that resort to the Hague Evidence convention in China would be futile.  For example, in *Milliken*, the Court specifically rejected BOC's assertion that plaintiffs could easily obtain documents through the Hague Convention.  2010 WL 5187744, at *8 ("This official analysis rebuts any contention that the information sought is 'easily obtained' by means other than an order compelling production by the Bank of China.").

Third, earlier this year, one of the leading U.S. experts on Chinese law opined that "a Hague Convention request issued by a United States court is not a realistic or meaningful option

---

[12] At the hearing, counsel for CMB suggested that "[t]he State Department memo . . . does not speak of any experience from the time that China signed on to the Hague Convention."  *Id.*. Ex. 15, at 38:18-20.  The quoted text above makes clear that the State Department analysis does, in fact, refer to China's post-Hague Convention treatment of requests for evidence.

for the Plaintiffs in [a counterfeiting] case to obtain the information that they seek" concerning the bank records of the counterfeiters.  *See* Weigel Decl. Ex. 22, at ¶¶ 21-22.[13]

Fourth, the futility of resorting to the Hague Convention is further confirmed by literature regarding obtaining evidence abroad.  A paper presented at the ABA's Annual Meeting of the Litigation Section in 2008 reported that the "complexity of the Letter of Request process . . . coupled with its inefficiency (usually one year or even longer) means that few litigants in China-related international actions successfully compel either documentary or testimonial discovery using Letters of Request under the Hague Convention.  Indeed, lawyers in China have been told informally that the Beijing High Court executes *approximately one such request per year*."  *Id.* Ex. 30, at 35 (emphasis added).[14]

Fifth, when it adopted the Hague Convention in 1998, China expressly reserved its right under Article 23 of the Convention to declare that it will not execute a Letter of Request seeking pre-trial discovery of documents.  *Id.* Ex. 29.  China has stated that only requests for "documents clearly enumerated in the Letter of Request and of direct and close connection with the subject matter of the litigation will be executed."  *Id.*  Accordingly, the "[t]he China Ministry of Justice and Supreme Court have significant discretion in applying this two-part test before permitting a Letter of Request to be executed."  *Id.* Ex. 30, at 35-36; *see also* Fang Shen, *Are You Prepared*

---

[13] "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.

[14] *See also* Stephanie A. Scharf et al., *Discovery of Documents and People Abroad*, PLIREF-PLL § 14.3 (2011) ("Although China is a party to the Hague Convention, discovery of documents and witnesses located in China may prove difficult," and "Letters of request by U.S. courts to the Chinese Central Authority, the designated Chinese agency for the production of documents, may also prove ineffective.").

*for this Legal Maze? How to Serve Legal Documents, Obtain Evidence, and Enforce Judgments in China*, 72 UMKC L. Rev. 215 (2003), at 232 ("China apparently retains much discretion in determining what constitutes a 'direct and close connection with the subject matter of the litigation' for purposes of enforcing requests sent to Chinese authorities."). There is no way to be sure, therefore, whether China will even honor Plaintiffs' request for pre-trial discovery.

At the April 19, 2011 hearing, the Banks could not provide the Court with any examples of Chinese officials providing meaningful or timely information to a U.S. trademark owner in a counterfeiting case, or even provide an estimate as to how long the process would take. *See* Weigel Decl. Ex. 15, at 23:20-25:9, 26:21-27:25, 39:6-20. At most, the Banks argue that Plaintiffs should be forced to wait months just to obtain basic information about the Defendants and their finances. *Id.* at 25:16-18. The Court will have to wait months, if not years, before the final resolution of this action can *begin*. Because the relevant assets will likely be long gone by then, any "relief" from this process would be rendered meaningless. *Cf. In re Vuitton Et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) (directing district court to issue TRO in a trademark infringement case where allowing defendant an opportunity to dispose of evidence and would "render fruitless further prosecution of the action").[15] Accordingly, the Banks have not provided Plaintiffs or this Court with any reason to believe that proceeding through the Hague Convention will be anything other than an expensive, time-consuming exercise in futility.

