UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

TIFFANY (NJ) LLC and TIFFANY AND
COMPANY,

                Plaintiffs,

       v.

QI ANDREW, GU GONG, SLIVER DENG, and
KENT DENG, all d/b/a TIFFANYSTORES.ORG,
FASHION STYLE and STORESORG; ABC
COMPANIES; and JOHN DOES,

                Defendants.

—————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

10-cv-9471

**MEMORANDUM OF LAW OF THIRD PARTY CHINA MERCHANTS BANK
IN OPPOSITION TO THE PLAINTIFFS' MOTION TO COMPEL THE
PRODUCTION OF DOCUMENTS**

Dwight A. Healy
Marika Maris (of counsel)
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Tel:  (212) 819-8200

# TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    1.    Procedural History ..........................................................................................3

    2.    CMBNY Does Not Have Control Over Documents in China .........................5

    3.    Chinese Law Prohibits Disclosure of the Information Plaintiffs' Seek.........................5

ARGUMENT ........................................................................................................................6

    A.    The Motion to Compel Should Be Denied Because Tiffany Has Not Demonstrated that CMBNY Has Access To or Control Over Documents Located in China ..........................................................................................6

    B.    Applying The Subpoena Extraterritorially Would Create A Conflict With Chinese Law ..............................................................................................11

    C.    The Subpoena Should Not Be Applied Extraterritorially ..............................24

    D.    Even If There Were Grounds To Compel Production Of Information In China, Tiffany Must Indemnify CMB For Any Expense Resulting Therefrom ......................25

CONCLUSION .....................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A., No. 90 Civ. 2370 (JFK) (FM), 2000
    WL 713057 (S.D.N.Y. June 2, 2000) ......................................................................23

Cooper Indus. Inc. v. British Aerospace, Inc., 102 F.R.D. 918 (S.D.N.Y. 1984)...........................10

Dietrich v. Bauer
    No. 95 Civ. 7051 (RWS), 2000 WL 1171132 (S.D.N.Y. Aug. 16, 2000)..........................11, 17

Fid. Partners, Inc. v. Philippine Exp. & Foreign Loan Guarantee Corp., 921 F. Supp. 1113
    (S.D.N.Y. 1996)....................................................................................................9

First National v. IRS, 271 F.2d 616 (2d Cir. 1959) ....................................................8, 23

Gucci Am., Inc. v. Curveal Fashion, No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639
    (S.D.N.Y. Mar. 8, 2010) ....................................................................................11, 12, 22

Huang v. Advanced Battery Technologies, Inc., 09 CV 8297 (HB) (S.D.N.Y. March 8, 2011) ....20

Hudson v. Hermann Pfauter GmbH & Co., 117 F.R.D. 33 (N.D.N.Y. 1987)..........................16, 17

Hunter Douglas, Inc. v. Comfortex Corp., No. Civ. A. M8-85 (WHP), 1999 WL 14007
    (S.D.N.Y. Jan. 11, 1999)........................................................................................10

In re Equitable Plan Co., 185 F.Supp 57 (S.D.N.Y. 1960) ......................................................10, 11

In re Grand Jury Proceedings Bank of Nova Scotia, 740 F.2d 817 (11th Cir. 1984) ....................23

In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig., No. 05-MD-1720
    (JG)(JO), 2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010) ..........................................12

In re Vivendi Universal, S.A. Sec. Litig., No. 02 Civ. 5571 RJH, 2004 WL 3019766
    (S.D.N.Y. Dec. 30, 2004) ......................................................................................16

Ings v. Ferguson, 282 F.2d 149 (2d Cir. 1960)....................................................................9, 12, 22

Intercont'l Credit Corp. v. Roth, 595 N.Y.S.2d. 602 (N.Y. Sup. Ct. 1991) ..............................17, 23

Knight v. Ford Motor Co., 615 A.2d 297 (N.J. Super. Ct. 1992) ....................................................17

Linde v. Arab Bank, PLC, 262 F.R.D. 136 (E.D.N.Y. 2009)...........................................7, 10, 16, 22

Milliken & Co. v. Bank of China, No. 09 Civ. 6123 (LMM), 2010 WL 5187744 (S.D.N.Y.
    Dec. 6, 2010).................................................................................................11, 18, 19

Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517 (S.D.N.Y. 1987).............12, 22, 23

Morrison v. Nat'l Austl. Bank, 130 S. Ct. 2869 (2010).............................................................14, 24

Motorola Credit Corp. v. Uzan, 388 F.3d 39 (2d Cir. 2004) ...........................................................12

New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.
    233 F.R.D. 259 (N.D.N.Y. 2006)..........................................................................................7, 10

Norex Petroleum Ltd. v. Access Indus., Inc., et al., 631 F.3d 29 (2d Cir. 2010) ..........................25

Oriental Commercial & Shipping Co., Ltd. v. Rosseel N.V., 125 F.R.D. 398 (S.D.N.Y. 1989) ....14

Orlich v. Helm Bros., 160 A.D.2d 135, 560 N.Y.S.2d 10 (1st Dep't 1990)....................................17

Richbell Info. Servs. v. Jupiter Partners L.P., 816 N.Y.S.2d 470 (1st Dep't 2006) ........................13

Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468 (9th Cir. 1992)..............................13

Samsun Logix Corp. v. Bank of China, et al., Index. No. 105262/10 (N.Y. Sup. Ct. May 12,
    2011). ..............................................................................................................................14, 23, 24

Securities and Exchange Commission v. Banca Della Svizzera Italiana, 92 F.R.D. 111
    (D.C.N.Y. 1981)...........................................................................................................................22

Sequa Corp. v. Gelmin, No. 91 Civ. 8675 (DAB), 1995 WL 404726
    (S.D.N.Y. July 7, 1995) ........................................................................................................13, 14

Societé Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of
    Iowa, 482 U.S. 552 (1987).............................................................................................................9

Telebrands Corp. v. HM Import USA Corp., No. 09-CV-3492, 2010 WL 814205 (E.D.N.Y.
    March 3, 2010)........................................................................................................................14, 15

Trade Dev. Bank v. Cont'l Ins. Co., 469 F.2d 35 (2d Cir. 1972) ..............................................12, 22

U.S. v. First Nat'l Bank of Chi., 699 F.2d 341 (7th Cir. 1983) .................................................12, 23

U.S. v. First Nat'l Bank, 321 F.2d 14 (2d Cir. 1963), rev'd on other grounds, 379 U.S. 378
    (1965)..............................................................................................................................................8

U.S. v. First Nat'l City Bank, 396 F.2d 897 (2d Cir. 1968)..............................................................8

Zenith Electronics v. Vizio
    Misc. No. M8-85, 2009 WL 3094889 (S.D.N.Y. Sept. 25, 2009).........................................7, 10

## STATUTES AND RULES

15 U.S.C. § 1116(d)(1)(A)...............................................................................................................13

Fed. R. Civ. P. 34 ..............................................................................................................5

Fed. R. Civ. P. 45 ......................................................................................................5, 25

Restatement (Third) of Foreign Relations Law of the United States § 441 ....................................12

Restatement (Third) of Foreign Relations Law of the United States § 442 ....................................12

## OTHER AUTHORITIES

Fang Shen, *Are You Prepared for this Legal Maze? How to Serve Legal Documents, Obtain Evidence, and Enforce Judgments in China*, 72 UMKC L. Rev. 215 (2003) ............................19

Stephanie A. Scharf et al., Discovery of Documents and People Abroad, PLIREF-PLL § 14.3 (2011) ..........................................................................................................................19

## PRELIMINARY STATEMENT

By its motion, Tiffany[1] seeks to compel production of records (if any) located in China that relate to bank accounts at the head office or Chinese branches of China Merchants Bank ("CMB" or the "Bank"), a bank organized under and subject to the laws of the People's Republic of China ("PRC" or "China").  Evidently frustrated that it cannot readily recover in the United States for its claimed injuries from Defendants, and unwilling to go to China (where it has substantial operations) to enforce its rights, Tiffany has targeted Chinese banks with whom Defendants may have had accounts in the hopes that by placing these banks in the untenable position of either complying with Tiffany's overbroad discovery demands or suffering civil and criminal penalties in China, Tiffany might extract some recovery from them.

