UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
                                                                                                 :

TIFFANY (NJ) LLC and TIFFANY AND COMPANY,   :

             Plaintiffs,                                                :

      v.                                                                :   2010 Civ. 9471 (WHP)

QI ANDREW, GU GONG, SLIVER DENG, and
KENT DENG, all d/b/a TIFFANYSTORES.ORG,
FASHION STYLE and STORESORG; ABC
COMPANIES; and JOHN DOES,

             Defendants.

------------------------------------------------------------------- x

**DECLARATION OF JAMES V. FEINERMAN**
**JAMES M. MORITA PROFESSOR OF ASIAN LEGAL STUDIES**
<u>**GEORGETOWN UNIVERSITY LAW CENTER**</u>

I, James V. Feinerman, declare as follows:

1. I am the James M. Morita Professor of Asian Legal Studies at Georgetown University Law Center and have been admitted as an attorney to practice before the courts of New York. I have been retained by counsel for non-parties Bank of China ("BoC") and Industrial and Commercial Bank of China ("ICBC") in the above-captioned action. I submit this affidavit in support of BOC's and ICBC's opposition to the plaintiffs' motion to compel the banks to produce documents located in China.

## Qualifications

2. I briefly summarize below my education, training and relevant experience. Following a B.A. in Chinese Studies at Yale College, I spent two years teaching and studying in Hong Kong at the Chinese University of Hong Kong, 1971-73. In ensuing years, I earned a Ph.D. in East Asian Languages and Literature at Yale University and a J.D. from the Harvard Law School, where I specialized in East Asian Legal Studies. During 1979-80, I was a participant in the national student exchange program sponsored by the Committee on Scholarly Communication with the People's Republic of China (CSCPRC, renamed "Committee on Scholarly Communication with China" - CSCC). For one year, I studied at Peking University and received a post-graduate certificate; in the fall of 1980, I spent an additional four months as a Visiting Scholar at the Institute of Law of the Chinese Academy of Social Sciences. I speak the Mandarin and Cantonese dialect of Chinese fluently and can also read Chinese.

3. I have taught at Georgetown, and also as a visitor at Harvard and Yale Law Schools, for over twenty-five years. Among other courses, I teach a course in Chinese Law.

4. In addition to my work as a professor of law, I served as Editor-in-Chief of the China Law Reporter, a publication of the American Bar Association's Section of

International Law and Practice, from 1986-1998; as Chair of the Committee on Legal Education Exchange with China, from 1993-1997; as Chair of the Asia Law Forum, of the Association for Asian Studies, from 1991-1996; and have been a Trustee of the Yale-China Association and the Lingnan Foundation.

5. From 1993-1995, I served as Director of the Committee on Scholarly Communication with China, Washington, D.C., the national organization sponsoring official academic exchange between the United States and China, sponsored by the National Academy of Sciences, the American Council of Learned Societies and the Social Science Research Council. In 1982-83, I taught as a Fulbright Lecturer on Law at the Peking University Law Department, Peking, People's Republic of China. From 1983-1985, I served as Administrative Director and Fellow of the East Asian Legal Studies Program at Harvard Law School, Cambridge, Massachusetts. In 2006, I taught as Fulbright Distinguished Senior Lecturer on Law at the Law School of Tsinghua University, Beijing, People's Republic of China. I have attached my curriculum vitae as Exhibit A to this affidavit.

### Summary of Opinions

6. I summarize my opinions as follows:

- China provides, through its accession to the Hague Evidence Convention, the exclusive method under Chinese domestic law for foreign litigants to request information located in China. In my opinion, the Chinese Central Authority would honor a properly tailored request for information through the Hague Evidence Convention.

- Further, Chinese banking law does not allow banks to disclose information about accounts located in China based on claims related to foreign proceedings, absent the proper authorization. These Chinese laws have serious binding force, including criminal penalties for violation, and China remains very serious about its judicial sovereignty.

