UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

TIFFANY (NJ) LLC and                     :
TIFFANY AND COMPANY,
                                         :   10 Civ. 9471 (WHP)(HBP)

           Plaintiffs,                   :   OPINION

     -against-                           :   AND ORDER

                                         :

QI ANDREW, GU GONG, SLIVER DENG
and KENT DENG, all d/b/a                  :
TIFFANYSTORES.ORG, FASHION STYLE
and STORESORG; ABC COMPANIES; and  :
JOHN DOES,
                                         :

           Defendants.
                                         :
-----------------------------------X


          PITMAN, United States Magistrate Judge:


I.  Introduction


          Plaintiffs move for an Order compelling non-parties

Bank of China ("BOC"), Industrial and Commercial Bank of China

("ICBC") and China Merchants Bank ("CMB") (collectively the

"Banks") to produce documents pursuant to a subpoena duces tecum

that was served upon them in January 2011.  The Banks oppose

plaintiffs' motion.

          For the reasons set forth below, plaintiffs' motion to

compel is denied without prejudice to renewal.

II.  Facts

Plaintiffs Tiffany (NJ) LLC and Tiffany and Company are
the well-known, high-end manufacturers of jewelry and other
products which hold "various federally registered and common law
trademarks used to identify the high quality goods merchandised
or manufactured by Tiffany" (Complaint, dated Dec. 20, 2010
(Docket Item 1), ¶ 1).  Plaintiffs allege that defendants sold
counterfeit Tiffany products through several websites hosted in
the United States.  Plaintiffs claim that defendants accepted
payment in U.S. dollars and used PayPal, Inc. ("PayPal") to
process customers' credit card transactions, then transferred the
profits to accounts held by the Banks (Memorandum of Law in
Support of Plaintiffs' Motion to Compel, dated May 3, 2011
(Docket Item 21), ("Pl.'s Mem. in Supp.") at 1).  PayPal was the
sole method of payment for these goods (Pl's Mem. in Supp. at 4;
Declaration of Robert Weigel, dated May 3, 2011 (Docket Item 22),
("Weigel Decl.") ¶¶ 4, 8, 11–13).  Defendants have not responded
to the complaint, nor have they responded to the Court's order
requiring them to produce documents related to their counterfeit-
ing operation (Pl.'s Mem. in Supp. at 3).

The Honorable William H. Pauley, III, United States
District Judge, entered a Preliminary Injunction on January 3,

2

2011 (Preliminary Injunction, dated January 3, 2011 (Docket Item 7), (the "PI Order")).  The PI Order directed that

> Plaintiffs' motion for continued expedited discovery from financial institutions is granted, and that any banks . . . or other companies or agencies that engage in the transfer of real or personal property, who receive actual notice of this order by personal service or otherwise, shall provide to Plaintiffs all records in their possession, custody, or control, concerning the assets and financial transactions of Defendants or any other entities acting in concert or participation with Defendants, including but not limited to records concerning the following:  . . . any and all Bank of China accounts in the name of or associated with Defendants . . . any and all Industrial and Commercial Bank of China accounts in the name of or associated with Defendants

(PI Order at 8).  The PI Order further directed that these institutions could "apply to this Court for relief from the terms of this paragraph within seven (7) days of service of this order" (PI Order at 9).

On January 5, 2011, plaintiffs served the New York branches of BOC and ICBC ("BOCNY" and "ICBCNY" respectively) with copies of the PI Order, and on January 7, 2011, plaintiffs served these branches with subpoenas pursuant to Federal Rule of Civil Procedure 45 (Declaration of Lanier Saperstein, dated May 17, 2011 (Docket Item 27), ("Saperstein Decl.") ¶¶ 5-6) seeking the following documents:  (1) communications concerning defendants or defendants' accounts; (2) documents containing contact information associated with defendants' accounts; (3) documents relating

3

to any and all credit card transactions processed in connection
with purchases from defendants or defendants' websites; (4)
documents concerning any open or closed checking, savings, or
money market accounts, and certificates of deposit held in the
name of any of the defendants, including bank statements; (5)
documents concerning any open or closed loans or mortgages
relating to any of the defendants; (6) wire transfer documents
and files relating to any of the defendants, including documents
reflecting the source of funds for wires into defendants' ac-
counts and (7) documents relating to Currency Transaction Reports
and Suspicious Activity Reports concerning any of the defendants
(see Pl.'s Mem. in Supp. at 4-5; Subpoenas, attached to Weigel
Decl. as Exs. 7, 9, 11).

On January 7, 2011, BOCNY informed plaintiffs that it
had searched its computer system, but did not find any accounts
held in the names of defendants.  BOCNY requested additional
information to distinguish common Chinese names, as well as the
full account number of the abbreviated account number set forth
in the PI Order.  It agreed to search for that account, as well
as any responsive wire transfer documents for which BOCNY acted
as an intermediary.  BOCNY also asserted that it "ha[d] no access
to or control over any customer accounts or any customer account
information located outside the United States" (Letter of Lanier

4

Saperstein to Anne Coyle, dated Jan. 7, 2011 and attached to
Saperstein Decl. as Ex. D).

On January 21, 2011, BOCNY informed plaintiffs that
after a search, it had not located any responsive wire transfers,
though it claimed it needed additional identifying information to
identify responsive wire transfers for "Ma Li" because it was too
common a name.  BOCNY also offered to assist plaintiffs in
preparing and submitting a discovery request to Chinese authori-
ties pursuant to the Hague Convention, a proposal to which
plaintiffs did not agree (Letter of Lanier Saperstein to Jennifer
Halter, dated Jan. 21, 2011 and attached to Saperstein Decl. as
Ex. E).

On January 24, 2011, BOCNY served objections and
responses to the subpoena, and stated that it did not have
"possession, custody or control" of documents at any branch or
office outside of the United States.  It also objected to produc-
ing any information to the extent such production would violate
domestic or foreign law (BOCNY's Objections and Responses to
Plaintiffs' Rule 45 Subpoena, dated Jan. 24, 2011 and attached to
Saperstein Decl. as Ex. F).  On February 24, 2011, BOCNY con-
firmed that it had no accounts matching the numbers provided by
plaintiffs, nor did it have any wire transfer documents to or
from those accounts during the relevant time period (Letter of

Lanier Saperstein to Jennifer Halter, dated Feb. 24, 2011 and attached to Saperstein Decl. as Ex. G).

Similarly, on January 7, 2011, ICBCNY informed plaintiffs that it held no accounts relating to any of the defendants (Letter of Ying Wang to Anne Coyle, dated Jan. 7, 2011 and attached to Saperstein Decl. as Ex. H).  ICBCNY later informed plaintiffs that it had no accounts matching the numbers provided by plaintiff, but proposed to assist plaintiffs in preparing a request pursuant to the Hague Convention (Letter of Lanier Saperstein to Jennifer Halter, dated Feb. 24, 2011 and attached to Saperstein Decl. as Ex. G).

On January 24, 2011, ICBCNY served its formal objections and responses to the subpoena and stated that it did not have "possession, custody or control" of documents at any branch or office outside of the United States, and objected to producing any information to the extent such production would violate domestic or foreign law (ICBCNY Objections and Responses, dated Jan. 24, 2011 and attached to Saperstein Decl. as Ex. I).

On January 26, 2011, plaintiffs served a copy of the PI Order and a Rule 45 Subpoena on CMB's New York branch ("CMBNY") seeking the same documents as those requested from BOC and ICBC (PI Order and Subpoena, dated Jan. 26, 2011 and attached to Weigel Dec. as Ex. 11).  In a letter dated January 28, 2011,

6

CMBNY's counsel informed plaintiffs that it "ha[d] no accounts or assets for the defendants listed in the PI [Order] and identified in your letter" and noted that CMBNY would serve "objections and responses to the Subpoena within the time called for in the Subpoena" (Letter of Dwight Healy to Jennifer Halter, dated Jan. 28, 2011 and attached to Declaration of Dwight Healy, dated May 17, 2011 (Docket Item 24), ("Healy Decl.") as Ex. A).  CMBNY then objected to the production of any documents not in the custody and control of CMBNY, noting that it did not have control over documents located in any other office of CMB.  CMBNY also objected to producing documents that "would violate any applicable domestic or foreign law, including the banking, commercial and criminal laws of the People's Republic of China" (CMB's Objections and Responses, dated Jan. 24, 2011 and attached to Weigel Decl. as Ex. 14).

