UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

TIFFANY (NJ) LLC and TIFFANY AND COMPANY,

              Plaintiffs,

       v.

QI ANDREW, GU GONG, SLIVER DENG, and
KENT DENG, all d/b/a TIFFANYSTORES.ORG,
FASHION STYLE and STORESORG; ABC
COMPANIES; and JOHN DOES,

              Defendants.

------------------------------------------------------------------- x

:
:
:
:
:
:
:
:  2010 Civ. 9471 (WHP) (HBP)
:
:
:
:
:
:
:
:
:

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO
MAGISTRATE JUDGE PITMAN'S JULY 25, 2011 OPINION AND ORDER**

Pamela Rogers Chepiga
Lanier Saperstein
Adrienne Schwisow
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 610-6300

*Attorneys for non-Parties Bank of China and
Industrial and Commercial Bank of China*

September 9, 2011

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS ................................................................... 3

    A.    The Subpoenas At Issue ................................................... 3

    B.    The Banks Respond In Good Faith To The Preliminary
        Injunction And Subpoenas ............................................... 4

    C.    The Case Before Magistrate Judge Pitman ....................... 5

    D.    Magistrate Judge Pitman's Thoughtful Decision .............. 6

ARGUMENT ........................................................................................ 8

I.     PLAINTIFFS FACE A HIGH BURDEN UNDER RULE 72 .......... 8

II.    MAGISTRATE JUDGE PITMAN APPLIED THE PROPER TEST ... 10

III.   MAGISTRATE JUDGE PITMAN CORRECTLY EVALUATED
      THE COMITY FACTORS ............................................................ 11

    A.    The Requested Documents Are In China ........................... 11

    B.    The Hague Convention Provided An Alternative Means
        For Obtaining The Information ......................................... 12

        1.    Plaintiffs Incorrectly Now Argue That "Easily Obtained"
            Should Be The Standard ........................................... 12

        2.    Magistrate Judge Pitman Carefully Evaluated The Evidence
            And Reached A Reasoned Determination That The
            Hague Convention Provides A Viable Alternative Means
            To Obtain The Requested Information ..................... 15

        3.    Magistrate Judge Pitman Considered The Milliken Decision
            And Found It Inapposite ........................................... 18

    C.    China's Interest In Bank Secrecy Outweighs The U.S. Interest ... 18

D.      Magistrate Judge Pitman Correctly Held That The Banks Face
        Potential Sanctions And Liability If They Violate Chinese Law .........................21

IV.     THE DECISION IN <u>GUCCI AMERICA</u> HIGHLIGHTS THE
        IMPORTANCE OF DISCRETION IN COMITY CASES
        CONSIDERING THE HAGUE CONVENTION .............................................................22

V.      PLAINTIFFS' REPEATED INNUENDO THAT THE BANKS HAVE
        NEEDLESSLY WASTED TIME IS A RED HERRING..................................................23

CONCLUSION.......................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

Alfadda v. Fenn,
149 F.R.D. 28 (S.D.N.Y. 1993) ................................................................................10

Anderson v. City of Bessemer City, N.C.,
470 U.S. 564 (1985)......................................................................................9, 16

Bass Pub. Ltd. Co. v. Promus Cos. Inc..,
868 F. Supp. 615 (S.D.N.Y. 1994)......................................................................9, 11

British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.,
90 Civ. 2370 (JFK)(FM), 2000 WL 713057 (S.D.N.Y. June 2, 2000).........................................14

Catskill Dev., LLC v. Park Place Entm't Corp.,
206 F.R.D. 78 (S.D.N.Y. 2002) ....................................................................................9

Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.,
753 F. Supp. 1078 (E.D.N.Y. 1990), aff'd, 938 F.2d 1574 (2d Cir. 1991) ...................................9

Gayle Martz, Inc. v. Sherpa Pet Grp., LLC,
651 F. Supp. 2d 72 (S.D.N.Y. 2009)................................................................................20

Gucci v. Curveal,
No. 09 Civ. 8458 (RJS)(THK), 2010 WL 808639 (S.D.N.Y. Mar. 8, 2010) ...............................14

Gucci Am., Inc., v. Weixing Li,
No. 10 cv 04974 (S.D.N.Y. Aug. 23, 2011) .........................................................22, 23

Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,
219 F.3d 104 (2d Cir. 2000)..........................................................................................20

Holland v. Island Creek Corp.,
885 F. Supp. 4 (D.D.C 1995) .......................................................................................10

Hudson v. Hermann Pfauter GmbH & Co.,
117 F.R.D. 33 (N.D.N.Y. 1987).................................................................................14, 15

Ings v. Ferguson,
282 F.2d 149 (2d Cir. 1960)...........................................................................................22

Linde v. Arab Bank, PLC,
262 F.R.D. 136 (E.D.N.Y. 2009) ...................................................................................22

Matthews v. USAir, Inc.,
882 F. Supp. 274 (N.D.N.Y. 1995)........................................................................9

Milliken & Co. v. Bank of China,
758 F. Supp 2d 238 (S.D.N.Y. 2010).............................................................18, 21

Minpeco, S.A. v. Conticommodity Servs. Inc.,
116 F.R.D. 517 (S.D.N.Y. 1987) ....................................................................10, 22

Nikkal Indus., Ltd. v. Salton, Inc.,
689 F. Supp. 187 (S.D.N.Y. 1988)........................................................................9

Orlich v. Helm Bros., Inc.,
160 A.D.2d 135, 560 N.Y.S.2d 10 (1st Dep't 1990) ...................................................22

Reino De Espana v. Am. Bureau of Shipping,
No. 03CIV3573LTSRLE, 2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005) ......................................14

Richmark Corp. v. Timber Falling Consultants,
959 F.2d 1468 (9th Cir. 1992) ..........................................................................14

Sheikhan v. Lenox Hill Hosp.,
No. 98 Civ. 6468(WHP), 1999 WL 386714 (S.D.N.Y. June 11, 1999) .........................................9

Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the Dist. of Iowa,
482 U.S. 522 (1987)...............................................................................13, 14, 18

Thomas E. Hoar, Inc. v. Sara Lee Corp.,
900 F.2d 522 (2d Cir.), cert. denied, 498 U.S. 846 (1990) ............................................9

United States v. First Nat'l City Bank,
396 F.2d 897 (2d Cir. 1968)...............................................................10, 19, 20, 21

United States v. Gioia,
853 F. Supp. 21 (D. Mass. 1994) .........................................................................9

United States v. U.S. Gypsum Co.,
333 U.S. 364 (1948).....................................................................................9

