UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                   :

TIFFANY (NJ) LLC, *et al.*,           :

                        :

             Plaintiffs,   :      10 Civ. 9471 (KPF) (HBP)

                        :

           v.         :      <u>OPINION AND ORDER</u>

                        :

QI ANDREW, *et al.*,            :

                        :

             Defendants. :

                        :
------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>June 15, 2015</u> |

KATHERINE POLK FAILLA, District Judge:

      Plaintiffs Tiffany (NJ) LLC and Tiffany and Company (collectively,

"Tiffany") have presented the Court with a Proposed Default Judgment against

all Defendants in this action. Tiffany alleges that Defendants committed

trademark violations by selling knock-off Tiffany products over the internet.

Tiffany seeks*, inter alia*, an accounting of Defendants' profits, with $52 million

awarded as a proxy for these profits, and a postjudgment freeze of Defendants'

assets worldwide, including assets held in various Chinese bank accounts.

Defendants, having not appeared in this action since its inception more than

four years ago, offer no opposition. In marked contrast, the Court has heard at

length from several non-party banks — Bank of China ("BOC"), Industrial and

Commercial Bank of China, Ltd. ("ICBC"), and China Merchants Bank ("CMB")

(collectively, the "Non-Party Banks"). Each of the Non-Party Banks holds

assets belonging to Defendants, and each argues that the Court lacks the

authority to issue the postjudgment asset freeze that Tiffany proposes.

For the reasons set forth herein, although Tiffany's application for a default judgment will be granted, the Court will modify the Proposed Default Judgment in two significant ways: first, the Court will award statutory damages instead of an accounting of profits; and second, the Court will strike the requested postjudgment asset freeze.

## BACKGROUND

### A.    Factual Background

The Court assumes familiarity with facts of this case, as set forth in the Opinions written by Magistrate Judge Henry B. Pitman.  *See Tiffany (NJ) LLC* v. *Qi Andrew*, No. 10 Civ. 9471 (RA) (HBP), 2012 WL 5451259 (S.D.N.Y. Nov. 7, 2012); *Tiffany (NJ) LLC* v. *Qi Andrew*, 276 F.R.D. 143 (S.D.N.Y. 2011).  In brief, this is a trademark counterfeiting case in which Tiffany alleges that Defendants sold counterfeit Tiffany products through U.S.-based websites such as TiffanyStores.org.  (Dkt. #76 ("Am. Compl.") ¶¶ 1-17).  Tiffany claims that Defendants used PayPal, Inc. ("PayPal") to process customers' credit card transactions, and then transferred the proceeds of the sales to accounts held by the Non-Party Banks.  (Am. Compl. ¶¶ 53-70).

### B.    Procedural Background

Tiffany filed this action on December 21, 2010.  (Dkt. #1).  On January 3, 2011, District Judge William H. Pauley III, after holding a preliminary injunction hearing at which Defendants failed to appear, entered a preliminary injunction that enjoined the Defendants' counterfeiting operation, froze their

assets, and provided for expedited discovery from Defendants and third-parties. (*See* Dkt. #4, 6, 7).

Tiffany thereafter obtained documents from non-party PayPal; the documents showed that Defendants had wired in excess of $250,000 from their PayPal accounts into specific accounts held by the Non-Party Banks.  (Dkt. #73 at 4).  Tiffany received additional information regarding Defendants from the Non-Party Banks through the Hague Convention.  (*See* Dkt. #59 at 8-10).[1]  On June 14, 2013, this case was reassigned to this Court.  (Dkt. #71).

On August 22, 2013, with leave of the Court, Tiffany amended the Complaint to add new Defendants.  (Dkt. #76).  On November 18, 2013, the Court issued an Order to Show Cause as to why a Default Judgment should not be entered.  (Dkt. #79)  None of the Defendants responded; however, prior to the Order to Show Cause Hearing, the Non-Party Banks submitted letters to

---

[1]     During discovery, Tiffany sought information about Defendants from the Non-Party Banks.  (*See generally* Dkt. #38, 50, 58, 70).  Citing to Chinese bank secrecy law, the Non-Party Banks objected to the production of this information.  Tiffany moved to compel the Non-Party Banks to produce the requested documents.  (Dkt. #20-22, 32-34).  The Banks opposed Tiffany's motion, arguing that the documents could be obtained through the Hague Convention.  (Dkt. #23-31).  On July 25, 2011, Magistrate Judge Pitman denied Tiffany's motion to compel and directed Tiffany to seek discovery from the Banks via the Hague Convention.  (Dkt. #38).  Judge Pauley affirmed Judge Pitman's Opinion and Order on November 14, 2011.  (Dkt. #50).  On August 7, 2012, the Chinese Ministry of Justice submitted a response to Magistrate Judge Pitman, indicating it had "partly executed the requests which it deems conform to the provisions of the [Hague] Convention."  (Dkt. #60, Ex. 14).  On September 20, 2012, Tiffany wrote to Magistrate Judge Pitman and District Judge Ronnie Abrams (to whom this matter had been reassigned) requesting entry of an order requiring the Non-Party Banks to produce all remaining responsive documents.  (*Id.*, Ex. 7).  Following a telephonic hearing with Tiffany and the Non-Party Banks, Magistrate Judge Pitman denied Tiffany's request for further discovery, finding that he could not "conclude that [the production] is so limited that the [Hague Convention] process has been futile."  (Dkt. #58 at 6).  On May 21, 2013, Judge Abrams affirmed Judge Pitman's ruling.  (Dkt. #70).

the Court, requesting an opportunity to submit briefing on the issues raised by Plaintiffs' Proposed Default Judgment, and highlighting for the Court two appeals pending before the Second Circuit in similar trademark actions.  (Dkt. #83, 84 (citing *Gucci Am., Inc.* v. *Li*, No 11-3934-cv, and *Tiffany (NJ) LLC* v. *Forbse*, No. 12-2317-cv)).[2]  In *Gucci* and *Forbse*, the Non-Party Banks appealed orders following the district courts' issuance of prejudgment asset freeze injunctions similar in scope to the one issued in the instant action, and similar to the postjudgment asset freeze contained in the Proposed Default Judgment. The Court adjourned the Order to Show Cause Hearing *sine die*, and directed Plaintiff and the Non-Party Banks to submit letter briefs following the issuance of the Second Circuit's decisions in *Gucci* and *Forbse*.  (Dkt. #86).