---

[15] *See also Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 558-59 (9th Cir. 1992) (implying that it might be an abuse of discretion for a court to fail to award equitable relief such as an asset freeze "if such an action were necessary to protect a plaintiff's right to recovery of [Section] 1117 profits and damages and to ensure that a defendant may not benefit by willfully engaging in illegal trademark activity").

### E.   United States Interests Strongly Favor Disclosure and Any Contrary Chinese Interest Pales in Comparison.

The motion to compel is also appropriate because America's interests in administering justice, protecting consumers against counterfeits, and preventing the theft of its intellectual property all strongly outweigh any Chinese interest in protecting counterfeiters. Courts in this District have repeatedly found that "the United States interest in fully and fairly adjudicating matters before its courts, including the enforcement of judgments, outweighs [a foreign country's] interest in protecting the confidentiality of its banking customers' records." *Curveal Fashion,* 2010 WL 808639, at *7.[16]

Courts have also repeatedly recognized that the U.S. has a strong interest in enforcing its trademark laws. *See, e.g., id.*, at *5; *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107-08 (2d Cir. 2000) ("Trademark laws exist to protect the public from confusion."); *Gayle Martz, Inc. v. Sherpa Pet Grp., LLC*, 651 F. Supp. 2d 72, 85 (S.D.N.Y. 2009) ("[T]he public interest lies in the enforcement of the Acts of Congress, especially the prevention of consumer confusion as espoused by the Lanham Act.") (internal quotation marks omitted).

---

[16] *See also Milliken*, 2010 WL 5187744, at *9 ("[C]ourts consistently recognize that the United States has a substantial interest in fully and fairly adjudicating matters before its courts. . . . The documented interests of the People of China are less compelling here.") (internal quotation marks omitted); *Ssangyong Corp. v. Vida Shoes Int'l, Inc.*, No. 03 Civ. 5014 (KMW) (DFE), 2004 WL 1125659, at *11 (S.D.N.Y. May 20, 2004) (explaining that the United States' interest in "the full and fair adjudication of matters before its courts . . . through complete discovery" is implicated in a variety of cases, including those "where a litigant acts as a private attorney general" and "*civil commercial litigation*") (emphasis in original); *In re Air Cargo Shipping Svcs. Antitrust Litig.*, No. 06-MD-1775, 2010 WL 1189341, at *4 (E.D.N.Y. Mar. 29, 2010) ("The court has little difficulty concluding that France's relatively weak national interest in prohibiting disclosure of the information sought by the plaintiffs is outweighed by the more substantial United States interests articulated above.")

Successive U.S. administrations and Congresses have repeatedly emphasized the strong U.S. interest in preventing counterfeiting.  *See* Weigel Decl. Exs. 31-33.   Attorney General Eric Holder recently noted that "[t]he rise in intellectual property crime in the United States and abroad threatens not only our public safety but also our economic well being."  *See id.* Ex. 32. The U.S. interest in protecting the consuming public is particularly strong in this case because Defendants not only violated Plaintiffs' rights, but also misleadingly told consumers that their "replica" were "100% sterling silver."  *See* Declaration of Joseph Pepe, dated Dec. 20, 2010 (Dkt. No. 14) ¶¶ 16, 25.  However, laboratory analysis revealed that the counterfeit goods contained barely any silver at all.  *See* Declaration of Richard Perrone, dated Dec. 20, 2010 (Dkt. No 13) ¶¶ 25-26.

In contrast, no significant Chinese interests would be undermined by requiring the Banks to produce documents relating to the counterfeiters' proceeds.  At most, the Banks argue that "China has a vital interest in upholding its banking and bank secrecy laws . . . to encourage the regular use of banks by businesses."  Joint Ltr. at 19.  As a leading expert in Chinese law commented in a similar case, "[t]here is clearly no state policy affording a high degree of protection to the clients of Chinese banks, and those clients can be under no illusions as to the security of their bank information."  *See* Weigel Ex. 22, at ¶ 14.  In particular:

> Under the provisions of Chinese law . . . a wide variety of organizations ("competent organs") have the right to inquire into and freeze bank accounts. These "competent organs" include, in the case of corporate entities, the following: courts, tax authorities, customs, procuratorates (similar to state prosecutors), police, state security authorities, military security authorities, prisons, antismuggling investigators, supervisory authorities (including military supervisory authorities) (essentially anti-corruption investigators) (inquiry only), auditing authorities (inquiry only), industrial-commercial administration authorities (in charge of company registration and other aspects of commercial regulation) (limited freezing powers), and securities regulatory authorities (inquiry only).