Tiffany mistakenly attempts to strengthen its position by suggesting that CMB has engaged in some form of wrongdoing or bad faith, and is complicit in the trademark violations attributed to the Defendants.  The Complaint does not name CMB as a defendant, and does not allege any wrongdoing by, or seek any relief against, CMB.  The bald statement that the Bank either "knew that the U.S. Dollars they were processing were the proceeds of an illegal counterfeiting operation and did not care" or were "turn[ing] a blind eye" to Defendants' actions (Pl. Mem. at 3) is unsupported by any allegation of fact (and is not true).[2]  Similarly unfounded

---

[1]     The following abbreviations are used herein:  the New York branch of CMB ("CMBNY"); Tiffany (NJ) LLC, and the other plaintiffs ("Plaintiffs" or "Tiffany"); Memorandum of Law in Support of Plaintiffs' Motion to Compel The Production of Documents From Third-Parties Bank of China, China Merchants Bank, and Industrial and Commercial Bank of China, dated May 3, 2011 ("Pl. Mem."); defendants in this action ("Defendants"); Bank of China ("BOC") and Industrial and Commercial Bank of China ("ICBC," and together with "BOC" and "CMB," the "Chinese Banks"); Declaration of Dwight A. Healy, dated May 17, 2011, submitted in opposition ("Healy Dec."); Declaration of Zhipan Wu, dated May 17, 2011, ("Wu Dec."); Declaration of Richard N. Pagnotta, Sr., dated May 17, 2011 ("Pagnotta Dec."); Declaration of Robert L. Weigel, dated May 3, 2011 ("Weigel Dec."); Declaration of Donald Clarke, dated January 3, 2011 ("Clarke Dec. II") (Weigel Dec. Ex. 22); Declaration of Donald Clarke, dated June 27, 2008 ("Clarke Dec. I") (Healy Dec. Ex. B); Preliminary Injunction and Order Authorizing Expedited Discovery, dated January 25, 2011 ("PI"); Subpoena, dated January 26, 2011 ("Subpoena"); Complaint, dated December 20, 2010 ("Complaint"); Transcript of April 19, 2011 Oral Argument ("Tr."); Joint Letter from Tiffany, BOC, CMB, and ICBC to Judge Pauley, dated March 25, 2011 ("Jt. Letter").

[2]     The Bank is not, as Tiffany seems to suggest, under an affirmative obligation to determine whether or not

is Tiffany's claim that CMB "accept[ed] hundreds of thousands of U.S. Dollars in wire transfers from the U.S. on behalf of" the individual defendants charged with trademark infringement.  Pl. Mem. at 3.  Plaintiff cites a single wire transfer of $2,000 going from one of the Defendants' PayPal, Inc. ("PayPal") accounts to CMB.  Jt. Letter at 4-5.  The fact, if it is one, that *Defendants* performed illegal acts in the U.S. (Pl. Mem. at 2) does not mean that an innocent nonparty such as CMB should be forced to violate the laws of its home jurisdiction.[3]

Equally wrong is Tiffany's contention that in responding to the Subpoena the Bank "refused to produce even the most basic information."  Pl. Mem. at 2.  CMBNY, the branch on which the Subpoena was served, promptly searched for responsive information to the Subpoena in New York, timely served appropriate Rule 45 objections and responses (the "Response"), and advised Plaintiff that it had not been able to identify any accounts of Defendants located at the branch or any documents called for by the Subpoena based on the information provided.

Plaintiffs' motion should be denied for a number of reasons.  First, Tiffany has failed to carry its burden of showing that CMBNY has "possession, custody, or control" over customer records held at CMB's office in China.  In fact, employees of CMBNY do not have access to or control over such records, and, under the relevant case law, CMBNY therefore lacks the necessary control.

Second, while Tiffany continues to assert that the records it seeks are "absolutely critical" (Pl. Mem. at 2), Tiffany has not shown how such records would assist it in prosecuting its claims against Defendants.  Tiffany admits that PayPal "was the sole method of payment accepted by Defendants for the counterfeit goods sold through their websites" (Pl. Mem. at 4), admits that PayPal provided Tiffany with any records associated with Defendants' PayPal accounts (id. at n.

---

any of its customers were selling products outside of China that violated the trademark laws of some other nation.

[3]      CMB does not, as Plaintiffs argue, contend that parties who are engaged in trademark infringement should be free from responsibility for their acts.  Pl. Mem. at 3. CMB is not a party here and takes no position on the merits.

2), and admits that it has obtained from GoDaddy.com ("GoDaddy") information about other websites used by Defendants.  Id. at n. 5.  Tiffany's speculation that getting a mass of account records from CMB will somehow provide it with essential information is not a legitimate basis to order discovery from CMB in the circumstances present here.

Third, it is undisputed that Chinese law prohibits disclosures of account information located in China, a fact demonstrated by the plain terms of the relevant provisions of the Chinese Commercial Bank Law ("CBL") and related regulations, and Chinese Criminal Law, all of which are cited and discussed in the accompanying Affidavit of Professor Zhipan Wu, one of the drafters of the CBL.  After denying in earlier litigation that Chinese law prohibits disclosure by Chinese banks, Plaintiffs' expert now admits that Chinese law in fact prohibits disclosure.

Under these circumstances, the case law does not support an order compelling CMB to proffer records in violation of Chinese law especially where, as here, evidence can be obtained through the Hague Convention on the Taking of Evidence Abroad ("Hague Convention").  Tiffany's strained argument that a Hague Convention request would be "futil[e]" (Pl. Mem. at 17) has just been further undermined by a recent change in the State Department website on which Tiffany relied for its argument.  The current, updated, website contains no suggestion that Chinese authorities will not give effect to a Hague Convention request.

## STATEMENT OF FACTS

### 1.    Procedural History

On December 21, 2010, Tiffany filed an unverified complaint, in which it asserts claims for trademark infringement.  Tiffany seeks injunctive relief against Defendants, including an order prohibiting them from continued violation of Plaintiffs' trademarks, and recovery of profits and damages.  Complaint at pp. 24-29.  On the same day that Tiffany filed the Complaint, the

Court issued a temporary restraining order, and on January 3, 2011, the Court signed the PI, which authorized expedited discovery from Defendants and third parties.  Weigel Dec. ¶¶ 3, 8.

On January 26, 2011, Tiffany served a copy of the PI and a Rule 45 Subpoena on CMBNY in New York.  Weigel Dec. Ex. 11.  The Subpoena included eight broad requests for information, all seeking information about any assets that the Defendants might have.  Although the Plaintiffs assert that the requests seek "documents necessary for determining the scope of Defendants' counterfeiting business" (Pl. Mem. at 4), the requests do not seek any information about the alleged counterfeiting activities of the Defendants.  The requests seek a broad range of information about Defendants' past and present accounts and assets, e.g., "[a]ll documents and internal or external communications concerning Defendants or Defendants' accounts, including, without limitation, all letters, emails, phone messages and notes of discussions with Defendants or any representative or purported representative of Defendants, and credit checks or investigations performed on Defendants or their principals," "[a]ll documents concerning any open or closed loans or mortgages relating to any of the Defendants . . . ," and "[a]ll documents relating to any cashier's, bank, or traveler's checks and money orders purchased by any of the Defendants . . . ."  Weigel Dec. Ex. 11.  By a January 28, 2011 letter, White & Case advised that CMBNY "ha[d] no accounts or assets for the defendants listed in the PI and identified in your letter."  Healy Dec. Ex. A.  The letter also stated that CMBNY would serve "objections and responses to the Subpoena within the time called for by the Subpoena."  Id.