2

- Finally, despite the Chinese government's indirect shareholdings in major Chinese banks, serious penalties may still be imposed on banks which violate Chinese banking laws and regulations, as illustrated in reported Chinese cases.

7. My opinions are based on my study of Chinese law, my examination of relevant statutes and cases and interactions with Chinese and foreign experts in Chinese law. These include the Constitution of the People's Republic of China, national laws issued by the National People's Congress, and administrative regulations issued by the State Council.

### China and The Hague Evidence Convention

8. The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Evidence Convention"), opened for signature, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, has been acknowledged by the United States Supreme Court to prescribe "certain procedures by which a judicial authority in one contracting state may request evidence located in another contracting state."[1]

9. The People's Republic of China in Article 261 of its Civil Procedure Law has detailed the sole means for foreign litigants to obtain international judicial assistance in China. That article states that any request for judicial assistance "shall be effected through channels provided in the international treaties concluded or acceded to by the People's Republic of China" or through diplomatic channels. (Exhibit B.) China acceded to the Hague Evidence Convention in 1998.

### Honoring Hague Evidence Convention Requests

10. China has made great strides in building a modern legal system over the past three decades. Among those accomplishments is the creation of a system of civil process to

---

[1] Société Nationale Industrielle Aerospatiale v. United States District Court for the District of Iowa, 482 U.S. 522, 524 (1987).

3

accommodate China's increasing global influence, including the collection of evidence in China relating to foreign proceedings. Indeed, a paper from 2008 cited by the plaintiffs, acknowledged China's "substantial progress" with respect to discovery, which includes China's ratification of the Hague Evidence Convention:

> Although a large number of unknowns exist in the Chinese discovery system, China has made substantial progress over the past decade, considering its long history of having no real appreciation for the discovery process. One such example of progress is China's ratification of the Hague Convention. With China's admission into the World Trade Organization and its involvement in the global market, demands for more predictable evidence gathering systems in China to aid international disputes continue to increase. China has also signed bilateral treaties of judicial assistance with over 20 countries and reached arrangements with Hong Kong and Macau….[2]

11. The paper further acknowledged that "[m]ore advancement by China will no doubt be made in the future.

12. In fact, the Chinese Ministry of Justice website indicates that in the first half of 2010 alone, there were 37 cases where the judicial assistance department assisted the foreign affairs department of the Ministry of Justice in matters relating to obtaining evidence for civil and commercial cases.[3]

13. Plaintiffs rely on the following language previously on the U.S. State Department's website for the proposition that China is unlikely to honor a request for documents through the Hague Evidence Convention: "[w]hile it is possible to request compulsion of evidence in China pursuant to a … letter of request (Hague Evidence Convention), such requests have not been particularly successful in the past."

---

[2] See "International Discovery: Around the World in Ninety Minutes," 2008 ABA Annual Meeting, Section of Litigation, August 7-10, 2008, at 33.

[3] See http://www.moj.gov.cn/sfxzjlzx/content/2010-07/23/content_2206673.htm (last visited May 13, 2011). The original and translated version of this website are appended as Exhibit C.

14. However, the U.S. State Department has since deleted that language from its website. The website now states that "[r]equests for depositions or other evidence in civil and commercial matters may be forwarded directly to the Chinese Central Authority," and that those seeking information can "[u]tlize the model letter of request annexed to the text of the Convention."[4] In my view, the updated language on the U.S. Department of State's website—particularly the fact that the State Department has dropped its previously somewhat negative commentary—acknowledges the significant strides that China has made in recent years with respect to commercial law matters.

15. China takes its treaty commitments seriously, and I believe China, especially now given its economic and legal progress in the last few years, would honor a properly tailored request for information through the Hague Evidence Convention, especially if the parties in the relevant litigation worked together to ensure that the request moves through the pertinent process.