Plaintiffs now move to compel the Banks to provide all documents called for by the subpoenas and the PI Order (Docket Item 20).  The Banks oppose this motion arguing:  (1) the Banks do not have custody or control of documents located in China and (2) plaintiffs' motion should be denied in accordance with notions of comity.

III.  <u>Analysis</u>

    A.  Scope of Subpoena
        <u>Served Pursuant to Rule 45</u>[1]

      1.  <u>Applicable Law</u>

    Rule 45 of the Federal Rules of Civil Procedure states that a subpoena may command a non-party to produce documents that are in its "possession, custody, or control."  Fed.R.Civ.P. 45; <u>see also</u> <u>Linde v. Arab Bank, PLC</u>, 262 F.R.D. 136, 141 (E.D.N.Y. 2009).

> "Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand."  <u>Searock v. Stripling</u>, 736 F.2d 650, 653 (11th Cir. 1984).  "Control" may also be found where an entity has "access to" and the "ability to obtain the documents."  <u>Bank of New York v. Meridien BIAO Bank Tanzania Ltd.</u>, 171 F.R.D. 135, 144 (S.D.N.Y. 1997); <u>see also</u>, <u>e.g.</u>, <u>In re Ski Train Fire of November 11, 2000 Kaprun Austria</u>, 2006 WL 1328259, *5 (S.D.N.Y. 2006) (same); <u>Addamax Corp. v. Open Software Found., Inc.</u>, 148 F.R.D. 462, 467 (D.Mass. 1993) (same).  The party seeking to compel a subsidiary to produce the documents of its foreign parent has the burden of showing that the documents are within the local subsidiary's con-

---

[1]The New York branches of the Banks are branches of the same corporate entities as their counterparts in China.  Accordingly, this Court has personal jurisdiction over the Banks.  The New York branches are not affiliates or subsidiaries.  <u>See</u> <u>Milliken & Co. v. Bank of China</u>, 09 Civ. 6123 (LMM), 2010 WL 5187744 at *8 (S.D.N.Y. Dec. 6, 2010) (McKenna, D.J., adopting Report & Recommendation of Francis, M.J.); <u>Dietrich v. Bauer</u>, 95 Civ. 7051 (RWS), 2000 WL 1171132 at *4 (S.D.N.Y. Aug. 16, 2000) (Sweet, D.J.).  The Banks do not contest this Court's jurisdiction.

>           trol.  See, e.g., State of New York v. Nat'l R.R.
>           Passenger Corp., 233 F.R.D. 259 (N.D.N.Y. 2006). "Ac-
>           cess" and "ability to obtain documents" have been found
>           where "documents ordinarily flow freely between" parent
>           and subsidiary.  Hunter Douglas, Inc. v. Comfortex
>           Corp., No. CIV. A. M8-85, 1999 WL 14007, at *3 (S.D.N.-
>           Y. Jan. 11, 1999).

Linde v. Arab Bank, PLC, supra, 262 F.R.D. at 141 (footnote

omitted).  See also Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490

F.3d 130, 138 (2d Cir. 2007) (documents are within a party's

possession, custody or control when it has the practical ability

to obtain them); Vacco v. Harrah's Operating Co. Inc., No. 1:07-

CV-0663 (TJM/DEP), 2008 WL 4793719 at *9 (N.D.N.Y. Oct. 29, 2008)

("The touchstone of control, which has been variously defined by

the courts, is the ability, whether through the exercise of a

legal right or authority or through other means, to obtain the

requested documents."); see George Hantscho Co. v. Miehle-Goss-

Dexter, Inc., 33 F.R.D. 332, 334-35 (S.D.N.Y. 1963) (Palmieri,

D.J.).

        Regardless of the witness' legal relationship to a

document, for the purposes of a Rule 45 subpoena, a document is

within a witness's "possession, custody, or control" if the

witness has the practical ability to obtain the document.  Babaev

v. Grossman, No. CV03-5076 (DLI)(WDW), 2008 WL 4185703 at *3

(E.D.N.Y. Sept. 8, 2008) ("Documents are under a party's control

when it has the right, authority or practical ability to obtain

them from a non-party."); In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (Peck, M.J.) ("Under Rule 34, control does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.") (internal quotation marks and citations omitted), aff'd sub nom., Gordon Partners v. Blumenthal, 02 Civ. 7377 (LAK), 2007 WL 1518632 (S.D.N.Y. May 17, 2007) (Lewis, D.J.); see In re Zyprexa Prods. Liab. Litig., 254 F.R.D. 50, 58 (E.D.N.Y. 2008), aff'd, 04-MD-1596, 2008 WL 4682311 (E.D.N.Y. Oct. 21, 2008); Bank of New York v. Meridien BIAO Bank Tanzania, Ltd., 171 F.R.D. 135, 146-47 (S.D.N.Y. 1997) (Francis, M.J.); George Hantscho Co. v. Miehle-Goss-Dexter, Inc., supra, 33 F.R.D. at 334-35.[2]  If the party subpoenaed has the practical ability to obtain the documents, the actual physical location of the documents -- even if overseas -- is immaterial.  Matter of Marc Rich & Co., A.G., 707 F.2d 663, 667 (2d Cir. 1983); In re

---

[2]Although some of the cases cited herein involve requests for the production of documents served pursuant to Fed.R.Civ.P. 34 rather than a Rule 45 subpoena, the difference is immaterial. "The scope of the two rules is coextensive . . . at least with respect to documentary discovery."  SEC v. Credit Bancorp, Ltd., 194 F.R.D. 469, 471 n.4 (S.D.N.Y. 2000) (Sweet, D.J.), citing First Am. Corp. v. Price Waterhouse LLP, 154 F.3d 16, 21 (2d Cir. 1998).

Flag Telecom Holdings, Ltd. Sec. Litig., 236 F.R.D. 177, 180
(S.D.N.Y. 2006) (Conner, D.J.); Cooper Indus., Inc. v. British
Aerospace, Inc., 102 F.R.D. 918, 920 (S.D.N.Y. 1984) (Edelstein,
D.J.).  However, "[l]egal and practical inability to obtain the
requested documents from the non-party, including by reason of
foreign law, may place the documents beyond the control of the
party who has been served with the Rule 34 request." Cohen v.
Horowitz, 07 Civ. 5834 (PKC), 2008 WL 2332338 at *2 (S.D.N.Y.
June 4, 2008) (Castel, D.J.), citing Shcherbakovskiy v. Da Capo
Al Fine, Ltd., supra, 490 F.3d at 138.

        The burden of demonstrating that the party from whom
discovery is sought has the practical ability to obtain the
documents at issue lies with the party seeking discovery. Golden
Trade S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 n.7 (S.D.N.-
Y. 1992) (Dolinger, M.J.) ("In the face of a denial by a party
that it has possession, custody or control of documents, the
discovering party must make an adequate showing to overcome this
assertion."); accord Honda Lease Trust v. Middlesex Mut. Assur.
Co., No. 3:05CV1426 (RNC), 2008 WL 3285242 at *2 (D. Conn. Aug.
7, 2008); SEC v. Credit Bancorp, Ltd., supra, 194 F.R.D. at 472;
In re Lozano, 392 B.R. 48, 54 (Bnkr.S.D.N.Y. 2008) (Glenn, B.J.).

        "[A] corporation is presumed to have custody and
control of its own records ordinarily required in the course of

11

business, and the burden of proving otherwise is on the corpora-
tion" (Pl.'s Mem. in Supp. at 7, <u>citing</u> <u>Hunter Douglas, Inc. v.</u>
<u>Comfortex Corp.</u>, CIV. A. M8-85 (WHP), 1999 WL 14007 at *3 n.6
(S.D.N.Y. Jan. 11, 1999) (Pauley, D.J.); <u>Cooper Indus. Inc. v.</u>
<u>British Aerospace, Inc.</u>, <u>supra</u>, 102 F.R.D. at 920 n.2; <u>In re</u>
<u>Equitable Plan Co.</u>, 185 F. Supp. 57, 60-61 (S.D.N.Y. 1960)
(Herlands, D.J.) (requiring foreign banks to respond to document
subpoenas served on New York branches)).  In this case, plain-
tiffs' subpoenas were directed to the corporate entities of BOC,
ICBC and CMB -- entities which actually have branch offices (not
subsidiaries or affiliates) in New York.