United States v. Vetco Inc.,
691 F.2d 1281 (9th Cir. 1981) ..........................................................................14

White v. Lenox Hill Hosp.,
No. 02Civ 5749 (WHP)(FM), 2005 WL 1421834 (S.D.N.Y. June 20, 2005)...................................9

## RULES AND STATUTES

12 C.F.R. § 353.3(g) ................................................................................................11

28 U.S.C. § 636(b)(1)(A) ...........................................................................................8

Fed. R. Civ. P. 45 ....................................................................................................3

Fed. R. Civ. P. 72(a) .......................................................................................1, 8, 24

## OTHER AUTHORITIES

Restatement (Third) of Foreign Relations Law § 442(1)(c) .......................................10

Non-parties Bank of China ("BOC") and Industrial and Commercial Bank of China ("ICBC") (together, the "Banks") respectfully submit this opposition to plaintiffs' objections to Magistrate Judge Henry B. Pitman's July 25, 2011 Opinion and Order (the "Order") denying plaintiffs' motion to compel the Banks to produce documents located in China. Magistrate Judge Pitman correctly directed plaintiffs in the first instance to use the procedures set forth in the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention") to obtain the documents they seek.

## PRELIMINARY STATEMENT

Plaintiffs have not shown—and cannot show—that Magistrate Judge Pitman's Order directing them to use the Hague Convention to obtain documents they seek from China is "clearly erroneous or contrary to law," as required by Federal Rule of Civil Procedure 72(a). Magistrate Judge Pitman rendered a thoughtful 51-page opinion based on two rounds of oral arguments and a fully developed record, including expert reports and factual declarations, and he carefully weighed the factors in the seven-part balancing test used by this Circuit to determine if comity pointed to use of the Hague Convention in the present dispute. Because Magistrate Judge Pitman in no way abused his discretion, his Order directing plaintiffs to use the Hague Convention may not be disturbed.

Magistrate Judge Pitman's Order recognizes the challenges facing both the plaintiffs, who seek recovery from alleged counterfeiters around the world, and the non-party Banks, who are bound to uphold the banking laws, including customer privacy restrictions, of their home jurisdiction. In light of those competing demands, Magistrate Judge Pitman directed plaintiffs to use the Hague Convention instead of Rule 45 subpoenas to obtain the documents they seek, but allowed for renewal of the motion to compel if the Hague Convention is

unsuccessful.  Magistrate Judge Pitman's ruling demonstrates sensibility, thoughtfulness and discretion, and belies plaintiffs' claims that the Order was "clearly erroneous or contrary to law."

Plaintiffs do not argue that Magistrate Judge Pitman applied the wrong balancing test, but complain about how he balanced the factors.  That is insufficient, however, to sustain a Rule 72(a) objection and overturn a magistrate judge's nondispositive order.  Further, the well-developed record demonstrates that, far from abusing his discretion, Magistrate Judge Pitman correctly concluded that the majority of factors in the balancing test weigh in favor of using the Hague Convention in this case:  the documents at issue, to the extent they exist, are in China; the Hague Convention provides a viable alternative method of obtaining the documents; the Banks face potentially serious repercussions for violations of the Chinese laws at issue; and the Chinese government's interest in protecting bank records outweighs the U.S. government's interest in allowing a private party to obtain information from non-parties in a private trademark infringement action.

Plaintiffs insinuate that the Banks are complicit in the alleged counterfeiting because they objected to the subpoenas.  But the Banks objected because Chinese law prohibits providing such customer account information absent proper authorization, which is lacking here.  Further, plaintiffs have not named the Banks as defendants or presented any evidence that the Banks knew of defendants' alleged activities.  Plaintiffs' strategy of trying to tarnish the Banks as complicit is thus contrary to the evidence, misleading and counterproductive.

As Magistrate Judge Pitman found, the Banks have acted in good faith to resolve this dispute by attempting to assist plaintiffs to the extent possible without violating Chinese law. To that end, the Banks have drafted a letter of request pursuant to the Hague Convention and circulated it to plaintiffs.  Plaintiffs nevertheless argue that the Banks have wasted time, a claim

that is belied by plaintiffs' actions.  If time was really of the utmost importance, plaintiffs would have pursued all options and accepted the Banks' offer—first made nearly nine months ago—to prepare a letter of request pursuant to the Hague Convention.  They could have accepted that offer while still continuing to litigate in this Court if they so chose.  As these proceedings have shown, traditional U.S. discovery procedures are by no means guaranteed to secure the subpoenaed information any faster or more efficiently than if plaintiffs had filed a Hague Convention request at the outset.

Finally, plaintiffs undoubtedly will emphasize Judge Richard J. Sullivan's recent decision granting a motion to compel BOC to produce documents in China in response to a Rule 45 subpoena in a factually similar case.  Respectfully, the Banks disagree with Judge Sullivan's decision.  But despite the outcome in that case, Judge Sullivan found that the issues were "far from completely one-sided," that BOC had a "legitimate basis" for objecting to producing account information from China and that BOC had raised a "genuine dispute" with plaintiffs. The fact that Judge Sullivan recognized these difficulties indicates that Magistrate Judge Pitman, in reaching the result he did, certainly did not act contrary to law or clearly err in his findings on these complicated questions.

## STATEMENT OF FACTS

**A.      The Subpoenas At Issue**

On January 5, 2011, plaintiffs served the Bank of China, New York Branch ("BOCNY") and Industrial and Commercial Bank of China, New York Branch ("ICBCNY"), with an ex parte preliminary injunction, and two days later with non-party subpoenas for documents pursuant to Federal Rule of Civil Procedure 45 (the "Subpoenas").  (Declaration of Lanier Saperstein, dated May 17, 2011, D.E. No. 27 ("Saperstein Decl."), ¶¶ 5, 6; Ex. C)  The

Subpoenas sought the production of eight broad categories of documents related to the defendants' finances, including communications with or concerning defendants, documents relating to all credit card transactions associated with defendants or defendants' websites, bank statements and documents concerning open or closed accounts, documents concerning loans or mortgages, wire transfer information and documents relating to Currency Transaction Reports and Suspicious Activity Reports.  (See Order at 3-4, Saperstein Decl., Ex. C at 3-5.)

**B.**     **The Banks Respond In Good Faith To The Preliminary Injunction And Subpoenas**

In response, the New York branches of the Banks quickly informed plaintiffs that they had no accounts or information corresponding to the relevant names, account numbers or searchable wire transfers.  (Saperstein Decl., Exs. D, H, E. )  BOCNY and ICBCNY also notified plaintiffs from the outset that they lacked the technical capability and authority to search for overseas accounts or restrain funds in accounts outside of the U.S., and that Chinese law "prohibits a bank from producing customer-account information based on foreign process." (Saperstein Decl., Ex. E, at 3.)   In addition, BOCNY and ICBCNY served timely formal objections and responses to the subpoenas, reiterating that they lack "possession, custody or control" of information at any branch or office outside of the U.S.  (Saperstein Decl., Exs. F, I.)