### C.      The Second Circuit's Decisions in *Gucci* and *Forbse*

On September 17, 2014, the Second Circuit issued an Opinion in *Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122 (2d Cir. 2014).  Because "[t]he legal issues decided in *Gucci* substantially overlap[ped] with the legal issues presented [in *Forbse*]," the Second Circuit "incorporate[d] the legal analysis in *Gucci*" into a Summary Order in the *Forbse* action, captioned on appeal as *Tiffany (NJ) LLC* v. *China Merchants Bank*, 589 F. App'x 550 (2d Cir. 2014) (summary order).[3]

---

[2]      Tiffany also notified the Court of the pendency of the *Forbse* appeal in its application for a default judgment.  (*See* Dkt. #81 ("Halter Decl.") ¶¶ 43-45).

[3]      To avoid confusion with previous decisions in the instant action, the Court will refer to the Second Circuit's summary order as *Forbse*.

In *Gucci*, after District Judge Richard J. Sullivan issued a preliminary injunction freezing the defendants' assets, plaintiffs filed a motion to compel the compliance of non-party BOC with the asset freeze and with various requests for documents.  The court granted the motion, and, when BOC failed to comply, the court held the Bank in civil contempt and imposed civil monetary penalties.

The Second Circuit affirmed the district court's issuance of the prejudgment asset freeze injunction because "[t]he [district] court had personal jurisdiction over the defendants, as well as the equitable authority to issue the prejudgment freeze."  768 F.3d at 129.  The Court first addressed the issue of whether personal jurisdiction of the non-party bank was a prerequisite to the injunction.  It rejected the argument, advanced by the non-party bank,

> that personal jurisdiction over the Bank was required for the district court to issue the ... Asset Freeze Injunction restraining the *defendants'* assets.  BOC does not argue that the *defendants* are not subject to personal jurisdiction in New York State.  And personal jurisdiction over the *defendants*, not the Bank, is all that was needed for the district court to restrain the defendants' assets pending trial.

*Gucci*, 768 F.3d at 129 (emphasis in original) (citing *United States* v. *First Nat'l City Bank*, 379 U.S. 378, 384 (1965)).

Relying on its decision in *NML Capital, Ltd.* v. *Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2819 (2014), the Second Circuit made clear that because the asset freeze injunction did not directly enjoin BOC, it was "irrelevant" whether the district court had personal

5

jurisdiction over the non-party bank when issuing the injunction.  *Gucci*, 768
F.3d at 129 (citing *NML Capital*, 727 F.3d at 243).  The Court acknowledged,
echoing *NML Capital*, that Federal Rule of Civil Procedure 65(d) automatically
forbids others — who are not directly enjoined but who act "in active concert or
participation" with an enjoined party — from assisting in a violation of the
injunction.  It reiterated that such injunctions "do not directly restrain the
conduct of nonparties.  Instead, they provide these nonparties with notice that
'they could become liable through Rule 65 if they assist … in violating the
district court's orders.'"  *Id.* at 130 (quoting *NML Capital*, 727 F.3d at 243).
Although questions of personal jurisdiction over non-parties must be
addressed before the determination of a non-party's liability or the issuance of
sanctions against a non-party, the Second Circuit made clear that "the district
court need not have personal jurisdiction over nonparties to issue a
preliminary injunction requiring a party before it to refrain from moving assets
during the pendency of the proceedings."  *Id.*

The Court next addressed the issue of whether the district court had the
equitable authority under *Grupo Mexicano de Desarrollo, S.A.* v. *Alliance Bond
Fund, Inc.*, 527 U.S. 308 (1999), to issue a prejudgment asset freeze.  In *Grupo
Mexicano*, the Supreme Court held that the district court "had no authority
[under Rule 65] to issue a preliminary injunction preventing [defendants] from
disposing of their assets pending adjudication of [plaintiffs]' contract claim for
*money damages*."  527 U.S. at 333 (emphasis added).  Parsing *Grupo Mexicano*,

the Second Circuit explained that, while "district courts have no authority to issue a prejudgment asset freeze pursuant to Rule 65 where such relief was not traditionally accorded by courts of equity[,] … they maintain the equitable power to do so where such relief *was* traditionally available: where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief." *Gucci*, 768 F.3d at 131 (emphasis in original, internal quotation marks and citations omitted).  Applying this principle to the plaintiffs' complaint alleging trademark infringement, the Second Circuit held that the injunction withstood scrutiny:

> Plaintiffs are seeking an *accounting* of the defendants' profits, in addition to injunctive relief and monetary damages, under the Lanham Act.…  [T]he common law action of "account" is one of the earliest examples of a restitutionary action in equity, imposing on a defendant the obligation to disclose and return profits from the use of the plaintiff's property, and founded in the Chancellor's equitable power to compel an accounting of wrongly gained assets.

*Id.* (emphasis in original, internal citations omitted).

The Second Circuit also addressed BOC's argument that the plaintiffs' accounting claim was "illusory" — specifically, that they were simply including the prayer for an accounting of profits in order to obtain an asset freeze, in the hope of eventually securing a statutory damages award.  *Gucci*, 768 F.3d at 133.  The Court dismissed this argument, noting that

> Under the Lanham Act … plaintiffs "may elect" between statutory or actual damages "at any time before final judgment is rendered."  15 U.S.C. § 1117(c).  Each of plaintiffs' three complaints has sought an accounting of

7

> profits (or actual damages) and there is no basis, on this
> record, to conclude that plaintiffs are not seeking what
> they ask for.