*Id.* Ex. 22, at ¶ 13.

21

Moreover, as BOC's submission in the *MyReplicaHandbag.com* case makes clear, the privilege belongs to the bank customer and can be waived. *Id.* Ex. 20. "The Second Circuit has found [it] to be 'of considerable significance,' in undermining the importance of the [privacy] interest" that it can so easily be waived. *See Curveal Fashion*, 2010 WL 808639, at *6; *S.E.C. v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 118 (S.D.N.Y. 1981) ("It is also of significance that the secrecy privilege . . . is one belonging to the bank customers and may be waived by them.").

### F.   The Banks' Asserted Hardship of Compliance Is Entirely Speculative.

In light of the absence of any evidence that a Chinese bank has been prosecuted for complying with the lawful order of a U.S. court, the Banks cannot argue that Chinese law excuses their failure to comply with Judge Pauley's order and the lawfully issued subpoenas served upon them in the U.S. "[T]he party relying on foreign law has the burden of showing that such law actually bars [the] production" at issue. *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, No. 90 Civ. 2370 (JFK) (FM), 2000 WL 713057, at *8 (S.D.N.Y. June 2, 2000).

Just last year, a court in this District concluded that the BOC cannot meet that burden. In *Milliken*, BOC argued, just as the Banks do here, that complying with discovery in the U.S. could result in "penalties from the government of China, as well as possible civil penalties from its account holder." 2010 WL 5187744, at *10 (internal quotation marks omitted). The Court rejected this claim, finding that "the possibility that the Bank will suffer hardship in complying with the discovery order is speculative at best." *Id.*[17]

---

[17] BOC produced documents from China in prior litigation, and does not contend that the Chinese government prosecuted it for this disclosure. The Banks' contention that the defendant in *MyReplicaHandbag.com* had consented to the disclosure of documents (*id.* Ex.

[Footnote continued on next page]

The Banks face no realistic prospect of being seriously prosecuted for complying with a U.S. court order.  This is because "banking institutions in the [People's Republic of China] are regulated and supervised by agencies controlled by the [Chinese Communist] Party."  *See id*. Ex. 34, at ¶ 13;  *see also* Duncan Alford, *The Influence of Hong Kong Banking Law on Banking Reform in the PRC*, 3 E. Asia L. Rev. 35, 37 (2008) ("The banking industry in China is a government dominated system that controls 80% of all financial assets of China.").[18]   The Chinese government also holds an indirect majority interest in the Banks.  *See* Weigel Decl. Ex. 37, at 1 ("a Chinese government owned investment company . . . owns controlling interests in. . . Bank of China . . . and Industrial and Commercial Bank of China."); Ex. 35, at 1 ("CMB is indirectly controlled by the Government of China through a number of wholly owned companies"); Ex. 36, at 1, n.2 ("The government of China owns approximately 74.8 percent of ICBC's shares").  The Chinese government's interest in the Banks further decreases the likelihood that it would take action against the Banks for complying with a U.S. court order.  *See id.* Ex. 22, at Ex. B, ¶¶ 11, 15-20, 39-42 (because BOC is "inextricably intertwined with the

---

[Footnote continued from previous page]

15, at 36:18-22) is contradicted by BOC's own statements to the Court that action in which the bank admitted that it did not have adequate consent under Chinese law.  *Id.* Ex. 20.  BOC also admitted that it took action "inconsistent with Chinese law" in freezing the defendant's account.  *Id.* Ex. 19. It does not appear that BOC was prosecuted for violating Chinese law, further suggesting that it is unlikely to suffer harm for producing documents here.  There is no evidence to suggest that CMB or ICBC would be any more likely to face penalties for complying with a U.S. court order than BOC was.