CMBNY's timely Response stated that it found no information about accounts of Defendants and had insufficient information to determine if it had any records about wire transfers involving Defendants.  The Response also objected to production of any documents that were not under the control of CMBNY, advised that CMBNY did not have control over

information located in any other office of CMB, and further objected to the extent that producing documents "would violate any applicable domestic or foreign law, including the banking, commercial and criminal law of the People's Republic of China."  Weigel Dec. Ex. 14.[4]

### 2.    CMBNY Does Not Have Control Over Documents in China

CMBNY does not have actual control over the records Plaintiffs' seek, because CMBNY does not have any hard copy records relating to any accounts maintained in China, and CMBNY's computer system is not linked with the computer systems of any of the non-U.S. branches or head office of the bank.  See Pagnotta Dec. ¶¶ 2-3.  Due to these separate computer systems, employees of CMBNY do not have access to records, including customer account records, that are located in the computer systems of the head office or non-U.S. branches of CMB.  Id. at 3.  In addition, no officer or employee of CMBNY has the authority or ability to direct employees at the other branches or the head office of the bank.  Id. at 6.

### 3.    Chinese Law Prohibits Disclosure of the Information Plaintiffs' Seek

It is undisputed that Chinese law prohibits the disclosure that Tiffany seeks here.  Under the relevant provisions of the CBL and related regulations, CMB employees would be subject to monetary sanctions and CMB would face civil liability to its customer(s) if it were to provide information about assets located in China in response to the Subpoena or PI.  See Wu Dec. ¶¶21-26.  In addition, China has recently adopted Section 253(A) of its Criminal Law which makes employees of a Chinese bank as well as the bank itself subject to criminal sanctions – including

---

[4]         The fact that CMBNY did not "apply to the Court to seek relief from the terms of the PI Order" (Pl. Mem. at 1) is irrelevant, because CMBNY properly provided timely objections and responses to the Subpoena, issued under Rule 45.  Such a subpoena is the only mechanism set forth in the Rules for obtaining documents from a non-party.  See Fed. R. Civ. P. 34 (c) ("As provided in Rule 45, a nonparty may be compelled to produce documents and tangible things or to permit an inspection.").  Under Rule 45 the subpoena recipient may object and the party serving the subpoena then must move to compel if it wishes to challenge the objections.   Fed. R. Civ. P. 45(c)(2)(b) ("A person [receiving a subpoena] may serve . . . a written objection to [producing the documents requested]. . . [T]he serving party may [then] move the issuing court for an order compelling production. . . .").  The federal rules do not authorize a court to override the procedures set forth in Rule 45 with respect to discovery from a non-party.

imprisonment – for disclosure of individual customer account information.  See id. ¶¶ 27-8.

In its papers, Tiffany relies on an expert opinion from Professor Donald Clarke in an action brought by Gucci America, Inc. and others ("Gucci II").  However, in 2008, Professor Clarke submitted a declaration in an earlier case ("Gucci I") in which he addressed, among other questions, "the extent to which Chinese law prohibits the Bank of China from complying with the order of  a United States court to disclose information about customer accounts, . . ."  Clarke Dec. I ¶ 2 (Healy Dec. Ex. B).  After advising the court that in addition to reviewing the submissions made by BOC in that case, he had "conducted independent research and have cited relevant sources in the text of my declaration," he opined that "Chinese law, at least insofar as its provisions cited by the BOC, does not prohibit the BOC from complying with the order of a United States court," without mentioning any of the provisions, cited in Professor Wu's Declaration in this case, that demonstrate such prohibitions.  Id. ¶ 10, 11.  In response to a Declaration from Professor Wu in the subsequent Gucci II case, Professor Clarke reluctantly conceded that in fact Chinese law did prohibit such disclosure.  Clark Dec. II ¶ 12 (Weigel Dec. Ex. 22).  In an effort to explain his opinion in Gucci I he argued that in the earlier case, BOC "bore the burden of proving the prohibition" (id.) and therefore Professor Clarke was under no obligation to tell the court that in fact Chinese law did prohibit disclosure in response to a U. S. court order, the very question (quoted above) on which he was purporting to offer an opinion to the court.  The fact Tiffany relies on this "leading" expert on Chinese law (Pl. Mem. at 17, 21) and cannot offer an opinion from a more forthcoming and less disingenuous academic, is telling.

## ARGUMENT

### A.     The Motion to Compel Should Be Denied Because Tiffany Has Not Demonstrated that CMBNY Has Access To or Control Over Documents Located in China

It is fundamental that a Rule 45 subpoena only requires production of documents that are

in the "possession, custody, or control" of the recipient.  Plaintiffs, as the party moving to compel, have the burden of showing that the documents are in the control of CMBNY, and cannot do so.  See Linde v. Arab Bank, PLC, 262 F.R.D. 136, 141-2 (E.D.N.Y. 2009); New York ex rel. Boardman v. Nat'l R.R. Passenger Corp., 233 F.R.D. 259, 268 (N.D.N.Y. 2006) ("The burden of establishing control . . .  rests with the demanding party").

The cases do not require the entity claiming that it does not have control over the documents requested to be "separately incorporated" from the entity alleged to have the documents, as Plaintiffs imply (Pl. Mem. at 5); courts look at the reality of whether the entity from which discovery is sought has actual control over the records.   See, e.g., Boardman, 233 F.R.D. at 268 (refusing to compel production of documents of one state agency (OSC) through another state agency (DOT) where court found that "DOT does not have access or control over OSC records . . . nor the practical ability to [access] those underlying documents").

CMBNY does not have hard copies of account records relating to accounts located with CMB branches or the head office in China, and it does not have electronic access to such records.  See Pagnotta Dec. ¶¶ 2-3.  As a result, employees of CMBNY do not have control over records, including customer account records, located in the computer systems of the head office or non-U.S. branches of CMB.  Id. ¶ 3; see Zenith Electronics v. Vizio, Misc. No. M8-85, 2009 WL 3094889, at *2 (S.D.N.Y. Sept. 25, 2009) (subsidiary lacked control over documents in possession of parent where subsidiary and parent maintained separate hard-copy and electronic archives).  No employee of CMBNY has the authority or ability to direct employees at the other branches or the head office of CMB to produce documents located abroad.  Pagnotta Dec. ¶ 6.[5]

---

[5]      We also note that regardless of the fact that a customer of CMB can remotely access its account information through a computer (Pl. Mem. at 14), CMBNY does not have the ability to access or view in New York any records held at CMB's head office or branches in China relating to the customer's account.  See Pagnotta Dec.

Contrary to Plaintiffs' apparent position that the branch's lack of control over records located in China is irrelevant, the Second Circuit has made clear that the actual control of foreign records by the branch in New York is a threshold issue in deciding whether to compel production, even when the office located here is part of the same legal entity as the office located abroad holding the documents in dispute.  In <u>First National</u> v. <u>IRS</u>, 271 F.2d 616, 618 (2d Cir. 1959), the court sustained a subpoena served on Citibank's head office in New York calling for production of documents located in its Panama City branch, because, the Second Circuit found, the district court had correctly found "actual, practical control by the Bank over its Panamanian branch records."  <u>See also</u> <u>U.S.</u> v. <u>First Nat'l Bank</u>, 321 F.2d 14, 22-23 (2d Cir. 1963) (noting that <u>First National</u> case involved "a question of whether the main office had sufficient control over its branch to order the return of certain records for examination . . ."), <u>rev'd on other grounds</u>, 379 U.S. 378 (1965).  The predicate to that conclusion was evidence that officers in the head office had the authority to direct employees of the branch to send records to the head office: "Any officer or agent of the corporation who has power to cause the branch records to be sent from a branch to the home office for any corporate purpose surely has sufficient control to cause them to be sent on when desired for a governmental purpose. . . ."  <u>First Nat'</u>, 271 F.2d at 618. Reinforcing the point, the court of appeals noted that the legislative objective of the governing Federal Reserve Act was "that branch banks 'shall be closely controlled by home institutions' . . . ."  <u>Id.</u> at 619.  The same recognition that actual control of offshore records by the office located in New York was a sine qua non for production is set forth in another decision by the Second Circuit in another case involving Citibank issued a decade later.  <u>See</u> <u>U.S.</u> v. <u>First Nat'l City Bank</u>, 396 F.2d 897, 898 n.3 (2d Cir. 1968) ("Citibank does not contend that records located at

---

¶¶ 2-3.  The records that Tiffany seeks here (should any exist) can only be accessed through the computer system in China.

its Frankfurt branch are not within the possession, custody or control of the head office").