Civil Law Practice with Regard to Attempts to Seek Evidence from Abroad

16. The U.S. approach to the extraterritorial collection of evidence in civil litigation differs from that of many foreign nations. In many civil law jurisdictions, such as China, the extraterritorial collection of evidence is regarded as a "judicial" or "public" act that may not be performed by private persons. To that end, civil law jurisdictions generally regard collection of evidence in litigation as a sovereign act that may be performed in their territory only by the state's own officials and in accordance with its own laws. In many civil law countries, evidence must be collected by an official of the local court, or by a specially designated official subject to the court's control.

---

[4] See http://travel.state.gov/law/judicial/judicial_694.html (last visited May 15, 2011). A copy of the current version of the U.S. State Department's webpage is appended as Exhibit D.

5

17. Many foreign nations, particularly civil law states, object to orders from foreign courts to take evidence within national territory from local nationals, except where local officials have been involved. These objections arise from several concerns. Originally, it stems from the territorial conception of national sovereignty; other sovereigns and their judicial institutions have no right to intrude on the territory of another sovereign. In addition, some civil law nations base their objections on the view that extraterritorial extension of judicial power could lead in particular cases to violations of national public policy in other areas.

18. In acceding to the Hague Evidence Convention, China took a limited reservation, further indicating its determination to control the intrusion of foreign legal process on Chinese judicial sovereignty.[5] Like many civil law nations, and even a number of common law jurisdictions, China has chosen not to adopt U.S.-style extensive pre-trial discovery. Indeed, according to the U.S. State Department's website, "[m]ost countries party to the Convention, with the exception of the Czech Republic, Israel, the Slovak Republic and the United States, made specific declarations objecting to the Article 23 provision on pre-trial discovery of documents."[6]

19. With its reservation, China has indicated the circumstances under which it will permit access by foreign litigants to its judicial system to obtain evidence in China. It

---

[5] China's reservation states that, in accordance with Article 23 of the Hague Evidence Convention concerning the Letters of Request "issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries, only the request for obtaining discovery of the documents clearly enumerated in the Letters of Request and of direct and close connection with the subject matter of the litigation will be executed." Hague Evidence Convention (listing the reservations filed by each signatory nation, including China), available at http://www.hcch.net/index_en.php?act=conventions.status&cid=82 (last visited May 11, 2011). A copy of the relevant webpage is appended as Exhibit E.

[6] See http://travel.state.gov/law/judicial/judicial_689.html (last visited May 15, 2011). A copy of the relevant webpage is appended as Exhibit F. The relevant language can be found on page 4.

6

should not be construed as a prohibition of obtaining evidence located in China; rather, it indicates that any requests should be properly tailored.

## **BOC and ICBC Cannot Violate Chinese Banking Law**

20. China's Commercial Bank Law and implementing regulations set forth the fundamental principle that banks must safeguard the rights of customers from interference or incursion from any party unless authorized by Chinese law. They also establish that information related to customer accounts may not be disclosed unless called for by a Chinese court or designated agency of the Chinese government.

### The Relevant Chinese Statutes

21. The Commercial Bank Law provides in Article 8 that "[c]ommercial banks shall carry out business in accordance with the relevant provisions of laws and administrative regulations . . ."; in Article 6 that "[c]ommercial banks shall safeguard the legal rights and interests of depositors against the encroachment of any entity or individual"; and in Article 53 that "no one working in a commercial bank may divulge any . . . commercial secret he acquires during his term of service." (Exhibit G.)

22. Based on those provisions, when an individual or company opens a bank account with a Chinese commercial bank, such as BOC and ICBC, and deposits funds in a bank account, the individual or company has a lawful right and interest in seeing its bank account and the funds in the bank account not be disclosed, frozen or seized because of a dispute the individual or company may have with another person or company, whether Chinese or foreign, unless and until certain procedures provided by Chinese law are followed and that lawful right and interest is modified or overridden.

23. The rationale for the banking law provisions is that when funds are deposited into a depositor's account, those funds are the personal assets of the customer, and the Chinese bank has no authority to take action with respect to those funds other than as directed by the customer or a "competent organ" such as a Chinese court. See infra ¶¶ 32-35.