  2.  Location of the Documents

    The New York branch offices all claim that the docu-
ments at issue are located in their China branches, and they
assert that the New York and China branches do not share computer
systems that can access the information sought and do not other-
wise exchange the type of information requested (Declaration of
Richard Pagnotta, dated May 17, 2011 (Docket Item 26), ("Pagnotta
Decl.") ¶¶ 2-3; Declaration of John Beauchemin, dated May 17,
2011 (Docket Item 28), ("Beauchemin Decl.") ¶¶ 3-6; Declaration
of Xintao Luo, dated May 17, 2011 (Docket Item 30), ("Luo Decl.")
¶¶ 3-6).  Therefore, the Banks claim that the documents are not

in the New York branches' custody and control and cannot be
produced.  They also claim that their personnel "do not have the
authority to direct personnel at the head offices or at Chinese
branches to disclose customer account information" and lack the
"ability" or "legal right" to obtain the information plaintiffs
request (Memorandum of Law in Opposition to Plaintiffs' Motion to
Compel the Production of Documents from Non-parties Bank of China
and Industrial and Commercial Bank of China, Ltd., dated May 17,
2011 (Docket Item 31), ("BOC/ICBC Mem. in Supp.") at 12-13,
citing Linde v. Arab Bank, PLC, supra, 262 F.R.D. at 141 and
Zenith Electronics v. Vizio, Misc. No. M8-85, 2009 WL 3094889, at
*2 (S.D.N.Y. Sept. 25, 2009) (Pauley, D.J.)).  The Banks further
note that although their foreign customers can access their
accounts electronically in the United States, the United States
branches of the Banks cannot themselves access this information
(see Pagnotta Decl. ¶ 4; Beauchemin Decl. ¶ 4).

        Plaintiffs claim that because "[n]one of the Banks' New
York branches are separately incorporated from the branches that
operate overseas, including the branches in China," the Banks
should be deemed to have custody and control over the documents
at issue (Pl.'s Mem. in Supp. at 5).

13

3.   The Banks have Custody
     and Control of the Documents

As noted by plaintiffs, "a corporation is presumed to have custody and control of its own records ordinarily required in the course of business, and the burden of proving otherwise is on the corporation" (Pl.'s Mem. in Supp. at 7, citing Hunter Douglas, Inc. v. Comfortex Corp., supra, 1999 WL 14007 at *3 n.6). "Clear proof of lack of possession and control is necessary to rebut the presumption." First Nat'l v. IRS, 271 F.2d 616, 618 (2d Cir. 1959).  In this case, plaintiffs' subpoenas are directed to the corporate entities of BOC, ICBC and CMB.  Though they were served on their branch offices in New York, the subpoenas are directed to these corporate entities in their entirety. The Banks do not dispute that their New York and China branches are part of the same corporate entity.  The necessary inquiry, therefore, is whether the Banks have overcome the presumption that they control the documents within their China branches.

This case is analogous to Ssangyong Corp. v. Vida Shoes Int'l, Inc., 03 Civ. 5014 (KMW)(DFE), 2004 WL 1125659 (S.D.N.Y. May 20, 2004) (Eaton, M.J.), in which the New York branch of a bank headquartered in Hong Kong claimed it did not have custody and control over the documents in the foreign branch.  The Court held that where the foreign bank and its New York branch were not

14

"separate entities," and account holders were aware that docu-
ments could be sent outside the foreign branch, the New York
branch had custody and control of the documents regardless of
their location abroad.  Ssangyong Corp. v. Vida Shoes Int'l,
Inc., supra, 2004 WL 1125659 at *4-5.  Although the Banks are
correct that an analysis of the "reality of whether the entity
from which discovery is sought has actual control over the
records" has been used to determine the reach of a subpoena or
document request (Memorandum of Law of Third Party China Mer-
chants Bank in Opposition to the Plaintiffs' Motion to Compel,
dated May 17, 2011 (Docket Item 23), ("CMB Mem. in Supp.") at 7),
this analysis is usually warranted only "[w]here there are two
entities."  Ssangyong Corp. v. Vida Shoes Int'l, Inc., supra,
2004 WL 1125659 at *4 (emphasis added).

          The Banks cite several cases in which motions to compel
discovery were denied because one branch of an entity was found
to lack control over the documents of another (CMB Mem. in Supp.
at 7, 10; BOC/ICBC Mem. in Supp. at 13 n.3, citing New York ex
rel. Boardman v. Nat'l R.R. Passenger Corp., 233 F.R.D. 259, 268
(N.D.N.Y. 2006); Zenith Electronics v. Vizio, supra, 2009 WL
3094889 at *2; Linde v. Arab Bank, PLC, supra, 262 F.R.D. at 142-
45).  However, these cases are not instructive because they give
no insight into the fact-specific question of whether the Banks

15

in this case, the New York branches of which are not legally separate entities, have overcome the presumption that they have control over their own documents.

The Banks also discuss several cases in which a corporate branch was either found to have control over documents in another branch, or did not argue otherwise (CMB Mem. in Supp. at 8-10; BOC/ICBC Mem. in Supp. at 13 n.13, citing First Nat'l v. IRS, supra, 271 F.2d at 618; United States v. First Nat'l City Bank, 396 F.2d 897, 898 n.2[3] (2d Cir. 1968); Ings v. Ferguson, 282 F.2d 149, 151-52 (2d Cir. 1960); In re Equitable Plan Co., supra, 185 F. Supp. at 59)). Again, these cases are not helpful because they do nothing to answer the factual question of whether the Banks have custody and control of the documents requested in this case.

The Banks attempt to overcome the presumption that they have custody and control over the documents by asserting that their New York and China branches have separate computer systems, and that their New York personnel cannot compel the China headquarters to produce account information. These facts are of no moment, however, because the subpoena is directed to the Banks as a whole, not solely the New York branches. The Banks do not

---

[3]CMB cites footnote 3, but quotes footnote 2.

16

argue that BOC, ICBC and CMB lack control over documents in China.  Accordingly, I find that the documents requested are, in fact, in the Banks' custody and control.

B.  Existence of a
    True Conflict

     In addition to arguing that they do not have possession and control of the documents, the Banks resist production on the ground that production is prohibited by Chinese law.  They rely on the following provisions of Chinese law, among others, in asserting this contention:

- Commercial Bank Law Article 6 which provides that commercial banks shall safeguard the legal rights and interests of depositors against the encroachment of any entity or individual

- Article 24 of the Corporate Deposit Regulations which provides that a financial institution shall keep secret the deposits of corporate depositors

- Article 28 of the Corporate Deposit Regulations which provides that savings institutions, defined to include banks, and their personnel shall keep secret depositors' savings and related information.  A commercial bank that discloses information about the deposit of a corporate depositor in violation of the provisions of Article 24, or looks into, freezes or debits the funds of a corporate depositor on behalf of others in violation of Chinese law, can be punished according to Article 73 of the Law of the People's Republic of China on Commercial Banks

- The Provisions on the Administration of Financial Institutions' Assistance in the Inquiry into, Freeze or Deduction of Deposits which provide the procedure for

inquiring into, freezing, or debiting banks' accounts. At least two conditions must be met before such an action can take place:  first, the request for inquiry into, freezing or debiting funds from the deposit account must be from an authorized governmental entity; second, the governmental entity must present the bank with a document called "a notice on the assistance with the inquiry into, or freeze or deduction of deposits" issued by the governmental entity at the appropriate level

- Article 73 of the Commercial Bank Law which provides that if a commercial bank illegally discloses informa- tion about, freezes, or debits an account, it shall pay interest for the deferred payment and the banking regulatory organ of the State Council shall order the commercial bank to take corrective action and impose on it a fine of not less than RMB 50,000 Yuan and not more than RMB 500,000 Yuan.  The bank may also be subject to civil liability from the depositors

- Article 78 of the Commercial Bank Law which provides that if a commercial bank violates Chinese law as described in Article 73, its directors, senior manage- ment personnel and other persons who are held directly responsible shall be given disciplinary punishment, which may include a note in the individual's human resources file, demotion or dismissal

- Article 253(A) of China's Criminal Law which pertains to staff members of particular institutions, including state and financial entities.  If these staff members sell or illegally provide personal information of citizens to others in violation of Chinese law, which they obtained during the entity's performance of duties or provision of services, those staff members shall, if the circumstances are serious, be sentenced to a fixed term of imprisonment of not more than three years, additional criminal detention and/or a fine.  Where any entity commits such a crime, it shall be fined, and the individuals in charge as well as any other individual who may be directly liable for the crime, shall be punished in accordance with the applicable law.  These restrictions apply in the absence of customer consent

(see Declaration of Zhipan Wu, dated May 17, 2011 (Docket Item 25), ("Wu Decl.") ¶¶ 9-33; Translation, attached to Wu Decl. as Exs. B-1, B-2, B-3, B-4, B-6; Declaration of James Feinerman, dated May 17, 2011 (Docket Item 29), ("Feinerman Decl.") ¶¶ 21-53).