In the spirit of cooperation, however, the Banks on January 21, February 24, and again on February 27 proposed assisting plaintiffs in preparing and submitting to the proper Chinese authorities a tailored request for documents located in China, pursuant to the Hague Convention.  (Saperstein Decl., Exs. E, G, J.)  Counsel for plaintiffs rejected these overtures, stating: "for various reasons, the Hague Convention is not a viable alternative for my clients." (Saperstein Decl., Ex. J.)  Unable to resolve the conflict, on March 25, 2011 plaintiffs and the Banks filed a joint letter to this Court summarizing the dispute.

C.      **The Case Before Magistrate Judge Pitman**

In response to the joint letter, the Court referred the discovery dispute to Magistrate Judge Pitman, who held a conference on April 19, 2011 on the issues raised in the letter.  At the conference, the Banks again reiterated their offer to draft a letter of request. (Saperstein Decl., Ex. M, at 23: 9-19.)  Recognizing the difficult and fact-intensive nature of the questions, Magistrate Judge Pitman directed plaintiffs to move to compel the documents they wanted from China, "because there are certain factual issues which really need to be addressed by individuals with firsthand knowledge."  (Saperstein Decl., Ex. M, at 46:5-7.)  Magistrate Judge Pitman urged in particular briefing on three topics:  (1) whether the New York branches have access to and control over the Banks' documents in China; (2) whether the Chinese laws forbidding the production of account information are enforced; and (3) what history, if any, China has regarding compliance with Hague Convention requests.  (Id. at 50:19-22, 52: 1-5.) Accordingly, plaintiffs moved to compel on May 3, 2011 ("Pl. Mot. To Compel").

On May 17, 2011, in connection with their opposition papers, the Banks submitted evidence demonstrating that, among other things:  (1) the New York branches do not have access to documents in China; (2) Chinese law prohibits the production of account information located in China absent proper authorization; and (3) China has granted requests for documents through the Hague Convention.  After full briefing, Magistrate Judge Pitman again held oral argument, this time for almost two hours on June 6, 2011.  The Banks also submitted additional evidence—namely, a January 21, 2011 regulation promulgated by the Chinese financial regulator, the People's Bank of China—reinforcing the sanctity of customer account information in China and providing explicitly:

> Unless otherwise stipulated by laws, regulations and provisions of
> the People's Bank of China, financial institutions of the banking

> industry shall not provide domestic personal financial information
> to overseas countries.

(Supplemental Declaration of Lanier Saperstein, dated September 9, 2011 ("Saperstein Supp.

Decl."), Ex. A., at 1, 4 (emphasis added)).

### D.     Magistrate Judge Pitman's Thoughtful Decision

On July 25, 2011 Magistrate Judge Pitman issued a 51-page Order directing use

of the Hague Convention and preserving plaintiffs' right to renew the motion to compel if the

Hague Convention is unsuccessful.  Because the Banks had asserted foreign law as a defense to

production of information located in China and because a true conflict existed between U.S. and

Chinese law, Magistrate Judge Pitman weighed the seven factors used in this Circuit to

determine whether comity dictates use of an alternative means, such as the Hague Convention, to

obtain the information.  (Order at 19.)  He concluded that five of the seven factors tipped in favor

of the Banks, warranting use of the Hague Convention.  His findings are summarized as follows:

1)  Importance of information.  Magistrate Judge Pitman held that the information

sought was important to plaintiffs and thus weighed this factor in plaintiffs' favor.  (Order at 23).

2)  Specificity of Requests. Magistrate Judge Pitman held that the requests were

sufficiently specific and thus weighed this factor in plaintiffs' favor.  (Id. at 24)

3)  Whether Information Originated in the United States.  Magistrate Judge

Pitman held that "the "actual information that plaintiffs seek is located abroad and cannot be

accessed by personnel at BOCNY, ICBCNY or CMBNY," and thus weighed this factor in the

Banks' favor.  (Id. at 24.)  Magistrate Judge Pitman premised his factual findings on the three

fact affidavits submitted by the Banks' (and China Merchants Bank's) compliance and

technology departments in New York.  (Id. at 24-25.)

4)  Alternative Means for Securing the Information.  After weighing declarations

by experts on Chinese law, as well as literature provided by plaintiffs and the Banks, Magistrate Judge Pitman concluded that there is evidence that China has honored judicial requests for documents.  (<u>Id.</u> at 35.)  Specifically, Magistrate Judge Pitman observed that China had honored judicial requests "for civil and commercial cases including investigation and evidence collection for 37 cases and 11 other cases" in the first half of 2010, based on figures from the Chinese Ministry of Justice.  (<u>Id.</u>)  Because this evidence and evidence as to the ongoing development of China's legal system demonstrated that the Hague Convention is a "viable alternative method for obtaining the information sought,"  Magistrate Judge Pitman held that this factor weighed in the Banks' favor.  (<u>Id.</u> at 36.)

   5)  <u>Interests of the States</u>.  Magistrate Judge Pitman held that because Chinese statutes and regulations governing bank privacy have "few exceptions and appear to provide harsh consequences for violations," and because the Banks are non-parties to this dispute, the Chinese interest in protecting bank customers' confidentiality outweighs the U.S. interest in enforcing orders and protecting trademark rights as against the rights of non-parties.  (<u>Id.</u> at 41.)

   6)  <u>Nature of the Hardship</u>.  Magistrate Judge Pitman held that, even though the cited examples of punishment under the Chinese laws are not "identical to the present case," because the laws governing bank secrecy "have been used to the detriment of banks in the past, and the potentially harsh sanctions are applicable to both the Banks and their personnel, the potential for hardship places this factor in favor of the Banks."  (<u>Id.</u> at 46.)

   7)  <u>Good Faith of the Party Resisting Discovery</u>.  Magistrate Judge Pitman held that the Banks did not act in bad faith.  On the contrary, they "contacted plaintiffs after receiving the PI Order and subpoenas, relayed the information found in their New York branches, and offered to help draft a Hague Convention request."  (<u>Id.</u> at 47.)

Magistrate Judge Pitman concluded:  "For all the foregoing reasons, plaintiffs are directed to request the information they seek in China through the Hague Convention at this time.  Should this process prove futile, plaintiffs may renew their application to enforce their subpoenas."  (Id. at 50-51.)