*Id.*

Although the Second Circuit upheld the issuance of the prejudgment asset freeze, in light of the Supreme Court's intervening decision in *Daimler AG* v. *Bauman,* 134 S. Ct. 746 (2014), it ruled that the district court had erred in its finding that the non-party bank, BOC, was properly subject to the court's general jurisdiction. *Gucci*, 768 F.3d at 133.  The Second Circuit remanded the case so that the district court could consider:  (i) whether it could exercise specific jurisdiction over BOC to order compliance with the asset freeze and subpoenas; and (ii) whether, assuming the necessary jurisdiction were present, such an order would be consistent with principles of international comity.  *Id.* at 145.  The Second Circuit vacated those portions of the district court's orders that compelled BOC's compliance with the asset freeze and subpoenas, and reversed the district court's finding of contempt.  *Id.* at 144.

For similar reasons, in *Forbse*, the Second Circuit "vacate[d] the [district court's] order requiring [BOC, ICBC and CMB] to comply with the asset freeze injunction and remand[ed] for the district court to determine, in accordance with … *Gucci,* whether it may properly exercise jurisdiction over the [non-party] Banks for the purpose of compelling their compliance with the asset freeze." 589 F. App'x at 553.

8

**D.      The April 29, 2015 Hearing**

On April 29, 2015, the Court held a hearing to discuss the Proposed

Default Judgment.   The hearing served the dual purposes of affording

Defendants one final chance to contest the default judgment, and permitting

the Court to explore the parameters of the postjudgment asset freeze.

Although Defendants were served with a notice of the hearing, they failed to

appear.  (*See* Dkt. #101).  At the Court's request, counsel for the Non-Party

Banks attended the hearing to address the postjudgment asset freeze, which

had been the subject of a series of letter briefs following the issuance of *Gucci*

and *Forbse*.  (*See* Dkt. #87-92, 94-98).   After discussing with Tiffany the

allegations in the Amended Complaint and Defendants' failure to appear in this

action, the Court indicated at the hearing that a finding of Defendants' liability

was appropriate, and would be entered.   (*See* Dkt. #102 (Transcript of the April

29, 2015 Default Judgment Hearing ("Hrg. Tr.")) 35).   However, with respect to

the postjudgment asset freeze, the Court reserved its decision to allow for

further consideration of the issues presented during the hearing.   (*Id.* at 35-

36).

**DISCUSSION**

**A.      Standard on a Default Judgment**

"The decision whether to enter default judgment is committed to the

district court's discretion, as is the decision whether to conduct a hearing

before deciding the default judgment motion."   *Greathouse* v. *JHS Sec. Inc.*,

784 F.3d 105, 116 (2d Cir. 2015) (internal citations omitted); *see generally* Fed. R. Civ. P. 55(b)(2) ("The court may conduct hearings or make referrals ... when, to enter or effectuate judgment, it needs to ... conduct an accounting; ... determine the amount of damages; ... establish the truth of any allegation by evidence; or ... investigate any other matter."); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2684, at 28 ("The court has discretion to decide whether to enter a judgment by default, ... and Rule 55(b)(2) empowers the district judge to hold hearings or 'order such references as it deems necessary and proper' to aid its execution of this discretion.").

In the context of a default judgment proceeding, a court approaches the issues of a defendant's liability and the appropriate relief separately. After a court has determined that a defendant is in default, it must "accept[] as true all of the factual allegations of the complaint" for the purposes of determining liability. *Au Bon Pain Corp.* v. *Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *accord Finkel* v. *Romanowicz*, 577 F.3d 79, 83-84 & n.6 (2d Cir. 2009). However, "[t]he entry of a default, while establishing liability, 'is not an admission of damages.'" *City of New York* v. *Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011) (quoting *Finkel*, 577 F.3d at 83 n.6). The prayer for relief in the complaint represents the outer boundary (the ceiling, in the case of money damages) of what may be awarded. *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is

demanded in the pleadings."); *Silge* v. *Merz*, 510 F.3d 157, 160 (2d Cir. 2007).

But a court otherwise retains the ability to "award[] the plaintiff any relief to

which the court decides it is entitled." *Mickalis*, 645 F.3d at 128.

**B.      Analysis**

  **1.      The Non-Party Banks' Standing**

A threshold issue presents itself, namely, whether the Court should even

consider the arguments raised by the Non-Party Banks in opposing the

postjudgment asset freeze injunction contained in the Proposed Default

Judgment.  Tiffany's argument is simple: "the banks have no standing to

oppose the proposed default judgment in this case" because they have not

moved to intervene in this action.  (Dkt. #97; *see also* Hrg. Tr. 11 ("I don't think

[the Non-Party Banks] have any standing to be here and complain.")).[4]  The

Non-Party Banks counter that they do not oppose the entry of a default

judgment against Defendants, but that they have a "plausible affected interest"

in the proposed asset freeze, which interest they argue suffices to confer

standing under Second Circuit precedent.  (Hrg. Tr. 16 ("The Second Circuit

rejected th[e] argument [that the Non-Party Banks lacked standing in *Gucci* and

*Forbse*] on the basis that … the banks had demonstrated a plausible affected

interest, and that's effectively that through these injunctions [the Non-Party

Banks] are in effect being told to freeze accounts in China under threat of being

---

[4]      Although Tiffany argued at the hearing that the Non-Party Banks lack standing, the
Court notes that Tiffany has suggested elsewhere that the Court could "'consider[]
[their] arguments as coming from *amici curiae*.'" (Dkt. #95 (quoting *NML Capital*, 727
F.3d at 240)).

held in contempt if we don't."); *see id.* at 21 ("[A]ssets don't restrain themselves, so [the injunction] does require the banks to do something.... [Tiffany has] very artfully drafted [the Proposed Default Judgment] in the passive voice so it says assets will be restrained.  They don't say by whom or how, and it's our position that that is the plausible affected interest[.]")).