[18]  *See also* Memorandum to David M. Spooner, Assistant Sec'y, Import Administration, U.S. Dep't of Commerce, *The People's Republic of China (PRC) Status as a Non-Market Economy (NME)* (May 15, 2006), at 4 ("While the Big Four SOCBs [State Owned Commercial Banks] (along with smaller regional banks and cooperatives) now have greater autonomy than in the past, government interests at both the central and local levels still exercise a great deal of control over banking operations and lending decisions."), *available at* http://ia.ita.doc.gov/download/prc-nme-status/prc-nme-status-memo.pdf.

government of China," it is "unlikely to be prosecuted for complying with [a U.S.] court order" to provide information in a counterfeiting case).

Accordingly, the risk that the Banks will be subject to prosecution by the Chinese government for complying with a valid U.S. court order is speculative at best. Further, the Banks voluntarily put themselves in their current position by availing themselves of the privilege of doing business in the United States *See In re Grand Jury Proceedings Bank of Nova Scotia*, 740 F.2d 817, 828-29 (11th Cir. 1984) (where corporation "voluntarily elected to do business in numerous foreign host countries," it "cannot expect to avail itself of the benefits of doing business here without accepting the concomitant obligations"). They also chose to accept wire transfers of U.S. Dollars from counterfeiters selling their wares into New York. Having made the decision to seek profits by participating in such ventures, the Banks must comply with validly issued court orders and subpoenas. *See First Nat'l City Bank of New York v. I.R.S.*, 271 F.2d 616, 620 (2d Cir. 1959) ("If the Bank cannot, as it were, serve two masters and comply with the lawful requirements both of . . ., perhaps it should surrender to one sovereign or the other the privileges received therefrom.").[19]

### G.  Good Faith of the Party Resisting Discovery

The Banks' good faith in refusing to produce documents is questionable. The PI Order contains no geographical limitation on its provisions requiring third party financial institutions to

---

[19]  Contrary to the Banks' assertions, *see* Joint Ltr. at 19-20, the *amicus curiae* submission of the Federal Reserve Bank of New York ("FRB") in *Samsun Logix Corp. v. Bank of China*, Index No. 105262/2010 (N.Y. Sup. Ct. 2010), does not support their argument. The concerns raised by the FRB in the *Samsun* case, which involves post-arbitration enforcement of a judgment, are not present here. The FRB's primary concern was that "[t]here is no New York connection to the . . . dispute." *See* Weigel Decl. Ex. 38, at 4. Plaintiffs' principal place of business and flagship store is in New York, the counterfeit goods were purchased in and shipped to New York, and the Court has jurisdiction over all of the relevant parties— Plaintiffs, Defendants and the Banks.

produce "all records," yet none of the Banks sought modification of the PI Order.  In *Milliken*, as here, the bank acted in "bad faith" by "repeated[ly] fail[ing] . . . to produce the requested discovery" in violation of Court orders.  2010 WL 5187744, at *11.  The Banks' failure to seek relief from a valid and binding court order in the present case in the five months since receiving notice of it "can only be interpreted as evidence of bad faith."  *Id.*  Further, there is no evidence that the Banks sought permission—either from the account holders or the Chinese government— to comply with the PI Order or the Subpoenas.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request an order: (i) compelling the Banks to timely produce all documents called for by the PI Order and Subpoenas, regardless of location of said documents; and (ii) awarding such other relief as the Court may deem just and proper.

Dated: New York, New York
　　　May 3, 2011

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ Robert Weigel
　　　　Robert L. Weigel (RW 0163)
　　　　Howard S. Hogan (HH 7995)
　　　　Jennifer C. Halter (JH 7032)
　　　　Anne M. Coyle (AC 3158)

200 Park Avenue, 51st Floor
New York, New York 10166-0193

Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Plaintiffs Tiffany (NJ) LLC*
*and Tiffany and Company*