The fundamental distinction between the relationship of a New York head office and a foreign branch, on the one hand, and a New York branch of a non-U.S. bank and its foreign head office and sister branches, on the other, was expressly recognized by the Second Circuit in Ings v. Ferguson, 282 F.2d 149, 151-152 (2d Cir. 1960), where the court of appeals, distinguishing the 1959 First National decision stated:   "In National City the subpoena was served at the main office in New York and required the production of records of a national bank located in its Panama branch.  Sustaining the subpoena, the court said, 'Any officer or agent of the corporation who has power to cause the branch records to be sent from a branch to the home office for any corporate purpose, surely has sufficient control to cause them to be sent on when desired for a governmental purpose properly implemented by a subpoena under 26 U.S.C. § 7602.' . . . There may be a serious question as to whether the manager of a New York Agency would have the power to direct the officers of a Canadian bank to send Canadian branch bank records out of the country in violation of a prohibitory statute . . . "[6]  See also Fid. Partners, Inc. v. Philippine Exp. & Foreign Loan Guarantee Corp., 921 F. Supp. 1113, 1120 (S.D.N.Y. 1996) (noting in context of asset restraint that the evidence showing, among other things, that the New York branch of a Philippine bank had neither "control nor management direction over PNB's Manila head office" undermined argument for extraterritorial application of restraining notice).

In short, the Second Circuit authorities involving banks make clear that the inquiry as to whether an office located in New York can be compelled to produce documents from the foreign

---

[6]      Tiffany attempts to distinguish Ings on the ground that it predates Societé Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa, 482 U.S. 552 (1987), but that case did not address a third party subpoena nor the relationship between a bank branch and foreign head office; nor does it purport to overrule Ings.  Nor does the fact that the court in Ings did not decide the case on basis of the control issue undermine CMB's argument here; Ings upheld a denial of a motion to compel on other grounds, but the opinion makes clear, as do the three First National cases cited in text, that the question of whether an office located here has control over the documents in the head office or branch abroad is a central inquiry.

head office is akin to the inquiry as to whether subsidiary can be compelled to produce documents in the control of a parent entity, which requires an examination of whether in fact the subsidiary (local office) has actual control over the documents or can compel the parent (head office) to produce them.   See Linde, 262 F.R.D. at 141; Zenith, 2009 WL 3094889, at *2; Boardman, 233 F.R.D. at 268.[7]   The New York branch of CMB does not have the "actual, practical control" over CMB's head office that would support a finding that the branch has possession, custody or control of documents at CMB's head office or Chinese branches.

Plaintiffs cite no court of appeals case that addresses the branch/head office distinction, and the few district court cases it cites are inapposite.  In re Equitable Plan Co., 185 F.Supp 57 (S.D.N.Y. 1960), the only case involving the question of whether a local office of a foreign bank could be compelled to produce documents from the foreign office, there was no suggestion that the bank had demonstrated, as CMBNY does here, that the New York office did not control the foreign head office.  Indeed the court noted that in cases where a branch of a bank has an "arm's length relationship" with its home office or other branches, the branches of the bank could be treated as independent entities.  Id. at 59.  CMBNY here has established an "arm's length relationship" with the head office and other branches of CMB with respect to documents – they maintain separate computer systems and CMBNY does not have access to customer records at the head office or other branches of CMB.  In any event, the Equitable opinion was issued the month before Ings and to the extent that it rests on the premise that the actual, practical control of a New York branch over a foreign head office is irrelevant, it is inconsistent with the Second

---

[7]      The cases Tiffany cites in which a court ordered discovery of a company's documents through its affiliate were cases in which the U.S. company could in fact cause the non-U.S. affiliate to comply with the subpoena at issue.  Hunter Douglas, Inc. v. Comfortex Corp., No. Civ. A. M8-85 (WHP), 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999) ("During oral argument, Blinds to Go's counsel acknowledged that . . . Blinds to Go (US), Inc. could cause its corporate parent in Canada to comply with a lawful subpoena and produce documents in this district"); Cooper Indus. Inc. v. British Aerospace, Inc., 102 F.R.D. 918, 920 n.2 (S.D.N.Y. 1984) (requiring defendant to produce documents where defendant did not show that it did not have control over documents at its affiliate).

Circuit authority and not good law.[8]  Dietrich v. Bauer, No. 95 Civ. 7051 (RWS), 2000 WL 1171132 (S.D.N.Y. Aug. 16, 2000), and Gucci Am., Inc. v. Curveal Fashion, No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639 (S.D.N.Y. Mar. 8, 2010), are also distinguishable.  The issue addressed in both cases was whether a parent bank could order a foreign subsidiary to produce documents.  Neither focused on whether, let alone ruled that, a branch could be compelled to produce documents from the head office, and neither addressed the Second Circuit cases discussed above.  In addition, in both cases there was no argument that the parent could not order the production of documents from the subsidiary.  See Dietrich, 2000 WL 1171132, at *4-5 (ordering parent bank to produce documents located at non-U.S. subsidiary where parent did not dispute that it could order subsidiary to produce the documents); Curveal, 2010 WL 808639, at *3 (finding control where there was no indication that parent disputed control over subsidiary). [9]

B.    **Applying The Subpoena Extraterritorially Would Create A Conflict With Chinese Law**

As stated by Professor Wu, a drafter of the CBL, Chinese Banks are prohibited from disclosing information about, or freezing or turning over, customer deposits without customer consent or authorization from Chinese governmental authorities.  Wu Dec. ¶ 16.  None of the Defendants alleged to be a customer of CMB has consented to the disclosure of confidential information.  Absent such consent or an order from a Chinese "Competent Organ" (which does not include a U.S. court) directing disclosure, CMB would be subject to monetary sanctions, and

---

[8]    Also of note, Equitable Plan found that where disclosure would violate non-U.S. law (in that case, Cuban law), as it would here, that disclosure should be denied.  Id. at 60.

[9]    Tiffany's heavy reliance on the MyReplicaHandbag.com litigation, which involved BOC and which we understand is addressed in more detail in BOC's opposition to the motion, is misplaced.  There is no decision finding that the bank had to produce documents in China in that case.  We also note that it was in that case that Gucci relied on the misleading declaration from Professor Clarke described above.  In any event, CMB was not a party to that case and BOC's actions are not attributable to CMB, and provide no basis for ruling against CMB in this case.  See Pl. Mem. at 9.  Similarly in Milliken & Co. v. Bank of China, No. 09 Civ. 6123 (LMM), 2010 WL 5187744, at *8 (S.D.N.Y. Dec. 6, 2010), the branch did not argue or demonstrate that it did not have control over documents located at the head office or other branches in China.

would also face civil liability to its customer(s), if it were to provide information about assets located in China in response to the Subpoena or PI.  See id. ¶¶ 16, 21-6.  Under the recently adopted Section 253(A) of the Criminal Law, employees of a Chinese bank as well as the bank itself would be subject to criminal sanctions – including imprisonment – for disclosure of individual customer account information.  See Wu Dec. ¶¶ 27-8.