24. That government policy has been adopted to create confidence of Chinese bank customers in the relatively new banking system that China has tried to develop as part of its economic modernization. Encouraging its citizens who had historically been skeptical about the safety of their deposits in banks—and their continued access to them—required the strongest possible assurances of confidentiality, which these legal enactments combine to provide.

### The Relevant Chinese Banking Regulations

25. The State Council of China promulgated the 1992 Regulation on the Administration of Savings ("Savings Regulations") to protect the legitimate rights and interests of individual depositors. (Exhibit H.) Article 32 of the Regulations on the Administration of Savings similarly provides that:

> [I]nstitutions [which are defined to include a bank] and their personnel shall have an obligation to keep secret the depositors' savings and relevant information. Savings institutions shall not inquire into, freeze or allocate savings deposits on behalf of any unit or individual, unless otherwise provided for by laws and administrative regulations of the State.

26. Article 34 of the Savings Regulations further provides:

> If any unit or individual commits any of the following actions in violation of the provisions of these Regulations, the People's Bank of China or one of its branches shall order it or him to make corrections, and may impose a fine, or order it or him to suspend business operations for rectification or revoke the Permit for Financial Business according to the seriousness of the circumstances. If the circumstances are serious enough to constitute a crime, the offender shall be investigated for criminal liability. … （8）disclosing information concerning a depositor's savings, or inquiring into, freezing or allocating savings deposits on others' behalf without completing legal procedures; …"

8

27. In 1993, the regulator People's Bank of China ("PBOC") promulgated "Some Provisions of the People's Banking of China on the Implementation of the Regulation on the Administration of Savings" ("Some Provisions"). (Exhibit I.) Article 39 of Some Provisions provides: "To protect the interest of depositors, inquiring into, freezing or allocating savings deposits must comply with the laws and administrative regulations of the State, any units should not inquire into, freeze or allocate savings deposits without proper authorization…."

28. Following the enactment of the Commercial Bank Law, the PBOC also promulgated the 1997 Measures for the Administration of Renminbi Corporate Deposit ("Corporate Deposit Regulations") to implement certain general principles enunciated by the Commercial Bank Law. Article 24 of the Corporate Deposit Regulations provides that "[a] financial institution shall keep secret the deposits of corporate depositors. (Exhibit J.) Article 28 of the Corporate Deposit Regulations provides:

> In case a commercial bank violates Article 24 of these Measures and divulges the deposit information of corporate depositors or acts as an agent for inquiry about, freeze or deduction of corporate deposit without statutory procedures, it shall be punished according to Article 73 of the Law of the People's Republic of China on Commercial Banks.

29. As discussed in more detail below, there have been a number of Chinese cases where a commercial bank has been held liable to its customer because the bank turned over the deposit of a customer to a third party without following the procedure provided by the Chinese law or failed to keep confidential the information about the deposit of a depositor or safeguard the customer's lawful rights and interests.

30. Thus, Chinese law prohibits Chinese commercial banks from complying with the order of a court in the United States (or other jurisdictions outside of China) to disclose information about customer accounts in China, to freeze such accounts, or to transfer funds from such accounts to a judgment creditor outside of China. If a Chinese commercial bank or an

9

officer or employee of the bank were to do any of the preceding acts in China in violation of Chinese law, it will expose itself and its officers and employees to punishment by China's banking regulatory agencies, to civil liabilities to the applicable account holder, and to criminal liability.

Procedures For Obtaining Customer Information

31. The Chinese law that provides the procedures governing the inquiry into, freezing, and deduction of bank deposits is called "Provisions on the Administration of Financial Institutions' Assistance in the Inquiry into, Freeze or Deduction of Deposits ("Financial Institution Assistance Regulations"). (Exhibit K.) The procedure provided by the Financial Institution Assistance Regulations is the "legal proceeding" referred to in Article 34 of the Savings Regulations, the "proper authorization" referred to in Article 39 of Some Provisions and the "procedure provided by law" referred to in Article 1 of the Corporate Deposit Regulations.