Where a party from whom discovery is sought asserts foreign law as a bar to production, courts perform a comity analysis to determine the weight to be given to the foreign jurisdiction's law.  In re Maxwell Commc'n Corp., 93 F.3d 1036, 1049 (2d Cir. 1996); see also Strauss v. Credit Lyonnais, S.A., No. CV-06-0702 (CPS), 2006 WL 2862704 at *18 (E.D.N.Y. Oct. 5, 2006); Container Leasing Int'l, LLC v. Navicon, S.A., No. CIV303V00101 (AWT), 2006 WL 861012 at *6 (D. Conn. Mar. 31, 2006); Alfadda v. Fenn, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (Katz, M.J.).  Plaintiffs do not dispute that there is a true conflict between United States and Chinese law on this issue and that resort to a comity analysis is appropriate.

C.   <u>Comity Analysis</u>[4]

In determining whether to order discovery of foreign documents and information, courts in this Circuit follow the Restatement (Third) of Foreign Relations Law § 442(1)(c) and consider:  (1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of retrieving the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is lo-cated.  <u>See</u> <u>Gucci America, Inc. v. Curveal Fashion</u>, 09 Civ. 8459 (RJS)(THK), 2010 WL 808639 at *2 (S.D.N.Y. Mar. 8, 2010) (Katz, M.J.); <u>Minpeco, S.A. v. Conticommodity Servs., Inc.</u>, <u>supra</u>, 116

---

[4]Comity is defined,

> in the legal sense, [a]s neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other.  But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

<u>Hilton v. Guyot</u>, 159 U.S. 113, 163-64 (1895).

F.R.D. at 523.  "In addition, courts in the Second Circuit may
also consider the hardship of compliance on the party or witness
from whom discovery is sought [and] the good faith of the party
resisting discovery."  <u>Gucci America, Inc. v. Curveal Fashion</u>,
<u>supra</u>, 2010 WL 808639 at *2 (internal quotations omitted).

     1. <u>Importance of the Information</u>

     Plaintiffs claim that discovery of defendants' opera-
tions and finances from the Banks is vital to the litigation
because defendants have not appeared in the action and it appears
that defendants themselves will not be providing any discovery
(Pl.'s Mem. in Supp. at 11).  Plaintiffs maintain that the Banks'
records include information regarding "'the sources and uses of
the funds'" from the counterfeiting operation, and that without
this information, plaintiffs will not be able to determine the
size and scope of defendants' illegal enterprise (Pl.'s Mem. in
Supp. at 11-12; Circular of the People's Bank of China, dated
Jan. 1, 2005 and attached to Weigel Decl. as Ex. 23).  The Banks
argue that plaintiffs have already obtained this information from
GoDaddy.com, the website provider, and PayPal, and, therefore, it
is not crucial that plaintiffs obtain it from the Banks.  The
Banks claim that because plaintiffs have established that PayPal
was the sole method of payment for the counterfeit goods sold on

defendants' websites, the Banks have no additional information. In reply, plaintiffs note that PayPal records do not identify the recipients of the funds or where the funds were transferred following their deposit (BOC/ICBC Mem. in Supp. at 14-15; CMB Mem. in Supp. at 13; Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Compel the Production of Documents from Third-Parties, dated May 24, 2011 (Docket Item 32), ("Pl.'s Reply Mem.") at 10-11).

Plaintiffs are correct in this regard.  Because the Banks' records could potentially reveal the identities of those involved in the counterfeiting operation, they are important to plaintiffs' claims.  Moreover, account transaction records could allow plaintiffs to discover if the funds from the accounts were used to create counterfeit goods, thereby identifying manufacturers, or to compensate others involved in the operation, thereby identifying other defendants.  This information cannot now be obtained from the websites' records or from defendants, making its production by the Banks all the more important.

Both plaintiffs and the Banks assert several additional arguments concerning the importance of the information, including whether plaintiffs may obtain discovery concerning enforcement of a judgment at this time.  Because these documents are relevant to the litigation at this, the pre-judgment stage, their importance

does not depend on whether they would be discoverable in connection with the enforcement of any judgment that may be entered in this matter.  Likewise, it does not matter at this stage whether the extraterritorial assets could be restrained by the PI Order or some other mechanism.  Because plaintiffs have demonstrated that the information they seek from the Banks is important for pursuing their claims at the present stage of the litigation, this factor weighs in favor of plaintiffs.

### 2.   The Requests' Specificity

The Banks next argue that plaintiffs' subpoenas are overly broad, but do not single out any particular request[5] to demonstrate overbreadth (BOC/ICBM Mem. in Supp. at 16; CMB Mem. in Supp. at 16).  In fact, plaintiffs' subpoenas here are virtually identical to that at issue in Curveal, which was found to be narrowly tailored (see Curveal Subpoena, dated Nov. 5, 2009 and attached to Declaration of Jennifer Halter, dated May 24, 2011 (Docket Item 33), ("Halter Decl.") as Ex. 5).  Gucci America, Inc. v. Curveal Fashion, supra, 2010 WL 808638 at *3.  However, CMB argues that, unlike in Curveal, plaintiffs' current requests

---

[5]BOC and ICBC claim that plaintiffs request suspicious activity reports which the Banks are prohibited from producing by law (BOC/ICBC Mem. in Supp. at 16).  The inclusion of this request does not render the subpoena overly broad.

are not targeted at specific accounts (CMB Mem. in Supp. at 16;
BOC Subpoena, dated Jan. 7, 2011 and attached to Weigel Decl. as
Ex. 7; ICBC Subpoena, dated Jan. 7, 2011 and attached to Weigel
Decl. as Ex. 9; CMB Subpoena, dated Jan. 26, 2011 and attached to
Weigel Decl. as Ex. 11).  To the contrary, these requests, like
those in Curveal, are directed to the accounts of the defendants.
In addition, plaintiffs provided account numbers for some defen-
dants (see Emails of Jennifer Colgan, attached to Weigel Decl. as
Ex. 10).  Certainly, these requests are sufficiently specific.
This prong, then, also weighs in favor of plaintiffs.

     3.   Whether Information
         Originated in the United States

      Plaintiffs claim that because the funds in the relevant
accounts originated in the United States, and because the Banks'
customers can access their foreign accounts in the United States,
the information at issue cannot be said to originate solely in
China (Pl.'s Mem. in Supp. at 14-15).  The Banks do not deny
these facts, but correctly note that the actual information that
plaintiffs seek is located abroad and cannot be accessed by
personnel at BOCNY, ICBCNY or CMBNY (BOC/ICBC Mem. in Supp. at

16-17; CMB Mem. in Supp. at 16).[6]  The overseas location of this information weighs in favor of the Banks.  Linde v. Arab Bank, PLC, supra, 262 F.R.D. at 150; Gucci America, Inc. v. Curveal Fashion, supra, 2010 WL 808639 at *3.

###### 4.  Alternative Means for Securing the Information

All parties acknowledge that a request for discovery by way of the Hague Convention is potentially an alternative means of securing the information at issue.  Plaintiffs have asserted five reasons why such a request would be futile (Pl.'s Mem. in Supp. at 15-19).  Generally, they argue that China's Hague Convention procedures "do not offer a meaningful avenue to discovery" because the process is likely to be "'unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules'" (Pl.'s Mem. in Supp. at 16, quoting Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, 482 U.S. 522, 542-44 (1987)).