Only after Magistrate Judge Pitman's Order did the plaintiffs accept the Banks' longstanding offer to draft a letter of request.  True to their representations, the Banks  circulated a draft letter of request to plaintiffs on September 7, 2011.  (See Saperstein Supp. Decl., ¶ 3.)

**ARGUMENT**[1]

Plaintiffs' objections to Magistrate Judge Pitman's Order are without merit.  First, plaintiffs cannot demonstrate that Magistrate Judge Pitman's reasoned and thoughtful Order, in which he weighed a well-developed record in the context of seven factors involving questions of international comity and foreign law, amounted to an abuse of discretion.  Second, the Order was correct on the facts and the law.  Finally, Magistrate Judge Pitman's provision for renewal of plaintiffs' motion to compel in the event that the Hague Convention is unsuccessful underscores the reasonable and prudent nature of the Order.

## I.     PLAINTIFFS FACE A HIGH BURDEN UNDER RULE 72

When a party challenges a magistrate judge's nondispositive written order pursuant to Rule 72(a), the district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a).  See also 28 U.S.C. § 636(b)(1)(A).  Discovery matters are considered non-dispositive and thus addressed by Rule 72(a).  See Thomas E. Hoar, Inc. v.  Sara Lee Corp., 900 F. 2d 522, 525 (2d Cir. 1990).

A magistrate judge's finding is clearly erroneous when "the reviewing court on

---

[1]         The Banks also join in the arguments raised by non-party China Merchants Bank.

the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). However, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985). This Court held that a party "seeking to overturn a nondispositive ruling under the clearly erroneous standard, generally bears a 'heavy burden.'" White v. Lenox Hill Hospital, No. 02 Civ 5749 (WHP), 2005 WL 1421834 at *1 (S.D.N.Y. June 20, 2005) (quoting Com-Tech Assocs., v. Computer Assocs. Int'l, Inc., 753 F. Supp. 1078, 1099 (E.D.N.Y. 1990), aff'd, 938 F.2d 1574 (2d Cir. 1991)). An order may be deemed "contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." Catskill Dev., LLC v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y. 2002).

A magistrate judge's ruling on discovery questions is afforded substantial deference, see Bass Pub. Ltd. Co. v. Promus Cos. Inc., 868 F. Supp. 615, 619 (S.D.N.Y. 1994), and reversal is only appropriate for abuse of discretion. Sheikhan v. Lenox Hill Hosp., No. 98 Civ. 6468 (WHP), 1999 WL 386714 at *2 (S.D.N.Y. June 11, 1999). A magistrate judge is afforded such broad discretion in discovery because "no one factor controls" and the need for the information must be balanced against the "burden of producing it and the exposure to irreparable harm." Matthews v. USAir, Inc., 882 F. Supp. 274, 275 (N.D.N.Y. 1995). Indeed, orders that involve the exercise of discretion in the form of balancing tests are generally not subject to reconsideration because "none of the actions which the magistrate judge could take would be 'contrary to law' although another judicial officer might have chosen to exercise discretion in a different manner." See United States v. Gioia, 853 F. Supp. 21, 26 (D. Mass. 1994); see also Nikkal Indus., Ltd. v. Salton, Inc., 689 F. Supp. 187, 189 (S.D.N.Y. 1988) (magistrate's decision

may consider witness credibility.)[2]

## II.      MAGISTRATE JUDGE PITMAN APPLIED THE PROPER TEST

Because Magistrate Judge Pitman found a true conflict between U.S. and Chinese

law, he then had to decide whether "the Court should exercise its discretion" to order use of the

Hague Convention instead of the Federal Rules of Civil Procedure.  See Alfadda v. Fenn, 149

F.R.D. 28, 33 (S.D.N.Y. 1993) (citing Minpeco, S.A. v. Conticommodity Services, Inc., 116

F.R.D. 517, 520 (S.D.N.Y. 1987)).   The Second Circuit has explained that, in this situation,

"what is required is a careful balancing of the interests involved and a precise understanding of

the facts and circumstances of the particular case."   United States v. First Nat'l City Bank, 396

F.2d 897, 901 (2d Cir. 1968).

Magistrate Judge Pitman thus correctly relied on the comity balancing test set

forth in the Restatement (Third) of Foreign Relations Law § 442 (1)(c) requiring a court to

consider the following factors:  (1) the importance of the documents; (2) the degree of specificity

of the request; (3) if the information originated in the United States; (4) the availability of

alternative means of retrieving the information; and (5) the extent to which noncompliance

would undermine important interests of the United States, or compliance would undermine

important interests of the foreign state.  Magistrate Judge Pitman also properly considered "the

hardship of compliance on the party or witness from whom discovery is sought [and] the good

faith of the party resisting discovery."  (Order at 21.)  Plaintiffs do not argue that Magistrate

Judge Pitman applied the wrong test, but complain that he evaluated the factors incorrectly.

Plaintiffs' complaints, disguised as allegations of clear error or acts contrary to law, do not

---

[2]      Plaintiffs' reliance on Holland v. Island Creek Corp., (Pl. Obj. at 7), is inapposite, as Magistrate
Judge Pitman certainly offered a 51-page "reasoned explanation" and in no way "adopts one
party's arguments in their entirety."  885 F. Supp. 4, 6 (D.D.C 1995).

demonstrate an abuse of discretion.  See Bass Pub. Ltd., 868 F. Supp. at 619.[3]

## III.   MAGISTRATE JUDGE PITMAN CORRECTLY EVALUATED THE COMITY FACTORS

Magistrate Judge Pitman held that five of the seven comity factors weighed in favor of the Banks, a conclusion that is amply supported by the law and record.[4]

### A.   The Requested Documents Are In China

Magistrate Judge Pitman correctly held that the information sought by plaintiffs is located in China.   (Order at 24.)   Plaintiffs continue to challenge that conclusion, notwithstanding extensive evidence showing that the information is outside the United States and that the New York branches lack the authority and capability to tap into the systems of their head offices or overseas branches to get it.

Without any basis, plaintiffs blame this limited access on "only internal Bank policies" and suggest that, because customers may be able to log in to their own accounts through the internet from anywhere in the world, the employees of the New York branches should be able to do the same by somehow accessing the Chinese accounts and "simply printing the information Plaintiffs have been seeking since January."   (Pl. Obj. at 10.)   Plaintiffs' suggestion is improper and contrary to the clear evidence regarding the limits and barriers of the New York branches' computer systems.   In response to plaintiffs' insinuation that because

---

[3]   Plaintiffs are wrong that Magistrate Judge Pitman "disregarded" district court cases ordering foreign banks to produce documents from outside New York.  (Pl. Obj. at 7-8.)  On the contrary, the Order cites the so-called "disregarded" cases at least 19 times.  Rather than blindly adopting the conclusions of these non-binding and distinguishable cases, however, Magistrate Judge Pitman appropriately considered them in the context of his own thoughtful comity analysis.