The Court notes, as a preliminary matter, one of the procedural oddities of this case:  Although the Non-Party Banks have not intervened in this action pursuant to Fed. R. Civ. P. 24, they would likely have standing to appeal as non-parties from a judgment in this action.  As the Non-Party Banks noted, a non-party who can demonstrate a "plausible affected interest" in the judgment can appeal.  *See Official Comm. of Unsecured Creditors of WorldCom, Inc.* v. *S.E.C.*, 467 F.3d 73, 78 (2d Cir. 2006) ("We have not required that a nonparty prove that it has an interest affected by the judgment; stating a plausible affected interest has been sufficient.").[5]  The Non-Party Banks' argument is facially compelling:  If they can inevitably raise arguments challenging the asset freeze to the Court of Appeals, it makes little sense for this Court to ignore them.  (Hrg. Tr. 18 ("We think the better course is not to enter an injunction for which there is no basis in the first place than to litigate these

---

[5]     The Non-Party Banks had argued during the April 29, 2015 Hearing that such a scenario has already occurred in prior cases involving these same players, and that Tiffany and the Non-Party Banks had litigated this issue through appellate motion practice in the consolidated *Gucci* and *Forbse* appeals.  *See Gucci Am.* v. *Bank of China*, No. 12-2317-cv, Dkt. #166 (2d Cir. Jan. 16, 2013) (unpublished disposition) (citing *WorldCom*, 467 F.3d at 78, and denying plaintiffs' motion to dismiss the appeals for lack of jurisdiction).

issues after the event based on an injunction that should never have been entered.")).  However, given the formal mechanism for intervention provided by Rule 24, the Court declines to consider whether prospective appellate standing somehow trickles down to the district court level.  Put another way, demonstrating a "plausible affected interest" may convey appellate standing, but the Court will not say that it provides an exception to Rule 24.  The Non-Party Banks are free to make their own strategic decisions as to how best to protect their interests, and they have elected not to intervene in this action.

While Tiffany is correct that the Non-Party Banks do not have standing to oppose the entry of a default judgment, that is a different question than whether the Court should consider their arguments.  The Court has broad authority to "conduct hearings … when, to enter or effectuate [a default] judgment, it needs to … conduct an accounting; … determine the amount of damages; … establish the truth of any allegation by evidence; or … *investigate any other matter*."  Fed. R. Civ. P. 55(b)(2) (emphasis added).  Pursuant to this authority, the Court has invited submissions and participation at the hearing from the Non-Party Banks as the holders of Defendants' assets that are to be frozen.  Such procedure may be unusual in the context of default judgment proceedings, but it is prudent given the procedural history of this case and the issues the Non-Party Banks have raised previously in this and other actions as

third-party litigants.[6]  Rule 55(b) affords flexibility in this procedurally one-sided context, and the Court took the opportunity to solicit information from those who could assist the Court in understanding the impact of the proposed asset freeze.  Additionally, even in the absence of the Non-Party Banks' submissions in this case, the Court would not have taken as granted the propriety of a plaintiff's request for relief.  Rule 55(b) neither requires nor anticipates that a plaintiff's prayer for relief be accorded any particular deference.  Especially in light of Tiffany's unusual request for a postjudgment asset freeze under Rule 65, the Court is inclined to scrutinize the proposal to ensure it complies with the sources of authority invoked therein.

---

[6]    The Court also notes that in a wide variety of contexts district courts solicit and entertain arguments from non-parties regarding proposed final judgments.  *See, e.g.*, *Aurelius Capital Partners, LP* v. *Republic of Argentina*, 584 F.3d 120, 127, 129 (2d Cir. 2009) (where non-party sovereign appeared "on a special and limited basis before the district court to argue in favor of vacating the district court's Orders," "[t]he district court acted well within its discretion to consider [the] arguments presented … to secure a full understanding of the jurisdictional issues"); *State of N.Y. by Vacco* v. *Reebok Int'l Ltd.*, 96 F.3d 44, 47 (2d Cir. 1996) (finding that the district court's consideration of arguments at a fairness hearing from parties who had not filed objections was "not a grant of standing," but instead "an indication of the court's willingness to receive the comments of [the non-parties] in the capacity of amici curiae"); *Marino* v. *Ortiz*, 806 F.2d 1144, 1147 (2d Cir. 1986) (noting that non-parties who elected not to oppose a consent decree by intervening in the lawsuit nonetheless were permitted to "present[] their claims at the objector hearing"); *United States* v. *LTV Corp.*, 746 F.2d 51, 53 (D.C. Cir. 1984) (finding that a non-party "did not automatically acquire party status simply by being permitted to comment on the proposed final judgment"); *United States* v. *Visa U.S.A., Inc.*, 183 F. Supp. 2d 613, 615 (S.D.N.Y. 2001) (considering submissions received from "several non-parties, [who] submitted proposed modifications to and additional comments regarding this court's Proposed Final Judgment"), *aff'd*, 344 F.3d 229 (2d Cir. 2003).

2.    **The Proposed Default Judgment Will Not Be Entered As Drafted**

a.    **The Text of the Proposed Default Judgment**

The proposed default judgment initially submitted to the Court by Tiffany in November 2013, prior to the Second Circuit's decisions in *Gucci* and *Forbse*, provided, *inter alia*, for an award of statutory damages for Defendants' willful trademark counterfeiting, pursuant to 15 U.S.C. § 1117(c)(2), in the amount of $1,000,000 per counterfeit mark used, for a total of $52,000,000, and statutory damages for Defendants' willful cybersquatting in the amount of $300,000.  Although Tiffany's Amended Complaint included as a prayer for relief a request that the Court "[d]irect Defendants to account to Tiffany for their profits … arising out of the acts of deception and infringement," (Am. Compl. 38 ¶ 2), Tiffany's initial proposed default judgment did not seek an accounting as a final form of equitable relief.  Instead, Tiffany "elected to receive statutory damages under 15 U.S.C. § 1117(c)(2) for Defendants' willful trademark counterfeiting."  (Halter Decl. ¶ 19).