It is well established that a U.S. court should not order a foreign party to take action in violation of the laws of its home jurisdiction.  See Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 441(1) ("In general, a state may not require a person (a) to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national"); Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60 (2d Cir. 2004).  The bar of foreign law is, in and of itself,  a substantial reason to deny discovery, and consistent with that rule courts in this Circuit have repeatedly declined to order the non-U.S. head offices and branches of a foreign bank to produce documents in contravention of the secrecy laws of their home jurisdictions.  See Trade Dev. Bank v. Cont'l Ins. Co., 469 F.2d 35, 41 (2d Cir. 1972); Ings, 282 F.2d at 151-152; Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 530 (S.D.N.Y. 1987).  Accord, U.S. v. First Nat'l Bank of Chi., 699 F.2d 341, 345 (7th Cir. 1983).

In determining whether to order discovery despite a foreign law prohibition, recent district court decisions have adopted the discovery-specific balancing test of Restatement § 442(1)(c), which sets forth seven principal factors as relevant to any comity analysis.  See In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig., No. 05-MD-1720 (JG)(JO), 2010 WL 3420517, at *6-7 (E.D.N.Y. Aug. 27, 2010); see also Curveal, 2010 WL 808639, at *8 (Pl. Mem. at 15).  All of those factors weigh against ordering discovery here.

      1.      Importance of the information requested.  Tiffany asserts that the documents

sought are "critical" to this action (Pl. Mem. at 11),[10] arguing that absent discovery from CMB and other Chinese banks it "will have no recourse to the remedies allowed by the U.S trademark law, . . ., and it will be impossible to determine the full size of and scope of Defendants' operations."  Neither point is persuasive.

Plaintiff itself points out that the websites used by Defendants are hosted by GoDaddy, a U.S. entity, from which Tiffany has already obtained information about other sites used by Defendants.  Pl. Mem. at n.5.  It also states that PayPal is the exclusive means of payment on the websites identified, and Plaintiff clearly has access to PayPal records.  Id. at n. 2.  Plaintiff makes no showing that CMB has (or why it would have) any fuller information as to the scope of Defendants' activities than Plaintiff already has.

Nor does it (or can it) show that the information sought is necessary for pre-judgment enforcement of any right conferred by the Lanham Act.  Section 1116(d)(1)(A) of the Lanham Act (Pl. Mem. at 12) provides for the seizure of the *counterfeiters*' records "documenting the manufacture, sale, and receipt of things involved" with the counterfeiting operation.  Pl. Mem. at 12.  Again there is no suggestion that CMB has (or has any reason to have) such records.[11]  None of the requests in the Subpoena seek documents related to the counterfeiting operation; the Subpoena seeks documents about the Defendants' *assets*.  See Id. at 4-5; Weigel Dec. Ex. 11.

As Plaintiffs all but concede, the case law is clear that discovery concerning an opposing party's assets is only permitted if such discovery is relevant to a claim, and cannot be justified on the basis that the information requested might be relevant to judgment enforcement.  See Sequa

---

[10]     As Tiffany's language acknowledges, in the circumstances present here, in order to justify discovery of records in another country from a third party, the information sought should not only be relevant, but must be "crucial" to the litigation.  Richbell Info. Servs. v. Jupiter Partners L.P., 816 N.Y.S.2d 470, 475 (1st Dep't 2006); see also Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1475 (9th Cir. 1992) (finding that "[w]here the outcome of litigation 'does not stand or fall on the present discovery order,' or where the evidence sought is cumulative of existing evidence, courts have generally been unwilling to override foreign secrecy laws.").

[11]     Regulatory requirements calling for the bank to maintain customer bank account and transaction records (Pl. Mem. at n.7) hardly mean that the banks have manufacturing records of their customers.

Corp. v. Gelmin, No. 91 Civ. 8675 (DAB), 1995 WL 404726 at *2 (S.D.N.Y. July 7, 1995);

Oriental Commercial & Shipping Co., Ltd. v. Rosseel N.V., 125 F.R.D. 398 (S.D.N.Y. 1989).[12]

     Tiffany tries to support its blatantly asset-directed requests by arguing that it is somehow necessary to enforce the pre-judgment asset restraint set forth in the PI.  But that argument ignores the fact that 1) the PI does not specifically purport to apply extraterritorially and there is no basis for any such asset restraint,[13] and 2) even if the restraint is valid and applies extraterritorially (which it does not), Tiffany would not need or be entitled to discovery of the documents it seeks.  As Sequa makes clear, discovery concerning assets and asset restraint are two separate remedies, with different purposes.  1995 WL 404726, at *2-8 (separately evaluating whether plaintiffs were entitled to asset restraint and discovery about assets, and noting that where plaintiff is concerned that a defendant is concealing assets, the remedy is an attachment or preliminary injunction - not discovery).  Regardless of whether a plaintiff successfully meets the criteria for an asset restraint, a plaintiff is not entitled to prejudgment discovery about a defendant's assets unless the plaintiff can show that the discovery is relevant to the merits of the plaintiff's claims.  Id. at *2.  Just recently, a New York district court, relying on Sequa, found that a plaintiff cannot obtain discovery about a defendant's assets simply on the basis that it is relevant to an asset restraint; the plaintiff still must show that the information sought is relevant to its claims.  Telebrands Corp. v. HM Import USA Corp., No. 09-CV-3492, 2010 WL 814205, 2

---

[12]    Even if this were not true, no such discovery would be appropriate here because Tiffany would not be able to enforce any judgment it obtains against those assets.  As the New York Supreme Court has recently confirmed, the separate entity rule bars a New York judgment creditor from recovering assets held in foreign bank branches by reason of the presence of a New York branch of the bank; and as a result, discovery concerning assets held at such foreign branches is not available even post judgment.  Samsun Logix Corp. v. Bank of China, et al., Index. No. 105262/10 (N.Y. Sup. Ct. May 12, 2011).

[13]    Attached to the Healy Affidavit is a memorandum submitted on behalf of BOC in other litigation outlining the arguments and citing relevant authorities that demonstrate that an extraterritorial asset restraint is impermissible. Without attempting to address each argument that supports that conclusion we note that (1) the Lanham Act by its terms does not apply extraterritorially and, therefore, under the Supreme Court's decision last year in Morrison v. Nat'l Austl. Bank, 130 S. Ct. 2869 (2010), the statute cannot be construed to so apply; and (2) there is no authority – none – that holds that a extraterritorial asset restraint directed to a third party is permissible where it would require a third party to act in violation of the explicit prohibitions imposed by foreign law.

(E.D.N.Y. March 3, 2010).  Where a plaintiff cannot make such a showing, as Tiffany cannot

here, discovery is not warranted.  Id. ("Plaintiff does not contend that in this case, the disputed

discovery is relevant to the parties' claims or defenses. Rather, plaintiff asserts that it needs the

information to determine whether defendants have violated the Preliminary Injunction  . . . the

document drafted by the parties and so-ordered by the Court contains no language whatsoever

regarding plaintiff's entitlement to discovery in order to police defendants' compliance with that

injunction. Nor has plaintiff made any showing to suggest that defendants have transferred or

disposed of any assets for the purpose of concealing them, in violation of the Preliminary

Injunction Order on Consent. Under these circumstances, plaintiff's motion for a compulsion

order is denied.").