32. To follow the relevant procedures, BOC and ICBC must ensure that at least two conditions are met: (a) the request for inquiry into, freezing and deducting funds from the deposit account in China of the Judgment Debtors must be from a "competent organ"; and (b) the "competent organ" must have presented to BoC a "notice on the assistance with the inquiry into, or freeze or deduction of deposits issued by the competent organs at or above the level of county or regiment" (the "Assistance Notice") (Exhibit J).

33. "Competent organs" are defined in Article 4 of the Financial Institution Assistance Regulations as "the judicial organs, administrative organs, military organs and public institutions exercising administrative functions that have the right to inquire about, freeze and deduct the deposits of entities or individuals in financial institutions according to the clear prescriptions in the laws and administrative regulations." (Exhibit K.) The "attached table"

10

referred to in that quoted definition explicitly lists all the "competent organs" and the extent of their authority with respect to inquiry into, or freeze or deduction of deposits.

34. The "competent organs" are: people's court, taxation authority, customs house, people's procuratorate, public security organ, state security organ, security department of the armed forces, prison, smuggling investigation organ, supervisory organ (including the supervisory organ of the armed forces), audit organ, industrial and commercial administrative organ, and securities regulatory organ. An entity not listed in that table—such as a foreign court—is not a "competent organ" under Chinese law.

35. While this list of "competent organs" may seem rather long, the limitation of that group to a small number of official government agencies is in keeping with China's desire to maintain a high degree of confidentiality for customers' bank records with a very limited exception for important government offices which might have need to access such information when properly authorized to do so pursuant to the relevant provision of the Chinese banking regulations.

36. Thus, the Chinese law requires commercial banks in China to keep secret deposits of a depositors and not to disclose information about such deposits or freeze or deduct such deposits on behalf of others unless certain exceptions apply, but a subpoena, restraining notice or turnover order issued by a court in the United States or any other jurisdiction outside of China does not fall within the exceptions. As such, the Chinese law prohibits Chinese commercial banks from complying with the order of a court in the United States or any other jurisdiction outside of China to disclose information about customer accounts, to freeze such accounts, or to transfer funds from such accounts to a judgment creditor outside China.

### Consequences For Violating The Chinese Banking Laws

37. Chinese law sets out the punishment that banks will suffer if they violate Chinese banking statutes and regulations. Article 73 of the Commercial Bank Law provides that if a commercial bank "illegally disclosed information about, froze, or deducted personal savings deposit account or entity deposit account", it "shall undertake to pay interests for the deferred payment" and "the banking regulatory organ of the State Council shall order the commercial bank to correct itself" (i.e. to cease such disclosures, unfreeze the account and restore deductions) and impose on it "a fine of not less than RMB ¥50,000 Yuan and not more than RMB ¥500,000 Yuan." (Exhibit G.)

38. Article 73 of the Commercial Bank Law further explicitly provides that a commercial bank that inquires into, freezes or deducts funds from a customer account in China illegally must be responsible for "civil liabilities to depositors." BOC and ICBC would therefore expose themselves to lawsuits in Chinese courts if it were to comply in China with the United States order requiring it to disclose information about customer accounts.

39. There have been a number of Chinese cases where a commercial bank has been held liable to its customer because the bank turned over the deposit of a customer to a third party without following the procedure provided by the Chinese law or failed to keep confidential the information about the deposit of a depositor or safeguard the customer's lawful rights and interests.

40. In <u>Yongsheng Wang v. Bank of China Nanjing Hexi Branch</u>, three men surreptitiously installed a recordable ATM card reader on the automatic door of Bank of China Nanjing Hexi Branch and a miniature video recording device above one of the ATMs on the premises of the branch and illegally obtained Wang's ATM card information and PIN number.