---

[6]Plaintiffs also claim that BOC did not search its Los Angeles branch for relevant documents and it is possible that responsive documents exist at that location (Pl.'s Mem. in Supp. at 14).  Because the parties have not adequately briefed this issue, my decision addresses only the production of documents from the Banks' China branches.

25

(1)   China's Record of Enforcement
of Haque Convention Requests

First, plaintiffs argue that the United States Depart-

ment of State had previously posted on its website that

> While it is possible to request compulsion of evidence
> in China pursuant to a letter rogatory or letter of
> request (Hague Evidence Convention), such requests have
> not been particularly successful in the past.  Requests
> may take more than a year to execute.  It is not un-
> usual for no reply to be received or after a consider-
> able time has elapsed, for Chinese authorities to
> request clarification from the American court with no
> indication that the request will eventually be executed

(Pl.'s Mem. in Supp. at 17; State Department Circular, attached

to Weigel Decl. as Ex. 29, (the "Circular") at 5).  The Banks

correctly note that this language has been removed from the State

Department website (BOC/ICBC Mem. in Supp. at 18; CMB Mem. in

Supp. at 17-18).  The State Department has not explained its

reason for the removal, but BOC and ICBC claim that it suggests

that the State Department no longer believes the statement to be

accurate (BOC/ICBC Mem. in Supp. at 2).

CMB correctly points out that plaintiffs fail to cite

the language from the State Department's website that states "The

United States is seeking clarification from the Government of the

People's Republic of China concerning how the Hague Evidence

Convention will be applied in China" (CMB's Mem. in Supp. at 17-

18 n.18; Circular at 6).  CMB further notes that when this

26

passage was posted, the Circular included citations to sources that were over fifteen years old, and ante-dated China's ratification of the Hague Convention in 1997 (CMB Mem. in Supp. at 17 n.18; Circular at 7-8, <u>citing</u> Hague Conference on Private International Law, Status Table, http://www.hcch.net/ index_en.php?act=conventions.status&cid=82).  Moreover, CMB claims that China has actively implemented the Convention, and in 2003 designated China's highest local courts to directly forward and transfer judicial assistance requests in accordance with the Hague Convention (CMB's Mem. in Supp. at 18 n.18, <u>citing</u> Huang Jin et. al., <u>Chinese Judicial Practice in Private International Law:  2006</u>, 8 Chinese J. Int'l L. 715, 717 (2009)).  BOC and ICBC specify that the Chinese Ministry of Justice has reported that over the last five years it has executed approximately 50% of the requests it has received, and that it takes an average of six to twelve months for a request to be executed.  In the first half of 2010, the Ministry of Justice honored thirty-seven requests for evidence in commercial and civil matters (BOB/ICBC Mem. in Supp. at 2; Feinerman Decl. ¶ 12).

I agree with the Banks that the deletion of the language from the State Department's Circular that is critical of China's enforcement of Hague Convention requests implies that the conditions described by the omitted language no longer exist.

27

There would be no reason for the State Department to withdraw the language if it were still accurate.[7]

Accordingly, I conclude that the Banks have demonstrated that the State Department website language should no longer be given any weight since it has been deleted.

(2) Plaintiffs' Contention that
the Southern District
Has Concluded the Hague
Convention in China is Futile

Plaintiffs cite Milliken & Co. v. Bank of China, supra, 758 F. Supp. 2d at 248, and claim that the Southern District has specifically rejected the argument that plaintiffs may easily obtain documents in China through the Hague Convention (Pl.'s

---

[7]The Banks further note that there are several examples of New York courts requiring parties to utilize the Hague Convention (BOC/ICBC Mem. in Supp. at 17-18; CMB Mem. in Supp. at 16-17, citing Laker Airways Ltd. v. Pan American World Airways, 607 F. Supp. 324, 326-27 (S.D.N.Y. 1985) (Brieant, D.J.); Societe Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa, supra, 482 U.S. at 542-44; Hudson v. Hermann Pfauter GmbH & Co., 117 F.R.D. 33, 38 (N.D.N.Y. 1987); Orlich v. Helm Bros., Inc., 160 A.D.2d 135, 143, 560 N.Y.S.2d 10, 14-15 (1st Dep't 1990); Ings v. Ferguson, supra, 282 F.2d at 152; In re Vivendi Universal, S.A. Sec. Litig., 02 Civ. 5571 (RJH), 2004 WL 3019766 at *1 (S.D.N.Y. Dec. 30, 2004) (Holwell, D.J.); Intercont'l Credit Corp. v. Roth, 154 Misc.2d 639, 641-42, 595 N.Y.S.2d 602, 603 (Sup. Ct. New York Co. 1991)). However, because none of these cases involve contemporary Hague Convention requests to China, they provide no assistance in predicting the effectiveness of the Hague Convention requests suggested by the Banks.

Mem. in Supp. at 17).  The Banks argue that this case is not
controlling because it was based on the language that has now
been removed from the State Department's website (BOC/ICBC Mem.
in Supp. at 18; CMB Mem. in Supp. at 18 n.19).  They also note
that it is factually distinguishable because Milliken involved a
"turnover" action following an unpaid judgment against a BOC
customer.  BOC asserted an affirmative defense, claiming that the
account holder's property was subject to "'claims of and security
interests held by the Bank that are superior to any claim of
Petitioner's,'" Milliken & Co. v. Bank of China, supra, 758 F.
Supp. 2d at 241-42, while also arguing that it should not be
required to answer interrogatories or produce documents unless
such demands were made pursuant to the Hague Convention.
Milliken & Co. v. Bank of China, supra, 758 F. Supp. 2d at 243.
The Banks claim that the court's discussion of the Hague Conven-
tion was "at best an alternative holding" in light of the court's
suggestion that as a party asserting an affirmative claim, BOC
was in a poor position to resist the discovery procedures set
forth in the Federal Rules of Civil Procedure (CMB Mem. in Supp.
at 18 n.19, citing Milliken & Co. v. Bank of China, supra, 758 F.
Supp. 2d at 245 (footnote omitted)).

        Plaintiffs' argument is based on a fundamental misap-
prehension of the principles of stare decisis.  An opinion of a

29

District Judge does not bind the court in which the District
Judge sits.  Hawkins v. Steingut, 879 F.2d 317, 321 (2d Cir.
1987); Bishop v. Henry Modell & Co., 08 Civ. 7541 (NRB), 2009 WL
3762119 at *10 n.10 (S.D.N.Y. Nov. 10, 2009) (Buchwald, D.J.);
Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.,
421 F. Supp. 2d 741, 768 n.22 (S.D.N.Y. 2006) (Leisure, D.J.).
Milliken does not, therefore, constitute binding precedent,
although it does have some persuasive power.

### (3) Expert Opinions

          Plaintiffs next rely on the opinion of Donald Clarke, a
professor at George Washington University Law School (Pl.'s Mem.
in Supp. at 18-19).  Specifically, plaintiffs rely on Clarke's
opinion that "'a Hague Convention request [to China] issued by a
United States court is not a realistic or meaningful option for
the Plaintiffs in [a counterfeiting] case to obtain the informa-
tion that they seek' concerning the bank records of the counter-
feiters" (Pl.'s Mem. in Supp. at 17-18; Declaration of Donald
Clarke, dated Jan. 3, 2010 and attached to Weigel Decl. as Ex. 22
("Clarke Decl."), ¶¶ 21-22).

          BOC and ICBC correctly note that Professor Clarke cites
to a website entitled "China Law Blog," which in turn cites to
the obsolete version of the State Department's website, to

support his opinion (BOC/ICBC Mem. in Supp. at 18-19; <u>see</u> Dan Harris, <u>How to Sue a Chinese Company. Part II. Discovery</u>, China Law Blog, Nov. 9, 2010, http://www.chinalawblog.com/2010/ 11/how_to_sue_a_chinese_ company_part_ii_discovery.html).[8]

Plaintiffs also rely on the opinion of William Alford, Director of East Asian Legal Studies at Harvard Law School, in which he states "'it does not seem likely that a Hague Convention request issued by a United States court would result in Plaintiffs in this case obtaining the information they seek.'" Alford, in turn, cites to five other reports supporting a similar conclusion (Pl.'s Reply Mem. at 14-15; Declaration of William Alford, dated May 24, 2011 (Docket Item 34), ("Alford Decl.") ¶¶ 23, 26).