[4]   The Banks respectfully disagree that the first two factors—importance of the information and specificity of the requests—favor the plaintiffs, and submit that that information sought by the subpoenas (including emails, phone messages, credit checks, mortgage applications, travelers checks, tax returns and credit card records) far exceeds what is necessary to point plaintiffs to "the identities of those involved in the counterfeiting operation."  (See Order at 22.)  Moreover, as demonstrated, U.S. law prohibits production of suspicious activity reports, another category of documents sought.  See 12 C.F.R. § 353.3(g).

customers have web access New York employees must too, Magistrate Judge Pitman correctly observed that the information may be accessed "by the account party but not by the bank." (Saperstein Supp. Decl., B (Transcript of June 6, 2011 Hearing) at 16:16-20.)

     **B.**    **The Hague Convention Provides An Alternative Means For Obtaining The Information**

          Magistrate Judge Pitman correctly concluded that the Hague Convention provides a viable alternative for obtaining the information that plaintiffs seek.  (See Order at 36.)  This conclusion was based on the well-developed factual record demonstrating that:  (1) China executed at least thirty-seven requests for evidence in the first half of 2010; (2) the Chinese Ministry of Justice reported that in the last five years it executed approximately 50 percent of the requests it received, with an average turnaround time of six to twelve months; (3) the documents sought by plaintiffs appear related to the litigation, as required by China's Article 23 Reservations (4); thirty-six Hague Convention signatories have also executed Article 23 Reservations, including the United Kingdom and Switzerland, suggesting that the mere existence of a reservation does not preclude China from executing a letter of request, as plaintiffs contend; (5) China's legal system continues to develop rapidly; and (6) the U.S. Department of State, which had previously expressed doubt about China's treatment of Hague Convention letter of requests, no longer expresses such a view, or any view, on the efficacy of the Hague Convention in China.  (Order at 25-36.)

     **1.**    **Plaintiffs Incorrectly Now Argue That "Easily Obtained" Should Be The Standard**

          For the first time, plaintiffs now argue that an order directing use of the Hague Convention requires a court to find that overseas documents must "easily be obtained" through

that route, and that Magistrate Judge Pitman clearly erred by not applying that standard.[5] However, neither the Supreme Court nor the Second Circuit has adopted that standard. Instead, Magistrate Judge Pitman considered the well-developed factual record and correctly concluded that the Hague Convention provides a "viable mechanism" to obtain the information plaintiffs purportedly need to prosecute their claims against the absent defendants. (Order at 48.)

        In Societe Nationale Industrielle Aerospatiale v. United State District Court for the District of Iowa, 482 U.S. 522, 541 (1987), which is the leading case in this area, the Supreme Court held that the Court of Appeals erred in finding that the Hague Convention did not apply to discovery demands between litigants subject to U.S. jurisdiction because such a rule would "deny the foreign litigant a full and fair opportunity to demonstrate appropriate reasons for employing Convention procedures in the first instance, for some aspects of the discovery process." Id. The Court declined to issue "specific rules to guide this delicate task of adjudication," id. at 546, but cautioned that American courts should "take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations." Id. Moreover, a court conducting a comity analysis should apply "scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." Id. at 544. The Court additionally held that the Restatement factors, including the availability of alternative means to obtain the information sought, were relevant to "any comity analysis." Id. at 544, n.28. Nowhere in Aerospatiale did the Court state that such information had to "easily be obtained" through the alternative means

---

[5]    Notably, plaintiffs did not argue the purported "easily obtained" standard in the papers supporting their motion to compel. Rather, plaintiffs argued that they should not be required to go through the Hague Convention because it would be "futile" to do so. (See Order at 25; Pl. Mot. To Compel at 15-19.) Magistrate Judge Pitman painstakingly addressed and rejected each of plaintiffs' arguments for why going through the Hague Convention in China would be futile. (See Order at 25-36.)

for a party to be required to use such means.

Moreover, the cases that plaintiffs cite for the "easily obtained" standard are factually distinguishable, non-binding and some do not even mention the phrase "easily obtained." Gucci v. Curveal, for example, involved a bank in Malaysia, which was not a party to the Hague Convention.  No. 09 Civ. 8458 (RJS)(THK), 2010 WL 808639, *3 (S.D.N.Y. Mar. 8, 2010).  The only alternatives for obtaining the account information at issue, therefore, were to obtain the consent of the bank customers or Central Bank of Malaysia, or bring a new suit in Malaysia to obtain a Malaysian judgment.  Id.  As the plaintiffs could not locate the customers and had been denied permission by the Central Bank, the court held that requiring plaintiffs to bring a new suit would "require the retention of Malaysian counsel, possibly significant costs and logistical concerns, and no clear likelihood of success."  Id. at *5.  Curveal is therefore inapposite where, as here, a viable option such as the Hague Convention exists.[6]

Further, a court need not be convinced that the Hague Convention will work seamlessly to be legally justified in ordering its use, especially given the Hague Convention's important goals.  In Hudson v. Hermann Pfauter GmbH & Co., 117 F.R.D. 33, 38-39 (N.D.N.Y. 1987), for example, the court carefully weighed the uncertainty accompanying use of the Hague

---

[6]     The case that Curveal cited for the proposition that the information must be "easily obtained" does not even stand for that proposition.  Instead, British International Insurance Co. Ltd. v. Seguros La Republica, S.A., No. 90 Civ. 2370 (JFK)(FM), 2000 WL 713057 *9 (S.D.N.Y. June 2, 2000) concludes, without analysis, that the "unavailability of alternative means of obtaining substantially equivalent information" counterbalances the fact that all the information is located in Mexico.  Id.  In turn, of the cases that British International cites, Richmark Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1475 (9th Cir. 1992) and Reino De Espana v. American Bureau of Shipping, No. 03 Civ 3573, 2005 WL 1813017, *9 (S.D.N.Y. Aug. 1, 2005), hold only that "if the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law."  Reino De Espana, 2005 WL 1813017, at *9 (citing Richmark).  It by no means follows, and no Second Circuit decision has so held, that, in order for an alternative means such as the Hague Convention to be viable, the information must "easily be obtained" through such means.  Indeed, United States v. Vetco Inc., 691 F.2d 1281, 1290 (9th Cir. 1981), also cited by British International, makes no reference at all to documents being "easily obtained," holding that the proper standard in the Ninth Circuit is whether an alternative means is "substantially equivalent" to obtaining the documents through U.S. courts.  Id.