After the Second Circuit issued its decisions, which emphasized the significance of the plaintiffs' request for an equitable remedy of accounting, Tiffany submitted a "revised default judgment which makes clear, in accord with the Second Circuit's ruling, that this Court [would be] awarding *the final equitable relief of an accounting of profits* that Plaintiffs sought in their complaint."  (Dkt. #90 at 1 (emphasis added)).  To that end, the operative Proposed Default Judgment provides that "Plaintiffs' request for an accounting

15

is granted.  Defendants are required to account for their profits and disgorge

them to Plaintiffs."  (Dkt. #90-1 ¶ 8).

The Proposed Default Judgment does not end there, however, but

continues on to provide damages in lieu of profits:

> In light of the Defendants' failure to produce any
> documents in this action, the Court awards statutory
> damages pursuant to 15 U.S.C. § 1117(c) *as a proxy for
> Defendants' profits*.  Pursuant to 15 U.S.C. § 1117(c)(2),
> as a proxy for Defendants' profits, Plaintiffs are entitled
> to an award of statutory damages in the amount of fifty-
> two million dollars ($52,000,000) for Defendants' willful
> trademark counterfeiting[.]

(Dkt. #90-1 ¶ 8 (emphasis added)).

Similar in scope to the prejudgment asset freeze provision contained in

the Preliminary Injunction, the Default Judgment contains a postjudgment

asset freeze provision that restrains Defendants' assets — including those held

by the Non-Party Banks — until the judgment is satisfied:

> In accordance with Rule 65 of the Federal Rules of Civil
> Procedure, 15 U.S.C. § 1116(a), Article 52 of New York
> State's Civil Practice Law and Rules, and this Court's
> inherent equitable power to issue remedies ancillary to
> its authority to provide final relief, all Defendants'
> Assets that have been previously identified as frozen or
> that were otherwise required to be restrained in
> compliance with this Court's orders, shall continue to
> be restrained, regardless of whether the Defendants'
> Assets are located in the United States or abroad....
> This includes, but is not limited to [Defendants'
> accounts with the Non-Party Banks].

(Dkt. #90-1 ¶ 11; *see also id.* at ¶ 12 (freezing, on the same terms, "any other of

Defendants' Assets that Plaintiffs identify in the future")).

16

Finally, the Proposed Default Judgment closes the case without prejudice to Tiffany's ability to, *inter alia*, "file a motion to find any of the holders [of] Defendants' Assets in contempt of this Court's prior orders or this Default Judgment; or … make an application to reopen this matter in the event it is necessary to pursue sanctions for any violations of this Default Judgment." (Dkt. #90-1 ¶ 14).

### a. Plaintiffs Have Failed to Elect Between an Accounting of Defendants' Profits and Statutory Damages

Under the Lanham Act, a successful plaintiff is "entitled, … subject to the principles of equity, to recover [i] defendant's profits, [ii] any damages sustained by the plaintiff, and [iii] the costs of the action." 15 U.S.C. § 1117(a). However, "the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under [Section 1117(a)], an award of statutory damages[.]" *Id.* § 1117(c).

On its face, the Proposed Default Judgment appears to ask for both an accounting of profits *and* statutory damages. Tiffany, however, urges the Court to construe its election as one for an accounting only, with statutory damage amounts awarded as a proxy for Defendants' profits. (Hrg. Tr. 9-10 ("[W]hat we've asked the Court to do, as a proxy for the accounting, since we all sort of know that they're not going to give us the records that we actually need to figure out how much they actually sold and how much they actually owe us is, for your Honor as a proxy to use the statutory damages[.]"); *id.* at 33 ("We were artful, coy and careful in what we asked the Court in the judgment, and we

17

specifically asked for an accounting.  And then the Court is faced with the situation of how do we do the accounting without the cooperation of the counterfeiters.  And we suggested as a means of resolving this dilemma, because I think the counterfeiters should not be allowed to put themselves in a better position, in other words, to deny us an accounting because they won't cooperate.").  The Non-Party Banks contend that the Lanham Act does not permit a plaintiff to hedge in this manner between recovery of profits under Section 1117(a) and statutory damages under Section 1117(c).  (*Id.* at 15 ("[Tiffany] put this wording into the judgment that says an accounting is ordered and the remedy is statutory damages.  The two things are mutually exclusive under the Lanham Act.... [T]he statute says it's one or the other.")).  The Court agrees with the Non-Party Banks, and finds that Tiffany's failure to elect between statutory damages and profits renders the Proposed Default Judgment defective.

The Court declines the invitation from Tiffany to consider the statutory damage figures provided by Section 1117(c) as a proxy to calculate profits under Section 1117(a).  When profits are difficult to calculate, or for any other reason, a plaintiff may elect to receive statutory damages.  As the text of Section 1117(c) indicates, statutory damages provide relief exclusive of recovery for profits and actual damages available under Section 1117(a).  *See* 15 U.S.C. § 1117(c) (statutory damages can be elected "*instead of* actual damages and profits" (emphasis added)); *see also Louis Vuitton Malletier S.A.* v. *LY USA, Inc.*,

18

676 F.3d 83, 110-11 (2d Cir. 2012) ("In 1996, Congress ... amended section 1117 to add subsection (c), providing for the alternative of statutory damages....  [T]he Act ... allows trademark plaintiffs to elect to recover statutory damages in counterfeit cases in lieu of actual damages[.]"); *Union of Orthodox Jewish Congregations of Am.* v. *Am. Food & Beverage Inc.*, 704 F. Supp. 2d 288, 290-91 (S.D.N.Y. 2010) ("Subsection 1117(c) provides trademark holders an alternative remedy to actual damages[.]"); *cf. Twin Peaks Prods., Inc.* v. *Publications Int'l, Ltd.*, 996 F.2d 1366, 1380 (2d Cir. 1993) (noting that, under the analogous provision of the Copyright Act, a plaintiff may elect statutory damages or actual damages "at any time before final judgment is rendered," but is not "permit[ted] ... to pursue both remedies to a conclusion and then select the one that ultimately prove[s] more favorable"); *Oboler* v. *Goldin*, 714 F.2d 211, 213 (2d Cir. 1983) (determining that the "[e]lection of statutory damages precludes recovery of actual damages and profits" under the analogous provision of the Copyright Act).