        Plaintiffs' claims are to recover damages and Defendants' profits.  Tiffany's own papers

show that it already has access to information relevant to that claim.[14]  Specifically, Tiffany

already has the PayPal records showing any transactions made through the Defendants websites,

see Tr. at 5-6, Pl. Mem. at 5, and the websites state that payment through PayPal is the only

acceptable method of payment.  Tr. at 9, Pl. Mem. at 4.  Thus, Plaintiffs have all the information

they need to pursue their claims against the Defendants - they have records which show how

much money the Defendants made through their websites.  Plaintiffs' only explanation for why

the information they seek from the Chinese Banks is important and necessary is speculation that

the websites might have allowed some other form of payment in the past, or that there may be

others involved in the counterfeiting operation.  Tr. at 9, Pl. Mem. at 2.  There is no authority for

directing a non-party foreign bank to produce documents in contravention of the laws of its home

jurisdiction on the basis of such speculation.

---

[14]        Tiffany does not seek to impose a constructive trust on specific assets, so it cannot justify its document
requests on the ground that it needs information about specific assets.

2.      <u>Degree of specificity of the request</u>.   Contrary to Plaintiffs' assertion that the requests are "narrowly tailored" to target "specific accounts" (Pl. Mem. at 13) the Subpoena defines "documents" broadly, and seeks a long list of records associated with any of the Defendants and any accounts or assets in which they may have an interest (<u>see</u> supra at 4).   The requests are not "target[ed] [to] the specific accounts at the Banks into which funds were wired from the PayPal accounts."   Pl. Mem. at 13.   As such, <u>Curveal</u> and <u>Milliken</u> (<u>id.</u> at 14) are irrelevant.

3.      <u>Origin of information</u>.   Any documents related to accounts of Defendants that may exist in China undoubtedly originated in China; as such this factor weighs in favor of CMB. <u>See</u>, <u>e.g.</u>, <u>Linde</u>, 262 F.R.D. at 150 (refusing to compel production of documents that "originated in or are located in Israel, not the United States").   While Plaintiffs contend that the "funds" originated in the U.S. (Pl. Mem. at 14), any <u>records</u> that the Plaintiffs now seek are located in China.   Thus, the origin of the <u>records</u> is in China.   Pl. Mem. at 5; <u>see also</u> Pl. Mem. at 10 (noting that the issue here is whether to "order discovery of documents and information located abroad").   As noted above, and despite Tiffany's assertions, the New York branch does not have access to or control over records located at the non-U.S. branches and head office of the bank. <u>See</u> Pagnotta Dec. ¶¶ 2-3.[15]

4.      <u>Availability of alternative means of securing the information</u>.   New York federal and state courts have required litigants to make use of the Hague Convention when the foreign country involved is a signatory, as is China (Wu Dec. ¶ 34).   <u>See</u> <u>In re Vivendi Universal, S.A.</u>

---

[15]      Plaintiffs cite to an excerpt from the CMB website which states that a customer can remotely access its account information through a computer, to argue that this somehow means that the documents Tiffany seeks "originate" in New York.   Pl. Mem. at 14.   However, as CMBNY has explained, regardless of whether a CMB customer in China is able to access its account information from his computer, CMBNY does not have the ability to access or view in New York any records held at CMB's head office or branches in China relating to the customer's account.   The records that Tiffany seeks to access here (should any exist) originate from, and are located in, China.

Sec. Litig., No. 02 Civ. 5571 RJH, 2004 WL 3019766, at *1 (S.D.N.Y. Dec. 30, 2004); Hudson

v. Hermann Pfauter GmbH & Co., 117 F.R.D. 33 (N.D.N.Y. 1987); see also Orlich v. Helm

Bros., 160 A.D.2d 135, 144, 560 N.Y.S.2d 10, 15 (1st Dep't 1990); Intercont'l Credit Corp. v.

Roth, 595 N.Y.S.2d. 602, 603 (N.Y. Sup. Ct. 1991).[16]   CMB's nonparty status makes resort to

the Hague Convention particularly appropriate here.   See Orlich, 160 A.D.2d at 144; Roth, 595

N.Y.S.2d. at 603.

Tiffany blithely asserts that the proponent of using the Hague Convention has the burden

of demonstrating that it is appropriate to use the Convention (Pl. Mem. at 16) but the cases are

far from uniform in that view.   See Hudson, 117 F.R.D. at 33 (burden is on party seeking

discovery); Knight v. Ford Motor Co., 615 A.2d 297, 300 (N.J. Super. Ct. 1992) (relying on

post-Aerospatiale Special Commission on the Hague Convention and Hudson to place the burden

on party opposing use of Convention procedures).   Particularly in this case, where none of the

other factors weigh in favor of an order compelling production, Tiffany should bear the burden

of demonstrating that the Hague Convention is not an available method of obtaining the

documents it seeks.   Tiffany cannot meet that burden.[17]

The lynchpin for Tiffany's argument that a Hague Convention request would be "futil[e]"

(Pl. Mem. at 17) was language on a State Department website suggesting that in the past,

requests for information directed to Chinese authorities had not been successful.   That language,

which on its face was long out of date,[18] has just been removed from the State Department

---

[16]   Dietrich, 2000 WL 1171132 at *5, which Plaintiffs cite for the argument that resort to the Hague
Convention is not necessary, did not apply the Restatement test, as the party objecting to discovery had not briefed
the issue.   In addition, no argument was advanced that discovery was prohibited by foreign law.

[17]   Even if Tiffany's view is accepted, however, CMBNY has more than met this burden.

[18]   The language relied on by Tiffany exclusively cited to sources that were over fifteen years old – all dating
back to before China ratified the Hague Convention in 1997.   See Weigel Dec. Ex. 29; Hague Conference on Private
International Law, Status Table, http://www.hcch.net/index_en.php?act=conventions.status&cid=82.   The language
quoted by Tiffany (Pl. Mem. at 17) was taken out of context and ignored other language which made clear that the
circular had not been updated since shortly after China ratified the Hague Convention: "The Convention entered into

website,[19] confirming that the language cited by Tiffany no longer represents the view of the State Department.  See Healy Dec. Ex. E.  The website now simply provides the procedure for seeking evidence from China under the Hague Convention, and in fact recognizes that obtaining evidence in China can only be accomplished through requests under the Hague Convention: "China is a party to the Hague Evidence Convention. Under its declarations to that Convention and subsequent diplomatic communications, China has indicated that taking depositions . . . and obtaining other evidence in China for use in foreign courts may, as a general matter, only be accomplished through requests to its Central Authority under the Convention."  Id.

Tiffany's reliance on the assertions of Professor Clarke is ironic at best.  It was the same "leading U.S. expert[ ] on Chinese law" (Pl. Mem. at 17) who advised this district court three years ago that Chinese law did not prohibit Chinese banks from disclosure of customer information in response to a U.S. court order (Clarke Dec. I  ¶ 11), only to concede earlier this year that in fact it did.  Clarke Dec. II ¶ 12.

Furthermore, both Professor Clarke and the other sources Tiffany cites for its argument that a Hague Convention request would not be promptly honored in China base their conclusion

---

force between the United States and the PRC in August 1998. The United States is seeking clarification from the Government of the People's Republic of China concerning how the Hague Evidence Convention will be applied in China."  Weigel Dec. Ex. 29.  The reality that the language formerly on the site was outdated even before it was removed was confirmed by its omission of developments following China's execution of the Convention.  Since ratifying the Convention, China has been active in implementing it, and in 2003 designated China's highest local courts to directly forward and transfer judicial assistance requests in accordance with the Hague Convention.  See Chinese Judicial Practice in Private International Law: 2006, 8 Chinese J. Int'l L. 715, 717 (2009).

[19]     In light of the removal of the language cited by Tiffany in the former State Department Circular, Tiffany's reliance on cases citing that language is misplaced.  Moreover, the only case cited for the proposition that courts have relied on the former State Department language (Pl. Mem. at 17) is the Milliken decision.  The court in that case addressed a situation where BOC had argued that it had a superior right to funds on deposit in a customer account but then refused to disclose the documents relevant to that issue.  The court's core holding was that in that situation, it was not fair for BOC to refuse production:

> It is one thing to require the party bringing a claim to resort to Convention procedures in order to obtain evidence from another entity necessary to support that claim.  It is entirely a different matter to permit a party to decline to disclose, except pursuant to Convention protocols, information that it expects to use to support the claims or defenses that it has affirmatively asserted. . . . The Bank cannot be permitted to obstruct production of the very documents that it would use to support its case . . .