12

(Exhibit L.) Using that information, the three men duplicated two ATM cards. They then used the two duplicated ATM cards and the PIN number to withdraw illegally more than ¥400,000 from Wang's bank account with Bank of China.

41. The court found the Bank of China, Nanjing Hexi Branch, liable to Wang for the deposit he lost through the theft because, among other reasons, (i) "it is the obligations of a commercial bank under the Commercial Bank Law to keep the information of the depositor confidential and to safeguard the legal rights and interests of the depositor against the encroachment of any entity or individual; (ii) the bank's confidentiality obligation encompasses not only the obligation to keep secret the depositor's personal information but also the obligation to provide a safe and secure transactional environment for its depositors; and (iii) the bank failed to provide a safe and secure transactional environmental to Wang, leading to his loss."

42. The court further stated that "pursuant to Article 33 [of the Commercial Bank Law], 'a commercial bank shall guarantee the payment of the principals of and interests on the deposits, and shall not delay or refuse to pay the principals of or interests on the deposits'; but the bank mistakenly paid the principals of and the interests on Wang's deposit to the fake ATM card holders and failed to fulfill its obligations to pay the principals of or interests on Wang's deposits to Wang. Therefore, Wang is entitled to get his deposit plus interest back from the Branch."

43. Notwithstanding the unusual circumstances of this case and the seeming lack of culpability on the part of BOC, the court sternly reprimanded the bank in imposing its sanctions:

> It is the legal obligation of a commercial bank to guarantee that no institution or individual infringes upon the legal rights of the depositor in order to protect depositor confidentiality. The obligation of a commercial bank to maintain secrecy is not limited to keeping the information already

provided by a depositor secret, but also includes providing the necessary security and confidential environment for depositors coming to the bank to conduct transactions.

44. In <u>Ruihua Li v. Agricultural Bank of China Jinggangshan Branch</u>, plaintiff Ruihua Li had ¥40,000 in his bank accounts with defendant Jinggangshan Branch and owed more than ¥39,684 to Yuan Zou, a payroll administrator at the institution where Ruihua Li worked. (Exhibit M.) Yuan Zou told Jinggangshan Branch that Ruihua Li owed her more than ¥39,684 and had told her before that she, Yuan Zou, could use the funds in Ruihua Li's bank accounts to satisfy the debt Ruihua Li owed her. Jinggangshan Branch turned over a total of ¥39,684 from Ruihua Li's bank accounts to Yuan Zou to satisfy the obligation Ruihua Li owed to Yuan Zou.

45. As a result of the turnover, Ruihua Li sued Jinggangshan Branch, asking the branch to compensate him for the ¥39,684 the branch had given to Yuan Zou. The court reasoned that unless a financial institution, such as the branch, has done so in accordance with the procedure provided by law, it may not "disclose information about, freeze or turn over funds from the account of a depositor in favor of a third party." The court found that the branch had turned over funds from Ruihua Li's bank accounts to Yuan Zou without following the procedure provided by law. On that basis, the court ordered Jinggangshan Branch to pay the depositor, Ruihua Li, ¥39,684, an amount that was turned over from his bank accounts, unless Yuan Zou returned that amount to Ruihua Li.

46. These cases show that Chinese courts take seriously commercial banks' obligations to keep customer account information confidential, not to turn over funds from customer's accounts unless the procedure provided by the Chinese law is followed, and to safeguard customers' rights and interests in their bank accounts. Indeed, in the first case, BOC merely failed to fulfill, but did not intentionally take any action to breach, its obligation to keep

14

customer account information confidential and safeguard customers' rights and interests in their bank accounts.

47. These cases confirm that if BOC or ICBC were to intentionally disregard its confidentiality obligations and violate the prohibition of the Chinese law by illegally disclosing customer account information to a judgment creditor outside China or restrain or turn over the funds in a customer account in China in favor of a judgment creditor outside China, and subsequently were sued in China by the customer for damages, the Chinese court will have no qualms in adjudging BOC and ICBC liable to their customers.