------------

[8]CMB also notes that three years ago Professor Clarke opined that

> Chinese law, at least insofar as its provisions have been cited by the BOC, does not prohibit the BOC from complying with the order of a United States court to disclose information about customer accounts, to freeze such accounts, or ultimately to transfer funds from such accounts to a judgment creditor

(2008 Declaration of Donald Clarke, dated June 27, 2008 and attached to Clarke Decl. as Ex. B). Now, however, Professor Clarke claims that Chinese Law does have that effect (Clarke Decl. ¶ 12). In fact, Professor Clarke appears to assert that his prior impression was based solely on the provisions of Chinese law BOC cited in 2008, while his current position is informed by the additional provisions BOC currently cites (Clarke Decl. ¶¶ 12-14). This potential equivocation is not relevant to Clarke's analysis of the futility of the Hague Convention request.

BOC and ICBC's expert, Professor James Feinerman, professor of Asian Legal Studies at Georgetown University Law Center, opines that "'China, especially now given its economic and legal progress in the last few years, would honor a properly tailored request for information through the Hague Convention'" and notes that in the first half of 2010, the Chinese Ministry of Justice honored thirty-seven requests for evidence in commercial and civil matters (BOC/ICBC Mem. in Supp. at 19; Feinerman Decl. ¶¶ 12, 15; Chinese Ministry of Justice Report, attached to Healy Decl. as Ex. C).

Similarly, Zhipan Wu, professor of law, Executive Vice Chancellor and Dean Emeritus at Peking University Law School, asserts that

> China is going through rapid development, and in the last 20 years has overhauled its judicial and regula-tory systems to become in line with international conventions. There is every reason to expect that Chinese courts will follow through on this development and will respond to a Hague Convention request issued by a U.S. court

(Wu Decl. at ¶ 36).

Conflicting expert opinions are not unique to this case.  To the extent these opinions, and the sources they cite, rely on the formerly extant version of the State Department website, they are less compelling.  However, because these experts appear to interpret the same empirical data divergently,

32

these declarations do little to push this factor more clearly in favor of plaintiffs or the Banks.

### (4) Relevant Literature

Plaintiffs also cite a 2008 paper concerning China's treatment of Hague Convention requests which states that few litigants have successfully obtained documents from China through the Hague Convention, and a 2011 article stating that utilization of a Hague Convention request in China may prove difficult (Pl.'s Mem. in Supp. at 18 n.14; International Discovery, dated August 2008 and attached to Weigel Decl. as Ex. 30, ("International Discovery") at 35-36; Stephanie A. Scharf et al., Discovery of Documents and People Abroad, PLIREF-PLL § 14:3 (2011)). BOC and ICBC correctly note that the sections in these articles concerning document discovery from China pursuant to the Hague Convention were based on Chinese laws restricting disclosure and the now-deleted State Department language (BOC/ICBC Mem. in Supp. at 19).[9] Thus, for the reasons set forth in Section III.C.4(1), these articles are not useful for this analysis.

---

[9]CMB also argues that the statement in the 2008 article that lawyers in China have been told that the Beijing high court executes one such request per year is unsupported, but nevertheless provides evidence of the fact that China does execute some Hague requests (International Discovery at 36).

33

(5)  China's Article 23 Reservation

Finally, plaintiffs note that in 1998 China adopted a reservation under Article 23 of the Hague Convention in which it stated that it will only execute pre-trial discovery requests for documents which are clearly enumerated in the request and which are of direct and close connection to the subject matter of the litigation (Pl.'s Mem. in Supp. at 18; Circular at 5-6).  Plaintiffs claim that this reservation indicates that China retains great discretion in determining whether to honor a request (Pl.'s Mem. in Supp. at 18-19, citing International Discovery at 35-36 and Fang Shen, Are You Prepared for this Legal Maze?, 72 U. Mo. Kan. C. L. Rev. 215 (2003), at 232).  CMB correctly points out that the law review article plaintiffs cite contains no authority for its conclusion (CMB Mem. in Supp. at 19 n.20).

More importantly, this reservation has been adopted by thirty-six Hague Convention signatories, including the United Kingdom and Switzerland, and, thus, the reservation does not demonstrate that China would refuse to execute a request for the documents plaintiffs seek (CMB Mem. in Supp. at 20, citing Hague Evidence Convention, Declarations Reservations, http://www.hcch. net/index_en.php?act=conventions.status&cid=82).  While it is not possible to conclude definitively whether China would execute a

request for the documents plaintiffs seek, the documents at issue certainly appear to be closely related to the litigation, and, therefore, plaintiffs' request is not clearly prohibited by this reservation.

Finally, while the Banks have not provided any examples of China executing a Hague request submitted by a United States trademark owner in a counterfeiting case (Pl.'s Mem. in Supp. at 19), CMB is correct to note that plaintiffs have not provided any examples in which China rejected such a request (CMB Mem. in Supp. at 20). CMB notes that the Chinese legal system has been developing rapidly over the last several years, and, therefore, there is little precedent concerning Chinese handling of Hague Convention requests (CMB Mem. in Supp. at 19). However, there is evidence that China has honored many judicial requests for documents. As noted in Section III.C.4(1), in the first half of 2010, the Chinese Judicial Assistance Center reported that it provided assistance to the Foreign Affairs Department of the Ministry of Justice "in respect of judicial assistance requests for civil and commercial cases including . . . investigation and evidence collection for 37 cases and 11 other cases" (Chinese Ministry of Justice Report, attached to Healy Decl. as Ex. C).

(6) Summary of Plaintiffs'
Futility Argument

Plaintiffs' five arguments in support of their conten-
tion that the Hague Convention is not a viable alternative method
for obtaining the information sought are not entirely persuasive.
While it appears that the United States State Department has
expressed doubt about China's implementation of Hague Convention
requests in the past, the State Department no longer expresses
this view.  The State Department's deletion of this language
renders the expert opinions which relied on it less persuasive.
Moreover, it appears that the Chinese courts have increased their
execution of these requests over time, but because this is a
relatively recent enterprise, there is a dearth of information as
to the current efficiency of this procedure.  In light of the
evidence that China does execute these requests, albeit at a rate
that is likely not ideal for plaintiffs, I cannot conclude that
this avenue is futile.  This factor, therefore, weighs in the
favor of the Banks.

5.   Interests of the States

The Banks argue that China has a significant interest
in enforcing its bank secrecy laws.  Professor Feinerman asserts
that these laws have been adopted to create confidence in a

relatively new banking system and to "[e]ncourag[e] its citizens who had historically been skeptical about the safety of their deposits in banks -- and their continued access to them -- [to utilize Chinese banks by providing] the strongest possible assurances of confidentiality" (BOC/ICBC Mem. in Supp. at 20; Feinerman Decl. ¶ 24; CMB Mem. in Supp. at 21; Wu Decl. ¶¶ 9-11).

Plaintiffs' arguments that this interest is entitled to diminished consideration because "competent organs" in China can gain access to these banking records, and account holders can waive their confidentiality, are not persuasive. Chinese law provides that only a limited number of Chinese bodies,[10] or account holders themselves, may access this information, thereby protecting individuals from indiscriminate intrusion. While it is true that "an absolute waiver of [] protections by the cus-tomer" has been considered significant in this analysis by the Second Circuit, this is not the deciding factor. See Gucci America, Inc. v. Curveal Fashion, supra, 2010 WL 808639 at *6, citing United States v. First Nat'l Bank, supra, 396 F.2d at 902. Moreover, there is no evidence that the account holders who would

---

[10]Chinese law provides that "competent organs" including "'the judicial organs, administrative organs, military organs and public institutions exercising administrative functions'" could retrieve account information and potentially submit it to a foreign court (Feinerman Decl. ¶ 33).

be affected by the execution of plaintiffs' requests here have, in fact, waived their rights.  China's multitude of criminal and civil regulations on the subject also evidence its strong interest in bank confidentiality.