Convention.  It held that, while one obstacle to effective use is the "fact that we are less familiar with those procedures than with the discovery provisions of the Federal Rules," the "inconveniences" that may accompany use of the Hague Convention nonetheless do not alone outweigh its "important purposes."  Id.  The court therefore concluded that "[t]o assume that the 'American' rules are superior to those procedures agreed upon by the signatories of the Hague Convention without first seeing how effective Convention procedures will be in practice would reflect the same parochial biases that the Convention was designed to overcome."  Id. Magistrate Judge Pitman's assessment is perfectly consistent with this reasonable approach.

> **2.**     **Magistrate Judge Pitman Carefully Evaluated The Evidence And Reached A Reasoned Determination That The Hague Convention Provides A Viable Alternative Means To Obtain The Requested Information**

Magistrate Judge Pitman carefully considered all the evidence relating to use of the Hague Convention in China and correctly concluded that the Hague Convention provides a viable alternative in this case for obtaining information from China.

Plaintiffs relied heavily on language formerly posted on the website of the U.S. Department of State for the incorrect proposition that using the Hague Convention process in China is futile.  (See, e.g., Pl. Mot. To Compel at 17.)[7]  The State Department removed that language, however, on or about May 13, 2011, after plaintiffs filed their motion to compel.  (See Saperstein Decl., ¶ 14.)  In his Order, Magistrate Judge Pitman spent more than two pages discussing evidence that the website was outdated to begin with and concluding that ultimately the deletion of the language that was "critical of China's enforcement of Hague Convention

---

[7]     The following previously appeared on the State Department's website: "While it is possible to request compulsion of evidence in China pursuant to a letter rogatory or letter of request (Hague Evidence Convention), such requests have not been particularly successful in the past.  Requests may take more than a year to execute.  It is not unusual for no reply to be received or after a considerable time has elapsed, for Chinese authorities to request clarification from the American court with no indication that the request will eventually be executed."  (See Order at 26; Saperstein Decl., ¶¶ 14-15, Ex. K.)

requests implies that the conditions described by the omitted language no longer exist."  (Order at 27.)

Moreover, Magistrate Judge Pitman reached that reasonable conclusion in the context of other evidence suggesting that China has become more engaged in the Hague Convention process.  This included evidence that China has executed half of all requests in the past five years, has an average execution turnaround time of six to twelve months, and honored thirty-seven requests for evidence in the first half of 2010.  (Id.)  It certainly was not clear error or an abuse of discretion for Magistrate Judge Pitman to accord no weight to a website entry that, at the time he held oral argument and drafted his Order, had been removed by the State Department and did not exist.  Nor did Magistrate Judge Pitman abuse his discretion in inferring, in light of the other evidence, that the website may have disappeared because the "conditions it described no longer exist."  (Id.)  Accord Anderson v. City of Bessemer, 470 U.S. at 574 (factfinder's decision cannot be clearly erroneous when there are two permissible views of the evidence, even if the findings are based on "inferences from other facts.")

Magistrate Judge Pitman also did not err in finding plaintiffs' expert and literary evidence "less compelling" in light of the deleted website language.  (Order at 32.)  Magistrate Judge Pitman did not find, as plaintiffs claim, that the experts and commentary that relied on the deleted website language "must also now be incorrect."  (Pl. Obj. at 13.)  Instead, he found both that the experts' opinions were less compelling and that, overall, because the conflicting experts in the case "appear to interpret the same empirical data divergently," the expert declarations "do little to push this factor more clearly in favor of the plaintiffs or the Banks."  (Order at 32-33.)

Plaintiffs make much of statistics indicating that in 2007 about 5 percent of Hague Convention letters of request were returned unexecuted (See Saperstein Supp. Decl., Ex. C, at

17) whereas in China the Ministry of Justice reported in 2011 that, over a five-year period, about half of letters rogatory or requests for the taking of evidence "have been executed with timely return transmittal to foreign requesting party."  (Saperstein Decl., Ex. S.)  Plaintiffs contend this data shows that China is an outlier in responding to Hague Convention requests.

        In reality, China's track record is consistent with other signatories, and even better than some, including the United Kingdom.  In 2007, for example, of the thirty-six letters that the U.K. executed, fifteen were executed in six to twelve months, more than in any other time frame and the same time frame as the Chinese average.  (Saperstein Supp. Decl., Exs. C, at ii; S.)  As to the rate of execution, the U.K. received 123 letters of request in 2007, 87 of which were returned unexecuted or were still pending as of December 1, 2008, which equates to a 30 percent execution rate for the U.K., compared to China's 50 percent execution rate.  In short, plaintiffs' likelihood of success in obtaining the evidence they seek through the Hague Convention in China appears to be in line with the chances of success in other countries.[8]

        As to timing, the average execution time for a Hague Convention letter of request in 2007 worldwide was six months.  Based on feedback from the responding nations, more of those letters were executed within six to twelve months than in any other time frame.  For example, of 936 reported letters, 215 were executed in six to twelve months, 201 were executed in four to six months, 29 were executed more than twelve months later, and 149 remained pending as of January 2009.  (Saperstein Supp. Decl., Ex. C, at ii.)  China, with its average execution time of six to twelve months, is thus again in line with other signatories to the Hague

---

[8]    Additionally, a 50 percent success rate within six to twelve months is by no means inconsistent with the odds that a litigant in a U.S. court could reasonably expect to face when bringing a motion to compel production of documents requested in a subpoena with a scope such as the subpoenas here.

Convention.[9]

In light of the above, Magistrate Judge Pitman did not abuse his discretion in rejecting plaintiffs' argument that the Hague Convention is futile and in holding that it provides a viable alternative for plaintiffs seeking information from China.