In light of the *Gucci* decision, which emphasized the link between the issuance of an asset freeze injunction and the prayer for final equitable relief, Tiffany has an obvious reason for conflating the remedies.  *See Gucci*, 768 F.3d at 130 ("Plaintiffs here seek the equitable remedy of an accounting of profits. In such circumstances, the district court had the inherent equitable authority to issue the Asset Freeze Injunction.").  But Section 1117 does not permit this Court to enter the kind of hybrid award contemplated by the Proposed Default

19

Judgment.  Instead, at some point before final judgment, Section 1117 obligates Tiffany to make a choice: Tiffany must choose whether to make the statutory damages election authorized by Section 1117(c).  Because Tiffany has failed to do so, and judgment in this case is at hand, the Court must consider whether the final equitable award of an accounting of profits or statutory damages is appropriate.

### b.    Statutory Damages Are the Appropriate Remedy

Tiffany argues that, in light of Defendants' default and failure to produce records regarding their profits, the Court faces a dilemma as to the appropriate remedy.  Specifically, Tiffany asserts that it otherwise would elect an accounting of Defendants' profits, but is hindered in doing so because of Defendants' refusal to appear.  Tiffany argues that it "should not be denied [the] remedy of an accounting because [the counterfeiters] won't cooperate." (Hrg. Tr. 24).  Because the Lanham Act provides for statutory damages precisely to address situations such as this, the Court disagrees that is faces any such dilemma: Statutory damages are the appropriate remedy.

The Court has already rejected what Tiffany has "suggested as a means of resolving [the] dilemma" caused by Defendants' failure to produce records of their profits (Hrg. Tr. 24) — namely, awarding a nominal accounting while concurrently substituting statutory damages figures into the judgment as a proxy for profits — because the Lanham Act does not permit this sort of remedy.  More fundamentally, the Court disagrees with Tiffany that *the Court*

20

should craft a remedy to address Tiffany's particular situation because Congress has already supplied the appropriate remedy for circumstances such as this.

It is an unfortunate reality that counterfeiters are apt to default when faced with a federal trademark lawsuit. However, it is precisely this tendency that motivated Congress to add statutory damages to the Lanham Act in 1996. *See* Anticounterfeiting Consumer Protection Act of 1996, § 7, Pub. L. No. 104-153, 110 Stat. 1386 (codified at 15 U.S.C. § 1117(c)); 141 Cong. Rec. S12079-03, 1995 WL 470078 ("The option to elect statutory damages in counterfeit cases ensures that trademark owners are adequately compensated and that counterfeiters are justly punished, even in cases where the plaintiff is unable to prove actual damages because, for example, the defendant engages in deceptive record-keeping.").

As the Second Circuit has explained,

> Congress appears to have been motivated by a gap in the law: Plaintiffs who were victorious on their civil counterfeiting claims were often unable to obtain an adequate recovery in actual damages because counterfeiters often maintain sparse business records, if any at all. In passing the Act, which allows trademark plaintiffs to elect to recover statutory damages in counterfeit cases in lieu of actual damages, Congress apparently sought to ensure that plaintiffs would receive more than *de minimis* compensation for the injury caused by counterfeiting as a result of the unprovability of actual damages despite the plain inference of damages to the plaintiff from the defendant's unlawful behavior.

21

*Louis Vuitton*, 676 F.3d at 111 (internal citations omitted); *see also Nike, Inc.* v. *Top Brand Co.*, No. 00 Civ. 8179 (KMW) (RLE), 2006 WL 2946472, at *2 (S.D.N.Y. Feb. 27, 2006) ("Congress added this provision in 1996 through the Anticounterfeiting Consumer Protection Act, specifically to address a situation where defendants have not provided sufficient records of profits for a plaintiff to establish actual damages."); *Sara Lee Corp.* v. *Bags of New York, Inc.*, 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999) ("The creation of this alternative to the more traditional damage remedies of recovery of the plaintiff's damages or the defendant's profits reflected a harsh reality — counterfeiters often do not keep or secrete records of their unlawful activities, thus making proof of the extent of the plaintiff's injury or the counterfeiters' profits impossible as a practical matter." (citation omitted)).  Indeed, courts have noted that "[s]tatutory damages are most appropriate when infringer nondisclosure during fact finding leaves damages uncertain." *Sara Lee*, 36 F. Supp. 2d at 165; *see also Church & Dwight Co., Inc.* v. *Kaloti Enters. of Mich., LLC*, 697 F. Supp. 2d 287, 291 (S.D.N.Y. 2009) ("The award of statutory damages is particularly appropriate in the default judgment context where plaintiff is without the benefit of any disclosure by the infringer, leaving damages uncertain."); *Century 21 Real Estate LLC* v. *Bercosa Corp.*, 666 F. Supp. 2d 274, 290 (E.D.N.Y. 2009) ("The defendants' default having made it impossible for [plaintiff] to determine the profits accrued by the defendants through the unauthorized use of [plaintiff's trademarks], statutory damages are

particularly appropriate here."); *Polo Ralph Lauren, L.P.* v. *3M Trading Co., Inc.*, No. 97 Civ. 4824 (JSM) (MHD), 1999 WL 33740332, at *4 (S.D.N.Y. Apr. 19, 1999) (finding statutory damages appropriate where "defendants ... declined to participate in this lawsuit, and ... thus deprived plaintiffs of the opportunity to make a meaningful assessment of the extent of their business, including volume of sales and profits earned"); *Latin Am. Music Co.* v. *Spanish Broad. Sys., Inc.*, 866 F. Supp. 780, 782 (S.D.N.Y. 1994) (Chin, D.J.) ("It is precisely in those instances where actual damages [under the Copyright Act] are difficult to ascertain that the award of statutory damages is appropriate."). Accordingly, because Congress has specifically addressed the problem that Tiffany faces by authorizing a significant award of statutory damages against defaulting defendants, there is no need to entertain Tiffany's novel proposal of using statutory damage figures as a proxy for Defendants' profits.[7]