2010 WL 5187744, at *5. The court's discussion of the Hague Convention, and its misplaced reliance on the outdated State Department circular, was at best an alternative holding.

solely on the outdated (and recently removed) language of the State Department Circular (Milliken, 2010 WL 5187744, at *8; Clark Decl. II at ¶¶ 21-22; Stephanie A. Scharf et al., Discovery of Documents and People Abroad, PLIREF-PLL § 14.3 (2011); Fang Shen, *Are You Prepared for this Legal Maze? How to Serve Legal Documents, Obtain Evidence, and Enforce Judgments in China*, 72 UMKC L. Rev. 215 (2003)[20]), or cite to no authority for their statements (ABA 2008 Report, Weigel Decl. Ex. 30).[21]  Those authorities no longer provide any reliable support for allowing Tiffany to circumvent the Hague Convention.

As the Court is no doubt aware, in recent decades China has experienced an extraordinarily rapid transformation from an agrarian society with no developed legal system to a society with a comprehensive new and modern court system.  The development of China's system is still in progress.  Under the circumstances, the fact that there may not be a body of reported decisions addressing Hague Convention requests is not surprising.  But that does not mean that China will not honor its obligations under the Hague Convention. Wu Dec. ¶¶ 35-6. China has honored dozens of judicial requests for documents, as the Chinese Ministry of Justice website indicates.  See Healy Dec. Ex. C.  The only way to find out for certain whether or not China will honor a Hague Convention request in this case from this Court is for the Court to actually require a plaintiff in Tiffany's position to pursue such a request in China, and to monitor the results of such a request.  When the Hague Convention was first adopted there was no record

---

[20]   The statement in the Fang Shen article that "China apparently retains much discretion in determining what constitutes a 'direct and close connection with the subject matter of the litigation' for purposes of enforcing requests sent to Chinese authorities" is not supported by any citation and the article cites no case where a Hague Convention request directed to China was denied.

[21]   Specifically, the statements in the ABA report which Tiffany cites, that "few litigants in China related international actions successfully compel either documentary or testimonial discovery using Letters of Request under the Hague Convention," and that "lawyers in China have been told informally that the Beijing High Court executes approximately one such request per year," (emphasis added) are completely unsupported, and appear to be based on rumor or gossip.  Moreover, the highlighted language undermines Tiffany's central point that the Chinese courts will not execute Hague Convention requests because it says that the Chinese High Court does in fact execute Hague Convention requests.

of how efficiently or effectively any signatory country would implement it.  The courts properly still used the treaty.

China's objections to the use of Hague Convention requests for pretrial document discovery in its reservations to the Convention (Pl. Mem. at 18-19) do not assist Tiffany.  Thirty-six countries, including the United Kingdom and Switzerland, have also made pretrial discovery reservations under Article 23 of the Hague Convention.  See Hague Evidence Convention, Declarations Reservations, http://www.hcch.net/index_en.php?act=conventions.status&cid=82. Indeed, most countries have made a blanket Article 23 reservation to pretrial discovery.  The language of the Chinese reservation cited by Tiffany merely sets forth the circumstances in which discovery of documents will be effected.  These circumstances are nearly identical to those adopted by other signatories such as the United Kingdom and Switzerland.  Id.  Since courts obviously have been willing to require resort to the Hague Convention to obtain discovery in other countries with Article 23 reservations, there is no reason that China's Article 23 reservation should be an impediment to the use of the Convention for requests directed to China.

Tiffany cites no case in which a Hague Convention request directed to China was not honored by Chinese courts.  In fact, other judges in this district have found the Chinese judicial system to be reliable and have not hesitated to require a party to seek redress in a Chinese court. While Huang v. Advanced Battery Technologies, Inc., 09 CV 8297 (HB) (S.D.N.Y. March 8, 2011), is not specific to a Hague Convention request (Pl. Mem. at n. 10), in that case, Judge Baer expressed confidence that the Chinese court would abide by the letter of Chinese law.  Here, the Court should also trust that a Chinese court would abide by China's commitment under the Hague Convention.  There is no reason to doubt that China would honor its Hague Convention obligations.  See Wu. Dec. ¶¶ 35-6.

As CMBNY has advised Tiffany's counsel, CMBNY is prepared to cooperate with Tiffany in using the Hague Convention.  Indeed, in order to try to address Plaintiffs' concerns, CMB is prepared to take whatever reasonable steps that it can in China, including, if permitted, submitting an application to the Chinese Central Authority in support of any proper request that Plaintiffs submit pursuant to the Hague Convention.

5.      <u>Interests of states</u>.  China has a vital interest in upholding its bank secrecy laws. As Professor Wu explains, China's bank secrecy laws and regulations are "intended to foster the creation and sound operation of private banks in China by, among other things, (1) assuring that banks operating in China are managed on a secure financial basis, and are able to meet their obligations; and (2) establishing rules that govern the relationship between banks and customers. The existence of such protections is necessary to encourage the regular and widespread use of banks . . . Chinese consumers would be hesitant to maintain bank accounts if information could be disclosed in response to directives from foreign courts or government agencies and without resort to any Chinese court or government agency." <u>Id</u>. at 9, 11.   The laws provide an essential link in the creation of a modern banking system akin to that of other developed countries.  China is so concerned with the protection of privacy rights of individual that as recently as 2009 it adopted criminal penalties for the violation of those rights.  <u>Id</u>. at 19.

The efforts of Tiffany's expert, Professor Clarke, to diminish the importance of that interest by arguing that a number of Chinese "competent organs" have the right to inquire into bank accounts (Pl. Mem. at 21) is unpersuasive.  All of those organs are *Chinese* government agencies.  Wu Dec. ¶ 16.  Chinese customers are familiar with and confident in Chinese courts and agencies, but would be hesitant to maintain bank accounts if account information could be disclosed in response to non-Chinese court or agency orders.  <u>Id</u>. at 11.

None of the cases or sources cited by Tiffany diminish that interest, or suggest that U.S. interest in enforcing its trademark laws trumps Chinese policy.  Pl. Mem. at 20-1.  <u>Curveal</u> did not state a general rule that the U.S. interest in enforcing judgment always outweighs the interest of a foreign country in enforcing its bank secrecy laws.  <u>Id.</u> at 20.  The court found only that the interest of Malaysia in the specific Malaysian law at issue in that case did not outweigh U.S. interests. <u>Milliken</u>, the only case Tiffany cites which discusses the interests of the U.S. and China (<u>id.</u> at n.16), is entirely inapposite for reasons noted above.  <u>Milliken</u> heavily relied on the bank's failure to have made timely objections to the requested discovery, and there is no indication that the Chinese interest was set forth in that case.  <u>See</u> 2010 WL 5187744, at *2, 3, 11.[22]

6.   <u>Nature of hardship</u>.  CMB and its employees would be violating Chinese law and would be subject to civil and criminal liability in China if forced to comply with the Subpoena.  Wu Dec. ¶¶  21-8.  In these circumstances an order requiring disclosure should not be granted. <u>See</u>, <u>e.g.</u>, <u>Trade Dev. Bank</u>, 469 F.2d at, 41; <u>Ings</u>, 282 F.2d at 151-152; <u>Minpeco</u>, 116 F.R.D. at 525-6; <u>see also</u> <u>Linde</u>, 262 F.R.D. at 151 (an order compelling production documents in violation of non-U.S. law "should be imposed on a nonparty … only in extreme circumstances").