48. Article 78 of the Commercial Bank Law further provides that "[i]n case a commercial bank has the circumstances as described in Article 73 [of the Commercial Bank Law], its directors and senior management personnel directly responsible therefore and other persons directly responsible shall be given disciplinary punishment . . . ."

49. Under various articles of Chapter VIII of the Commercial Bank Law, "Legal Responsibility," there is provision along with civil liability that "if a crime is constituted, criminal responsibility shall be investigated according to law." This provision is explicitly included as part of Article 78 of the Commercial Bank Law, holding out the threat of criminal punishment of directors and senior management personnel and others directly responsible for violations of provisions of Article 73 of the Commercial Bank Law.

50. Concerns about bank customer confidentiality have also led to the amendment of China's Criminal Law in February 2009, which now provides (Art . 253(A)) as follows:

> Where any staff of a state authority or an entity in the fields such as finance, telecommunications, transportation, education or medical treatment, in violation of the state regulations, sells or illegally provides to others any personal information on individuals which is obtained during

15

the authority's or the entity's performance of duties or provision of services shall, if the circumstances are serious, be sentenced to not more than three years of fixed-term imprisonment or criminal detention, and/or be fined .

51.     The existence of these criminal penalties reflects a strong governmental policy to assure confidentiality of bank customer accounts.  It further underscores the fact that a wide range of penalties may be imposed for breach of bank customer confidentiality.  Thus, Chinese law provides sanctions – in the form of fines, civil liability and criminal penalties – for violating the provisions of these laws and regulations.

52.     Plaintiffs rely on the MyReplicaHandbag.com case to suggest that BOC and the other Chinese banks will suffer no consequences should BOC and the other banks produce customer account information outside the procedures set forth under the Hague Evidence Convention.  My understanding is that the customer in that case had, at the outset of the case, provided consent to comply with the disclosure concerning, and freezing of, deposits called for by an order of the U.S. court.  Further, it appears that, notwithstanding the customer's consent, BOC still felt concerned, and therefore, while it made the documents available in such a way to afford confidentiality, BOC ultimately paid a relatively large settlement to resolve the matter.

53.     Further, the fact that no enforcement action was taken against BOC in China with respect to the MyReplicabag.com case, especially given the customer's consent at the outset of the matter, does not demonstrate that the Chinese authorities will not enforce the Commercial Bank Law, PBOC Regulations or Chinese Criminal Law should they believe that a bank intentionally violate those laws and regulations.

**BOC And ICBC Are Not Immune From Chinese Banking Laws**

54. BOC and ICBC and their employees are not above the law nor immune from the imposition of sanctions because the PRC government has an indirect ownership interest in the banks for a number of reasons. First, China's significant reforms of state-owned enterprises in connection with its transition to a market economy from the state-run command economy has actually further separated such enterprises from the states.

55. Second, as a result of these reforms, state-owned enterprises have been reorganized as separate corporate entities; BOC and ICBC are independent enterprise legal person; under applicable Chinese law, they enjoy "legal capacity and capacity for civil acts, and, according to law, independently enjoys civil rights and assumes civil liabilities."

56. Third, as demonstrated by the banking laws and regulations detailed above, there is ample legal basis for imposing civil, administrative and criminal liability on BOC, ICBC and their personnel for failure to comply with relevant Chinese laws and regulations. As the case law cited above also makes clear, BOC has been held liable in a civil case, and PRC banks and their employees have also been sanctioned for failing to comply with PRC laws and banking regulations.

57. Therefore, despite the indirect governmental shareholdings in BOC and ICBC, the important policy considerations underlying Chinese banking laws mean that actions against banks which violate any of the banking laws' confidentiality provisions would remain extremely vulnerable to the wide range of sanctions those laws afford. Compliance with a foreign court order to disclose customer information in the face of these considerations would be a considerable risk. Governmental ties simply would provide no guarantee against fines, civil liability or criminal penalties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 17, 2011 in Washington, D.C.

_James V. Feinerman_
James V. Feinerman