Plaintiffs also claim that the true Chinese interest at issue is protecting against illicit or corrupt disclosure only. They claim that disclosure pursuant to a foreign court order does not contravene this policy (Pl.'s Reply Mem. at 16-17; Alford Decl. ¶ 12).  However, the applicable Chinese regulations are not limited to illicit or corrupt disclosures, and prosecutions have not required it.  In fact, BOC reports that it has been held liable for violating these laws unintentionally (BOC/ICBC Mem. in Supp. at 21; Feinerman Decl. ¶¶ 26, 51).

Still, plaintiffs argue that the "'United States interest in fully and fairly adjudicating matters before its courts . . . outweighs [a foreign country's] interest in protecting the confidentiality of its banking customers' records'" (Pl.'s Mem. in Supp. at 20, quoting Gucci America, Inc. v. Curveal Fashion, supra, 2010 WL 808639 at *7; Milliken & Co. v. Bank of China, supra, 2010 WL 5187744 at *9-10; Ssangyong Corp. v. Vida Shoes Int'l, Inc., supra, 2004 WL 1125659 at *11; In re Air Cargo Shipping Servs. Antitrust Litig., No. 06-MD-1775, 2010 WL 1189341 at *4 (E.D.N.Y. Mar. 29, 2010)).  Additionally,

plaintiffs note that the United States has a strong interest in enforcing its trademark laws (Pl.'s Mem. in Supp. at 20, citing Gucci America, Inc. v. Curveal Fashion, supra, 2010 WL 808639 at *5; Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107-08 (2d Cir. 2000); Gayle Martz, Inc. v. Sherpa Pet Grp., LLC, 651 F. Supp. 2d 72, 85 (S.D.N.Y. 2009) (Baer, D.J.)).

BOC and ICBC claim that the United States interest in this matter is mitigated by the fact that this information is of "'indirect and attenuated significance to the issues to be decided'" (BOC/ICBC Mem. in Supp. at 20, quoting Linde v. Arab Bank, PLC, supra, 262 F.R.D. at 151 and Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., 5:04 CV 1152, M8-85 (HB), 2005 WL 3046284 at *2 (S.D.N.Y. Nov. 14, 2005) (Baer, D.J.)).  However, as noted in Section III.C.1., this information is directly related to plaintiffs' claims.  Still, the Banks' status as non-parties does attenuate the United States interest in enforcing discovery obligations.  Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., supra, 2005 WL 3046284 at *2, citing Minpeco v. Conticommodity Servs., Inc., supra, 116 F.R.D. at 530.  Moreover, CMB is correct that the cases plain-tiffs cite that recognize the United States interest in the enforcement of its trademark laws do not hold that this interest

necessarily trumps a foreign sovereign's interest in bank confidentiality (CMB Mem. in Supp. at 22).

While the present case bears some similarities to Curveal in that the protections afforded by Chinese law can be waived by the customer and China has not yet voiced any objection to the production of the documents, it is distinguishable because Chinese law, unlike the Malaysian law at issue in Curveal, explicitly prohibits disclosure of the information plaintiffs seek. Gucci America, Inc. v. Curveal Fashion, supra, 2010 WL 808639 at *6-7. China's pertinent regulations appear to have very narrow exceptions, while those in Malaysia had several, indicating that there is a stronger foreign interest in this case than in Curveal.

Plaintiffs' reliance on Milliken & Co. v. Bank of China, supra, 758 F. Supp. 2d at 244-45, is also somewhat misplaced because the Court noted that because it was dealing with initial disclosures, required by a party, the sovereignty of the foreign state was implicated to a lesser extent than if it were dealing with demands for production directed to a non-party witness.

Plaintiffs also cite In re Air Cargo Shipping Servs. Antitrust Litig., supra, 2010 WL 1189341 at *4, which dealt with a French blocking statute -- a statute that has the objective of

40

"controlling access to information within [France's] borders" --
as opposed to the Chinese regulations which are meant to foster a
greater trust in the Chinese banking system.  Because the inter-
ests are not comparable, this case is not instructive.  Likewise,
plaintiffs also rely on Hermes Int'l v. Lederer de Paris Fifth
Ave., Inc., supra, 219 F.3d at 107-08, and Gayle Martz, Inc. v.
Sherpa Pet Grp., LLC, supra, 651 F. Supp. 2d at 85.  In those
cases, the Court discussed the important public policy concerns
protected by trademark law, but did not do so in the context of
enforcement of a subpoena directed to a foreign entity, and did
not address any conflicting foreign interests similar to those
protected by China.  Accordingly, those cases do little to
determine whether those interests should outweigh the foreign
interests in this case.

    While the United States certainly has an interest in
enforcing its orders and protecting trademark rights, the Chinese
interest in protecting its account holders' confidentiality
appears more significant in this case.  The regulations at issue
have few exceptions and appear to provide harsh consequences for
violations.  The fact that the Banks are non-parties further
pushes this factor in favor of the Banks.

6.  <u>Nature of the Hardship</u>

The Banks argue that they and their personnel would be forced to violate Chinese law and be subject to civil and criminal punishment if they were required to produce customer account information located in China (ICBC/BOC Mem. in Supp. at 21; CMB Mem. in Supp. at 22; Wu Decl. ¶¶ 21-28).

The Banks' status as non-parties weighs against compelling production of documents in violation of Chinese law because such an order "'should be imposed on a nonparty . . . only in extreme circumstances'" (BOC/ICBC Mem. in Supp. at 21, <u>citing</u> <u>Linde v. Arab Bank, PLC</u>, <u>supra</u>, 262 F.R.D. at 151). <u>See also</u> <u>Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd.</u>, <u>supra</u>, 2005 WL 3046284 at *2; <u>Minpeco S.A. v. Conticommodity</u> <u>Services, Inc.</u>, <u>supra</u>, 116 F.R.D. at 526-27.  The Banks need not prove that they will certainly be punished if forced to comply with plaintiffs' subpoenas, but they must show that the possibility of civil and/or criminal punishment for disclosure is more than speculative.  <u>British Int'l Ins. Co. Ltd. v. Seguros La</u> <u>Republica, S.A.</u>, 90 Civ. 2370 (JFK)(FM), 2000 WL 713057 at *8 (S.D.N.Y. June 2, 2000) (Maas, M.J.) ("[T]he party relying on foreign law has the burden of showing that such law actually bars [the] production.") (internal quotations and citations omitted);

42

see also Milliken & Co. v. Bank of China, supra, 758 F. Supp. 2d
at 249-50.

Contrary to plaintiffs' argument, Milliken & Co. v.
Bank of China, supra, 758 F. Supp. 2d at 249-50, does not resolve
this issue.  In Milliken, BOC was attempting to assert a prior
claim to the assets at issue without providing discovery.  The
Court there compelled discovery notwithstanding the prohibition
of Chinese law because it found that BOC had "'cited no instance
in which such sanctions have been imposed'" and that the threat
of prosecution was, therefore, speculative.  Milliken & Co. v.
Bank of China, supra, 758 F. Supp. 2d at 249-50, citing In re Air
Cargo Shipping Servs. Antitrust Litigation, No. 06 MD 1775, 2010
WL 2976220 at *2 (E.D.N.Y. July 23, 2010)[11]; Gucci America, Inc.
v. Curveal Fashion, supra, 2010 WL 808639 at *7.  Unlike Millik-
en, the Banks here have cited Chinese cases in which a commercial
bank was held liable to its customer after turning over the
individual's funds or information to a third party.  For example,
in Ruihua Li v. Agricultural Bank of China Jinggangshan Branch,
Jing Min Chu Zi No. 220 (People's Court of Jiggangshan City,

---

[11]It is unclear from the record whether BOC ever produced
the information requested in Milliken.  It appears that the case
settled before production occurred.  It is therefore not possible
to ascertain whether BOC was, or would have been, sanctioned
civilly or criminally for complying with the Court's order.

Jiangxi Province, Nov. 10, 2008), (attached to Wu Decl. as Ex. B-7), an account holder sued BOC for transferring funds from his bank account to his creditor.  The court ruled that the bank had to return the funds, unless the creditor did so first, because BOC may not "'disclose information about, freeze or turn over funds from the account of a depositor in favor of a third party'" without following the proper legal procedures (Wu Decl. ¶ 23; see Ruigua Li case, attached to Wu Decl. as Ex. B-7; Feinerman Decl. ¶ 45).