### 3.    Magistrate Judge Pitman Considered The <u>Milliken</u> Decision And Found It Inapposite

Plaintiffs are wrong that Magistrate Judge Pitman's decision is "irreconcilable" with Magistrate Judge Francis' decision in <u>Milliken & Co. v. Bank of China</u>, 758 F. Supp. 2d 238 (S.D.N.Y. 2010).[10] <u>Milliken</u> is factually distinguishable from this case in at least one important way:  BOC asserted an affirmative defense of a lien on the account at issue and ultimately moved for a protective order against the production of documents relating to that defense.  Magistrate Judge Francis required BOC to produce documents, but, in language that supports the Banks here, held that it is fair to "require the party bringing a claim to resort to Convention procedures in order to obtain evidence from another entity necessary to support that claim."  <u>Milliken</u>, 758 F. Supp. 2d at 245.  Moreover, in declining to require plaintiffs to use the Hague Convention, Magistrate Judge Francis relied heavily on the same now-deleted State Department language suggesting that using the Hague Convention in China may be difficult.  <u>Id.</u> at 248.  Magistrate Judge Pitman therefore correctly considered this case and found it

---

[9]    Plaintiffs' professed skepticism regarding China's intent to honor its treaty obligations under the Hague Convention is at odds with evidence of plaintiffs' fast-growing business there.  Plaintiffs' own statements indicate that they opened four new stores in China in 2010 and they expect to open as many as 30 additional new stores there in the next three years, possibly more than any other place.  (<u>See</u> Saperstein Decl., Exs. A, B).  Such anticipated growth presumably would not be forecast if plaintiffs had any serious doubt about China protecting plaintiffs' rights and enforcing the rule of law.

[10]   The Supreme Court's command to courts to "demonstrate due respect" for foreign interests and use the Hague Convention "when [a court] deems that course of action appropriate, after considering the situations of the parties before it as well as the interests of the concerned foreign state" is especially crucial in distinguishing between the nuances of individual non-binding cases.  <u>See</u> <u>Aerospatiale</u>, 482 U.S. at 533.

unpersuasive, a decision that is certainly not contrary to law.

      **C.**    **China's Interest In Bank Secrecy Outweighs The U.S. Interest**

Magistrate Judge Pitman carefully weighed the U.S. interests in fully and fairly adjudicating matters before its courts, as well as enforcing its trademark laws, against China's interest in enforcing its bank secrecy laws.  His conclusion that China's interests outweigh U.S. interests is supported by both the record and the law.

China's legitimate interest is not, as plaintiffs accuse, in "allowing its citizens to use these laws in order to hide the records and funds associated with a counterfeiting operation." (Pl. Obj. at 20.)  Rather, it is, as Magistrate Judge Pitman correctly held, in encouraging the growth and stability of a relatively young banking system by providing assurances of confidentiality to citizens "who had historically been skeptical about the safety of their deposits in banks—and their continued access to them."  (Order at 37.)

Magistrate Judge Pitman correctly considered the number, type and strength of applicable Chinese statutes, setting forth at least seven provisions, both civil and criminal, that protect customers.  (Order at 17-19).  He also considered the potentially harsh consequences for violations, that the laws provide few exceptions, that the laws are not blocking statutes, and that the Banks are not parties to this litigation.  (Id. at 41.)  Moreover, the Second Circuit has held that, when gauging the "vital national interests of a foreign nation, especially in matters relating to economic affairs," it is important to recognize that public policy can be expressed in "ways other than the criminal law" and that maintaining a "sharp dichotomy between criminal and civil penalties is an imprecise means of measuring the hardship for requiring compliance with a subpoena."   See United States v. First Nat'l City Bank, 396 F.2d at 902.  Moreover, Plaintiffs' argument that Magistrate Judge Pitman clearly erred because the statutes provide that customer

information may be disclosed to a limited number of "competent Chinese organs" is incorrect, as such limited disclosure provisions still work to protect customers "from indiscriminate intrusion."  (Order at 37.)

   While analyzing the interests of the U.S. and China, Magistrate Judge Pitman acknowledged that the U.S. has an interest in enforcing its trademark laws, as contained in the Lanham Act, and appropriately cited <u>Hermes International v. Lederer de Paris Fifth Avenue, Inc.</u>, 219 F.3d 104, 107-08 (2d Cir. 2000) and <u>Gayle Martz, Inc. v. Sherpa Pet Group, LLC</u>, 651 F. Supp. 2d 72, 85 (S.D.N.Y. 2009).  Magistrate Judge Pitman correctly held, however, that the courts in these cases did not consider, as he did, the U.S. interest in enforcing trademarks in the context of conflicting foreign interests.  Accordingly, these cases have little relevance in this case, and Magistrate Judge Pitman's holding that China's interests outweigh the U.S. interests cannot be contrary to law.

   Plaintiffs also are incorrect that Chinese law provisions creating exceptions for disclosure where there is customer consent tip this factor in their favor.  The Second Circuit case plaintiffs cite for that proposition is inapposite, as it involved West Germany, where "bank secrecy is not even required by statute."  <u>United States v. First Nat'l City Bank</u>, 396 F.2d at 903.  As such, the court found it "surely of considerable significance that Germany considers bank secrecy simply a privilege that can be waived by the customer and is content to leave the matter of enforcement to the vagaries of private litigation."  <u>Id.</u>

   China, on the other hand, has spelled out in no fewer than seven explicit civil and criminal statutory provisions exactly what is required of banks via-a-vis their customers' privacy.  (<u>See</u> Order at 17-19).  In addition, a notice promulgated by the People's Bank of China in January reminded banks that "[t]he protection of personal financial information is the statutory

20

obligation of financial institutions of the banking industry," and that, "[u]nless otherwise stipulated by laws, regulations and provisions of the People's Bank of China, financial institutions of the banking industry shall not provide domestic personal financial information to overseas countries."  (Saperstein Supp. Decl., Ex. A.)[11]

Finally, plaintiffs revive their suggestion that the Banks' employees in New York should violate internal Bank policies (and Chinese law) by somehow hacking into customers' accounts to obtain the information in China that plaintiffs seek.  (Pl. Obj. at 21-22.)  Although plaintiffs argue that this maneuver would somehow avoid the current conflict with Chinese law, this route is clearly not a viable alternative for the Banks.

**D.    Magistrate Judge Pitman Correctly Held That The Banks Face Potential Sanctions And Liability If They Violate Chinese Law**

The Chinese bank secrecy laws at issue have been used before against the Banks, and therefore could easily be invoked against the Banks or their employees in the future, as Magistrate Judge Pitman concluded.  (See Order at 46.)  Magistrate Judge Pitman is correct that the examples of enforcement need not be identical to the present situation, and that in Milliken, BOC, a non-party, provided the court no examples of prior enforcement, leading that court to conclude that the possibility of hardship for the Bank was "speculative at best."  Milliken, 758 F. Supp. 2d at 250.  But this case is different, as the Banks did provide examples of enforcement and potentially harsh sanctions, which Magistrate Judge Pitman carefully considered.  (Order at 42-47).