As the Court indicated during the April 29 Hearing, the Court deems the significant amount of damages Tiffany seeks to be reasonable under the circumstances. (Hr. Tr. 35). When assessing the appropriate amount of

---

[7]    For reasons that will be discussed *infra*, the crucial part of the particular remedy that Tiffany proposes is the concomitant postjudgment asset freeze. The Court need not weigh in on whether a remedy that included a postjudgment asset freeze would be a more suitable or effective remedy to redress companies for the wrongs of counterfeiters. Congress has considered the issue, and answered with statutory damages provided by Section 1117(c).  *See Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999) (when faced with "new conditions that might call for a wrenching departure from past practice, Congress is in a much better position than we both to perceive them and to design the appropriate remedy"); *cf. id.* at 342 (Ginsburg, J., concurring in part and dissenting in part) ("Congress, of course, can instruct the federal courts to issue preliminary injunctions freezing assets pending final judgment, or instruct them not to, and the courts must heed Congress' command.").

statutory damages, courts often look for guidance to cases decided under the

analogous statutory damages provision of the Copyright Act, 17 U.S.C.

§ 504(c).  *See, e.g.*, *Tiffany (NJ) LLC* v. *Dong*, No. 11 Civ. 2183 (GBD) (FM),

2013 WL 4046380, at *5 (S.D.N.Y. Aug. 9, 2013) (collecting cases).

Considering the factors set forth in *Fitzgerald Publ'g Co.* v. *Baylor Publ'g Co.*,

807 F.2d 1110, 1117 (2d Cir. 1986), that courts have applied to Copyright Act

and Lanham Act cases,[8] and given the substantial scope of the infringement

set forth in great detail in Tiffany's default judgment papers, the Court

concludes that an award of $1,000,000 per mark per type of good infringed,

which represents half of the statutory cap, "is appropriate to accomplish the

dual goals of compensation and deterrence — and in particular to emphasize

that the trademark laws and court proceedings are not mere incidental costs

to doing business in the profitable counterfeit trade."  *Gucci Am., Inc.* v.

*Curveal Fashion*, No. 09 Civ. 8458 (RJS), 2010 WL 308303, at *3 (S.D.N.Y.

Jan. 20, 2010); *see also Nike*, 2006 WL 2946472, at *3 (awarding the then-

maximum statutory amount of $1,000,000 per mark per type of good).  With

respect to the cybersquatting violations, the Court deems an award of the

statutory maximum of $100,000 per infringing domain name authorized by

---

[8]     Under the Copyright Act, courts look to factors such as: (i) "the expenses saved and the
profits reaped"; (ii) "the revenues lost by the plaintiff"; (iii) "the value of the copyright";
(iv) "the deterrent effect on others besides the defendant"; (v) "whether the defendant's
conduct was innocent or willful"; (vi) "whether a defendant has cooperated in providing
particular records from which to assess the value of the infringing material produced";
and (vii) "the potential for discouraging the defendant."  *Fitzgerald*, 807 F.2d at 1117.

Section 1117(d) to be appropriate for the same reasons.  In total, the Court therefore will award a combined $52,300,000 in statutory damages.

### 3.    A Postjudgment Asset Freeze Is Not Appropriate

The Court must next consider whether the postjudgment asset freeze contained in the Proposed Default Judgment is appropriate.  First, because the Court has determined that an award of statutory damages is appropriate, there is no basis under *Grupo Mexicano* to maintain the freeze on Defendants' assets.  *See Grupo Mexicano*, 527 U.S. at 333 (a district court "ha[s] no authority to issue a preliminary injunction preventing [a party] from disposing of [its] assets pending adjudication of [a] contract claim for money damages"); *Klipsch Grp., Inc.* v. *Big Box Store Ltd.*, No. 12 Civ. 6283 (AJN), 2012 WL 4901407, at *2 (S.D.N.Y. Oct. 11, 2012) ("[C]ourts in this district have focused on freezing assets to preserve the equitable remedies of a return of lost profits and an accounting, not statutory damages."), *supplemented*, 2012 WL 5265727, at *6 (S.D.N.Y. Oct. 24, 2012) (noting that "statutory damages under the Lanham Act are a remedy at law, not one at equity" (collecting cases)).  On this basis alone, the postjudgment asset freeze provisions must be stricken from the Proposed Default Judgment.

Furthermore, although Tiffany argues that the requested postjudgment asset freeze is the "logical extension" of what the Second Circuit approved in the prejudgment context (Hrg. Tr. 7), the Court disagrees.  Even assuming Tiffany had skirted *Grupo Mexicano* by electing the standalone final equitable

relief of an accounting of profits, the Court is not convinced that *Gucci* extends so logically into the realm of postjudgment asset freezes.  To resurrect an argument that failed the Non-Party Banks in the prejudgment context before the Second Circuit, the Court notes that that any accounting claim at this stage is illusory.  In *Gucci*, the Second Circuit found "no basis, on this record, to conclude that plaintiffs [we]re not seeking what they ask for" — i.e., an accounting of profits.  768 F.3d at 133.  In sharp contrast, here there is a basis to conclude that Tiffany is seeking something other than "what they ask for" in the Amended Complaint.  Tiffany acknowledges that an accounting of profits simply will not occur.  (Hrg. Tr. 7 ("[A]n accounting would require … that the bad actor would show you all his books and records and show you the profits that he made and turn those profits over…. My defendants are not going to do that[.]"); *id.* at 9 ("[W]e all sort of know that [the Defendants are not] going to give us the records that we actually need to figure out how must they actually sold and how much they actually owe us.")).