Furthermore, a non-party bank opposing discovery is not, as Tiffany seems to suggest (Pl. Mem. at 22), required to prove that it will actually be prosecuted for breaking the law; it must

---

[22]   The cases cited by Tiffany similarly do not support the proposition that the fact that confidentiality can be waived by the customer lessens the magnitude of the interest.  In <u>Curveal</u>, for example, the court noted that the prohibition on bank disclosures in the Malaysian law at issue contained "several exceptions" potentially applicable in that case, including a provision permitting disclosure "where the licensed institution has been served a garnishee order."  <u>Curveal</u>, 2010 WL 808639 at *4.  No comparable exception has been shown here.  <u>See</u> Wu Dec. ¶ 16.  In addition, in <u>Curveal</u>, Malaysia was not a party to the Hague Convention, so the plaintiff would have had to commence a separate action in Malaysia and secure a judgment in Malaysia to obtain discovery.  2010 WL 808639 at *4-5.  <u>Compare</u> Wu Dec. 34.  In <u>Securities and Exchange Commission</u> v. <u>Banca Della Svizzera Italiana</u> 92 F.R.D. 111, 118 (D.C.N.Y. 1981), the court ordered disclosure because it found that the secrecy privilege was not intended to protect some "public interest."  Here on the other hand, Professor Wu makes clear that China has a vital national interest in enforcing its bank secrecy laws.  Wu Dec. ¶¶ 9-11.

only show that disclosure is prohibited by the foreign law at issue.[23]  See Minpeco, 116 F.R.D. at 526.; Roth, 595 N.Y.S.2d at 603; see also First Nat'l Bank of Chi., 699 F.2d at 345.  See also In re Equitable at*4 (Pl. Mem. at 7-8) (refusal to order discovery of documents in Cuba where production "might" [not "will"] subject officers to criminal penalties").

Notably, Chinese authorities have prosecuted persons who have violated the criminal privacy law, resulting in imprisonment for those responsible for the violation.  Wu Dec. ¶ 28. Tiffany's assertion that the Chinese Banks will not be prosecuted because the Chinese government holds an *indirect* interest in each bank is unfounded.  Pl. Mem. at 23.  The Chinese courts have not been hesitant to issue rulings adverse to state-owned institutions.  See Wu Dec. ¶ 32.  Indeed, Chinese banks such as BOC have been held liable in the past for violating bank secrecy laws (Wu Dec. ¶ 23), and the expert to which Tiffany cites fails to address the likelihood that the Chinese Banks would be sued by customers in China (Clarke Dec. II ¶¶ 11, 12).

Aside from the penalties CMB would face for violating Chinese law, complying with this type of information request is itself burdensome, which the Federal Reserve Bank of New York ("FRBNY") recently recognized in an amicus submission it made in a pending New York Supreme Court case, Samsun Logix Corp. v. Bank of China, et al., Index No. 105262/2010 (N.Y. Sup. Ct. 2010).  Tiffany asserts that the FRBNY's primary concern in Samsun was that the

---

[23]     The cases Plaintiffs cite for the argument that the bank must produce documents despite a foreign law prohibition are inapposite or actually support denial of such an order in this case.  In British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A., No. 90 Civ. 2370 (JFK) (FM), 2000 WL 713057, at *5 (S.D.N.Y. June 2, 2000) (Pl. Mem. at 22), the court ordered post judgment discovery against the defendant where Mexican law did not prohibit disclosure and there was no alternative means (e.g., Hague Convention) of obtaining discovery.  In First Nat'l, 271 F.2d at 619, the court actually held that if production would violate Panamanian law, it should not be compelled. ("[T]the Bank argues that production of the branch's records located in Panama would require action by personnel in Panama in violation of the constitution and laws of Panama. If such were the fact we should agree that the production of the Panama records should not be ordered.").  In In re Grand Jury Proceedings Bank of Nova Scotia, 740 F.2d 817, 828-9 (11th Cir. 1984), the records sought were those of American citizens, and the Cayman Islands, the place from which the documents were sought, had previously established a policy against the use of its bank secrecy laws to shield criminal activities.  And as CMB has already explained (supra at n. 19), in Milliken the bank was asserting a superior interest in the funds at issue and did not timely object to discovery – both circumstances which are not present here.

dispute was not connected to New York (Pl. Mem. n. 19), but the FRBNY expressed concerns in general with forcing the New York branches of non-U.S. banks to comply with subpoenas seeking information located abroad:

> Even when records are electronic, many banks rely on different computer platforms… Banks are also required to navigate the legal requirements of each country's bank secrecy laws.  It's a huge undertaking, and [if required to respond to such subpoenas] banks will also become routine players in costly and complicated international lawsuits either in the United States, as here, when opposing a subpoena, or abroad when complying with a subpoena.

Transcript of Oral Argument at 75-6, Samsun, Index No. 105262/2010 (Feb. 4, 2011), Healy Decl. Ex. D.   The burden concerns raised by the FRBNY are equally present here

7.    Good faith of party resisting discovery.  Having complied with Rule 45, CMB has acted in good faith.  CMBNY searched its records for information responsive to the Subpoena and promptly provided Tiffany with the Response to the Subpoena based on records CMBNY had in its custody and control in New York.  See Weigel Dec. Ex. 14.  From the outset, CMB advised Tiffany of its position that the Subpoena only reaches information in New York.  See Id. Finally, CMBNY has consistently and repeatedly made clear that it will cooperate with Tiffany in using the Hague Convention.[24]

**C.    The Subpoena Should Not Be Applied Extraterritorially**

The Supreme Court recently reaffirmed the rule that "unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions."  Morrison v. Nat'l Austl. Bank, 130 S. Ct. 2869, 2877 (2010) (citations and internal quotations omitted).  The Court there rejected an attempt by plaintiffs to apply provisions of the Securities Exchange Act of 1934

---

[24]    Milliken, which Tiffany cites to argue that CMB acted in bad faith (Pl. Mem. at 25), is again inapposite. There the bank had "repeated[ly]" failed to comply with the court's orders.  Here, there is no court order to compel - that is the very issue which Tiffany and the Chinese Banks are now briefing.  CMB certainly has not "repeated[ly]" failed to comply with any order, as none exists.

extraterritorially, abrogating the Second Circuit's long standing "conduct and effects test" for extraterritorial application.  Id. at 2878.  The Second Circuit has since made clear that Morrison means what it says, and applied the "bright line test" set forth in Morrison.  See Norex Petroleum Ltd. v. Access Indus., Inc., et al., 631 F.3d 29, 32 (2d Cir. 2010).

The Subpoena was issued under Federal Rule of Civil Procedure 45.  The enacting statute, the Federal Rules generally and Rule 45 itself are all "silent as to any extraterritorial application."  Id. at 32.  Thus under Morrison and Norex, Rule 45, and the Subpoena issued under it, should have no extraterritorial application.

### D.   Even If There Were Grounds To Compel Production Of Information In China, Tiffany Must Indemnify CMB For Any Expense Resulting Therefrom

Rule 45(C)(1)(b)(ii) mandates that any order to compel "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  As noted, CMB will be subject to sanction and criminal penalties and civil liability to its customer for complying with any such order.  Under the plain terms of Rule 45, an order to compel must protect CMB from such expense, so if the Court orders discovery it should be conditioned on Plaintiffs indemnifying CMB for any cost or expense that flows therefrom.  Rule 45(C)(1)(b)(ii).

### CONCLUSION

For the foregoing reasons, the Bank of China respectfully requests that the Court deny the Plaintiffs' motion to compel.

Dated:  May 17, 2011                    WHITE & CASE LLP

                                        By: /s/ Dwight A. Healy
                                            Dwight A. Healy
                                            Marika Maris (of counsel)
                                            1155 Avenue of the Americas
                                            New York, New York  10036
                                            Telephone:  (212) 819-8200
                                            Facsimile:  (212) 354-8113
                                            *Attorneys for China Merchants Bank*