In another case, Yongsheng Wang v. Bank of China Nanjing Hexi Branch, Gazette of the Supreme People's Court of the Republic of China, Issue No. 2 2009, pp. 44-48 (People's Court of Gulou District, Nanjing City, Jiangsu Province, Nov. 26, 2008), (attached to Wu Decl. as Ex. B-8), BOC was held liable to a customer whose information and deposited funds were illegally obtained by three individuals using an ATM card reader and miniature video camera (Wu Decl. ¶ 24; Wang Case, attached to Wu Decl. as Ex. B-8; Feinerman Decl. ¶ 40).  The BOC branch was held liable to the customer in part because "'it is the obligations of a commercial bank under the Commercial Bank Law to keep the information of the depositor confidential . . . against the encroachment of any entity or individual'" (Wu Decl. ¶ 24; Wang Case, attached to Wu Decl. as Ex. B-8; Feinerman Decl. ¶ 41).

44

The Banks' experts argue that if BOC's unintentional breach of its obligation to protect account information and funds was punished, "a Chinese court will have no qualms in adjudging [the Banks] liable to the customer" for intentional breaches (Wu Decl. ¶ 25; Feinerman Decl. ¶ 47).[12]

In addition, the Banks' expert, Zhipan Wu notes that Article 253(A), which was enacted in October 2009, was used to prosecute defendants who illegally acquired personal information about individuals in China and sold it for profit.  Those defendants were sentenced to between three and eleven years in jail (Wu Decl. ¶ 28, citing People's Prosecutor of Xiangzhou District, Zhuhai Municipality v. Shao Guosong, Zhou Jianping, Xiang Xing Chu Zi No. 1337 (2009), attached to Wu Decl. as Ex. B-9). Although these circumstances are distinguishable, the case demonstrates that Article 253(A) statute has been used to prosecute individuals and that violations can result in serious punishment.

---

[12]Plaintiffs' argument that the Banks are less likely to be prosecuted because the Chinese government owns an interest in these institutions is unpersuasive.  It is clear that account holders can sue such institutions pursuant to these regulations, and have done so (Feinerman Decl. ¶¶ 54-57; Wu Decl. ¶¶ 31-33). Moreover, plaintiffs have presented no evidence that the Chinese authorities will fail to apply Chinese law to the Banks simply because they are partially owned by the Chinese government (Pl.'s Mem. in Supp. at 23-24).

While plaintiffs are correct that none of these examples are identical to the present case, they fail to cite any instances in which Chinese banks complied with a United States court order compelling production of documents without negative consequence.  Plaintiffs inability to cite such evidence, however, may be the result of the fact that there is no comprehensive compilation of judicial or prosecutorial actions in China (Wu Decl. ¶ 30).  Nevertheless, because these regulations have been used to the detriment of banks in the past, and the potentially harsh sanctions are applicable to both the Banks and their personnel, the potential for hardship places this factor in favor of the Banks.[13]

---

[13]Plaintiffs claim that <u>Gucci America, Inc. v. MyReplicaHandbag.com</u>, 07 Civ. 2438 (JGK), 2008 WL 512789 (S.D.N.Y. Feb. 26, 2008) (Koeltl, D.J.), demonstrates that the Banks are unlikely to be sanctioned for producing the requested documents because BOC allowed inspection of similar documents during that litigation and did not suffer any negative consequences (Pl.'s Mem. in Supp. at 22 n.17).  However, that case involved a defendant who appeared and consented to abide by a TRO which provided for disclosure, only to refuse to provide additional written consent to BOC (Stipulation, dated April 17, 2007 and attached to Saperstein Decl. as Ex. O; Letter of Walter Loughlin, dated June 21, 2007 and attached to Weigel Decl. as Ex. 20).  BOC claims that the defendant threatened to sue BOC in China following the freeze of his account (BOC/ICBC Mem. in Supp. at 22).  Because it appears these issues were resolved in a series of settlements, the specifics of which are not stated in the record (BOC/ICBC Mem. in Supp. at 22), and because of its distinguishable factual situation, I do not find this case instructive.

Finally, to the extent plaintiffs contend that because the Banks do business in the United States they should be compelled to produce the documents, their argument is unavailing. An entity's presence in the United States, without more, does not obviate the need for a comity analysis where compliance with a discovery request would violate foreign law.  Likewise, plaintiffs' claim that the Banks "made the decision to seek profits by participating in" this counterfeiting scheme is inaccurate; plaintiffs have submitted no evidence suggesting that the Banks had any awareness of the source of the funds at issue (Pl.'s Mem. in Supp. at 24).

### 7.   Good Faith of the Party Resisting Discovery

There is no evidence in the record that the Banks are acting in bad faith.  Plaintiffs are incorrect that the Banks have acted like the bank in <u>Milliken</u> in repeatedly failing to produce requested documents (Pl.'s Mem. in Supp. at 25).  The Banks contacted plaintiffs after receiving the PI Order and subpoenas, relayed the information found in their New York branches, and offered to help draft a Hague Convention request. The fact that the Banks chose to object to the subpoenas as

47

opposed to seeking relief from the PI Order does not indicate bad faith.[14]

D.  Summary of Comity Analysis

While the first two prongs of the comity analysis, namely the importance of the information and the specificity of the request, weigh in favor of plaintiffs, every other factor weighs in favor of the Banks.

Specifically, the fact that the information requested is located in China puts the third factor in favor of the Banks. The fourth factor, analyzing whether there is an alternative means for securing the information, similarly favors the Banks. The fact that the State Department removed language on its website critical of China's enforcement of Hague Convention requests implies that the omitted language is no longer accurate. Accordingly, case law, secondary sources and expert opinions which rely on this language to conclude that a Hague Convention request in China is not a viable mechanism for this kind of discovery are not persuasive.  Moreover, I do not believe that China's Article 23 reservation will necessarily preclude discov-

---

[14]Plaintiffs also claim that the Banks acted in bad faith by not contacting the account holders at issue to request consent (Pl.'s Mem. in Supp. at 25).  It is unclear from the record whether the Banks have done so.

ery of the documents plaintiffs seek because this reservation purports to limit execution of pre-trial discovery requests to those which are clearly enumerated and concern documents directly and closely related to the subject matter of the litigation. Because I find that these documents are so related, I do not agree that this will necessarily be a barrier to production.

The fifth factor, the respective interests of the states, also resolves in favor of the Banks, albeit more narrowly. While the United States certainly has a general interest in enforcing its laws and protecting trademark rights, the Banks' non-party status mitigates against these interests in this case. China's interest in protecting bank customers' privacy and encouraging use of, and confidence in, its relatively new banking system is evidenced by the multitude of civil and criminal regulations it has enacted to protect these interests. The potentially harsh sanctions and narrow exceptions to these regulations indicate that China's interests in cases such as this one are more significant than those at issue for the United States.

The sixth factor, examining the nature of the hardship imposed upon the foreign party, also weighs in favor of the Banks. Were the Banks to disclose the requested information in contravention of Chinese law, they could be subject to civil and

49

criminal sanctions.  Plaintiffs are correct that the examples in
the record in which the Banks have been held liable for viola-
tions of these regulations are not analogous to the case at hand.
However, there is no indication that the Banks will not be
prosecuted for violating these same regulations pursuant to a
Court Order from the United States.  The lack of records of
Chinese judicial decisions on this issue prevents a comprehensive
review of the application of these regulations.  Because the
Banks and their personnel could potentially be severely sanc-
tioned for such disclosure, this factor also weighs in favor of
the Banks.

Finally, there is no indication that the Banks have
acted with bad faith in this matter.  Accordingly, this prong
also weighs in their favor.

IV.  <u>Conclusion</u>

For all the foregoing reasons, plaintiffs are directed
to request the information they seek in China through the Hague

Convention at this time.  Should this process prove futile,

plaintiffs may renew their application to enforce their subpoe-

nas.

Dated:  New York, New York
        July 25, 2011

                              SO ORDERED,

                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Robert Weigel, Esq.
Gibson, Dunn & Crutcher, LLP (NY)
47th Floor
200 Park Avenue
New York, New York 10166

Lanier Saperstein, Esq.
Allen & Overy, LLP
1221 Avenue of the Americas
New York, New York 10020

Dwight Healy, Esq.
White & Case, LLP
1155 Avenue of the Americas
New York, New York 10036