Moreover, Magistrate Judge Pitman correctly held that the Banks' status as non-parties weighs against ordering the production of documents in violation of Chinese law (see

---

[11]    In United States v. First National City Bank, 396 F.2d. at 899, the Second Circuit also held that, depending on the facts, a regulation or order promulgated by a country's banking regulator may carry more weight than, for example, a misdemeanor criminal statute, due to the extreme power the regulator holds over the bank.

Order at 42) because the Banks are innocent entities and thus undeserving of the potentially harsh sanctions that could arise.  This position is from a long line of cases holding that an order compelling production from a non-party should be imposed "only in extreme circumstances." See Linde v. Arab Bank, PLC, 262 F.R.D. 136, 151 (E.D.N.Y. 2009).  The Second Circuit also has found it "highly undesirable that the courts of the United States should countenance service of a subpoena upon a New York agency of a foreign bank which is not a party to the litigation and whose country has provided procedures for securing information, the production of which is consistent with its laws." Ings v. Ferguson, 282 F.2d 149, 152 (2d Cir. 1960).[12]

*      *      *

The Banks have shown that Magistrate Judge Pitman did not clearly err, act contrary to law, or abuse his discretion in his careful evaluation and analysis of each of the comity factors.  On the contrary, the July 25 Order was correct in finding that the Hague Convention is the proper means for plaintiffs to seek the documents they say they need.

## IV.   THE DECISION IN GUCCI AMERICA HIGHLIGHTS THE IMPORTANCE OF DISCRETION IN COMITY CASES CONSIDERING THE HAGUE CONVENTION

Plaintiffs in their reply are likely to invoke the recent decision by Judge Sullivan in Gucci America, Inc., v. Weixing Li, No. 10 cv 04974, D.E. No. 75, at 13 (S.D.N.Y. August 23, 2011), but their reliance would be misplaced.  In Gucci America, Judge Sullivan granted Gucci's motion to compel the production of customer account documents in China from non-party Bank of China in a trademark infringement suit.  Judge Sullivan conducted the same seven-

---

[12]    Accord Minpeco, S.A. v. Conticommodity Services Inc., 116 F.R.D at 526 (S.D.N.Y. 1987) ("[W]here the party sought to be compelled to produce documents in violation of foreign secrecy laws is merely a neutral source of information, and not itself a target of a criminal investigation or an adverse party in litigation, some courts have found the hardship to weigh more heavily in the balance."); Orlich v. Helm Bros., Inc., 160 A.D.2d 135, 143, 560 N.Y.S.2d 10 (1st Dep't 1990) (use of Hague Convention  "virtually compulsory" when discovery sought from a non-party in a foreign jurisdiction.)

part comity analysis as Magistrate Judge Pitman, but concluded that the factors, on balance, weighed in favor of Gucci.  Id.  Judge Sullivan and Magistrate Judge Pitman heard much of the same evidence relating to Chinese law and the Hague Convention, cited many of the same cases, and yet simply disagreed as to which way they thought the evidence tipped the scales.  Judge Sullivan wrote multiple times that he "respectfully disagrees" with Magistrate Judge Pitman's decision in this case, and acknowledged the difficulty of the comity issues involved:

> Taken as a whole, the arguments advanced by the Bank are reflective of a genuine dispute with Plaintiffs.  That the Court ultimately disagreed with the position taken by the Bank does not mean that the Bank's actions were improper or otherwise unjustified.  As noted above, the issue before the Court involved a highly fact-specific inquiry and the application of a multi-pronged balancing test that was far from completely one-sided.

Id. at 13 (emphasis added).

The Banks respectfully disagree with Judge Sullivan's conclusions and believe he ruled contrary to law in multiple respects.[13]  In any event, the decision in Gucci America does not advance plaintiffs' objections here, but rather highlights the significant level of discretion involved in comity balancing tests.  For this reason, Judge Sullivan's differing conclusions in Gucci America do not impact this Court's decision on whether Magistrate Judge Pitman abused his discretion in formulating his own 51-page Order explicating reasoned conclusions to deny plaintiffs' motion to compel.

## V.   PLAINTIFFS' REPEATED INNUENDO THAT THE BANKS HAVE NEEDLESSLY WASTED TIME IS A RED HERRING

The Banks understand and appreciate plaintiffs' efforts to trace money involved in alleged illicit activities, and the Banks have expressed a willingness to work with plaintiffs.

---

[13]   For example, Judge Sullivan adopted the improper "easily obtained" standard with respect to the availability of alternative means to obtain documents.  As set forth above, (see supra Section III.B.1 & n. 5), that standard is incorrect as a matter of law.

However, plaintiffs' repeated accusations that the Banks have somehow wasted time by objecting to the subpoenas are specious and unfair.  (See, e.g., Pl. Obj. at 6.)

The Banks have never missed deadlines, requested extensions without plaintiffs' prior agreement, stalled, or sent plaintiffs on wild goose chases to buy time.  The fact is that discovery under the Federal Rules of Civil Procedure provides safeguards so that non-parties like the Banks may lawfully object when they are asked to take action that they cannot take.  Those safeguards prolong the discovery process, allowing objections and then negotiations relating to scope, confidentiality, privilege and costs, and then perhaps extensive, time consuming document retrieval, review and production.  All of that takes time.

Plaintiffs' assertion that such a process in a case like this would not take six to twelve months—even without a motion to compel—defies belief.  The fact is that there is no evidence or guarantee that reliance on the Hague Convention would not resolve this dispute just as fast as the traditional discovery process under the Federal Rules.  Further, had plaintiffs agreed to use the Hague Convention nearly nine months ago when the Banks first proposed it, this dispute may have been moot by now.  Instead, the plaintiffs gambled that they would not be forced to use the Hague Convention, and they lost.  Their dissatisfaction with the conclusions explicated in a well-reasoned 51-page order, however, does not entitle them to a second opinion under the high standards set by Rule 72(a).

**CONCLUSION**

For the foregoing reasons, the Banks respectfully request that the Court deny

plaintiffs' objections to Magistrate Judge Pitman's July 25, 2011 Order.

Dated:   New York, New York                    ALLEN & OVERY LLP
             September 9, 2011

                                                      By:  /s/ Lanier Saperstein
                                                             Pamela Rogers Chepiga
                                                             pamela.chepiga@allenovery.com
                                                             Lanier Saperstein
                                                             lanier.saperstein@allenovery.com
                                                             Adrienne Schwisow
                                                             adrienne.schwisow@allenovery.com

                                                      1221 Avenue of the Americas
                                                      New York, New York 10020
                                                      Tel: 212-610-6300
                                                      Fax: 212-610-6399

                                                      *Attorneys for non-parties Bank of China and
                                                      Industrial and Commercial Bank of China*