Additionally, the Second Circuit was careful to cabin its decision to prejudgment asset freezes issued as part of preliminary injunctions.  *See Gucci*, 768 F.3d at 129 ("[T]he district court [could] restrain the defendants' assets *pending trial.*" (emphasis added)); *id.* at 130 ("[T]he district court [was authorized] to issue a preliminary injunction requiring a party before it to refrain from moving assets *during the pendency of the proceedings.*" (emphasis added)); *id.* at 131 ("district courts … maintain th[is] equitable power … where

the plaintiff is pursuing a claim for final equitable relief, and *the preliminary injunction* is ancillary to the final relief" (emphasis added)).  Indeed, the logic behind a prejudgment asset freeze is the maintenance of the status quo pending adjudication of a claim.  *See Grupo Mexicano*, 527 U.S. at 324; *Deckert* v. *Independence Shares Corp.*, 311 U.S. 282, 290 (1940) ("the injunction was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill"); *Animale Grp. Inc.* v. *Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007) (per curiam) (ruling that the district court was "authorized to preserve the status quo by entering a limited asset freeze"); *CSC Holdings, Inc.* v. *Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) ("Since the assets in question here were profits ..., the freeze was appropriate and may remain in place pending final disposition of the case."); *Paradigm BioDevices, Inc.* v. *Centinel Spine, Inc.*, No. 11 Civ. 3489 (JMF), 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013) ("when the plaintiff ... asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment" (internal quotation marks and citation omitted)).  The Court sees no reason why a prejudgment freeze should continue into the postjudgment context, where Tiffany's claims have been fully adjudicated.

Finally, although Tiffany asserts that "the Court keeps th[e] authority to maintain the asset freeze even after entry of judgment to ensure the availability of the requested final relief" (Dkt. #95 at 3), the Court is unconvinced that a

27

Rule 65 injunction is an appropriate vehicle for the postjudgment restraint.  A plaintiff's ordinary recourse upon securing a money judgment is to look to postjudgment remedies provided by Fed. R. Civ. P. 69 and state law.  Specifically,

> Rule 69(a)(1) of the Federal Rules of Civil Procedure provides that "[t]he procedure on execution — and in proceedings supplementary to and in aid of judgment or execution — must accord with the procedure of the state where the court is located...."  Thus, the Court must look to post-judgment remedies available, and the limitations to those remedies, under New York law.

*Motorola Credit Corp.* v. *Uzan*, 978 F. Supp. 2d 205, 207 n.2 (S.D.N.Y. 2013).  "[G]iven Rule 69's instruction that the procedures to be utilized by federal courts to execute upon a judgment must accord with the procedure of the state where the court is located, the Court is skeptical that [a Rule 65] injunction allows [Tiffany] to skirt limitations on such relief under New York law through the use of a broad federal procedural mechanism."  *Id.* at 214 (internal quotation marks and citations omitted); *cf. Grupo Mexicano*, 527 U.S. at 330-31 ("The remedy sought here could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance.  Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?"); *S & S Mach. Co.* v. *Masinexportimport,* 706 F.2d 411, 418 (2d Cir. 1983) (rejecting attempt to skirt the requirements of the Foreign Sovereign Immunities Act "merely by denominating their restraints as injunctions against

the negotiation or use of property rather than as attachments of that property"
and holding "that courts in this context may not grant, by injunction, relief
which they may not provide by attachment").[9]  Accordingly, the postjudgment
freeze contained in the Proposed Default Judgment must be removed.

### 4.   Other Issues Raised by the Non-Party Banks

Finally, the Court declines to address the issues raised by the Non-Party
Banks regarding personal jurisdiction and comity (*see generally* Dkt. #89, 91),
as these questions are premature.  *See NML Capital*, 727 F.3d at 243
(observing that "questions of personal jurisdiction ... are premature" until the
nonparties "are summoned to answer for assisting in a violation of a district
court's injunction[]").  These issues, as the Second Circuit made clear in *Gucci*,
are far from trivial, and may take center stage during postjudgment execution
proceedings.  In a similar vein, while the Court appreciates the Non-Party
Banks' arguments regarding the application of the separate entity rule and the
New York Court of Appeals' decision in *Motorola Credit Corp.* v. *Standard
Chartered Bank*, at this stage these arguments serve little beyond illustrating
the incentives Tiffany has to seek relief via a Rule 65 injunction.  (*See* Dkt. #94
(arguing that "*Motorola* makes clear that the Rule 65 injunction sought by

---

[9]   Tiffany cites two cases, neither of which is binding on this Court, to support the
maintenance of the postjudgment asset freeze under Rule 65.  (*See* Dkt. #95 at 3 (citing
*Meyers* v. *Moody*, 723 F.2d 388, 389 (5th Cir. 1984) (per curiam); *West Hills Farms, LLC*
v. *ClassicStar, LLC*, 2013 WL 4515046, at *1 (E.D. Ky. Aug. 23, 2013))).  The Court
declines to adopt a reading of a postjudgment asset freeze remedy under Rule 65 that
would seemingly subsume the postjudgment remedies provided by Rule 69 and state
law.

Tiffany is nothing more than an attempted, and impermissible, end-run around the limited geographical scope of New York's postjudgment enforcement mechanisms")).  *See generally Motorola Credit Corp.* v. *Standard Chartered Bank*, 24 N.Y.3d 149, 163 (2014) ("[W]e conclude that a judgment creditor's service of a restraining notice on a garnishee bank's New York branch is ineffective under the separate entity rule to freeze assets held in the bank's foreign branches.").  Substantive consideration of the separate entity rule, as applied to the Non-Party Banks in this action, will come to pass (if at all) in the context of postjudgment proceedings under Rule 69.

## CONCLUSION

For the reasons discussed herein, Tiffany's application for a default judgment will be GRANTED, as modified.  Tiffany shall submit a revised Proposed Default Judgment that is consistent with this Opinion and Order by June 22, 2015.  The Default Judgment will be so-ordered by the Court upon review for compliance with this Opinion and Order.

SO ORDERED.

Dated:      June 15, 2015
            New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

30